IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TODD YUKUTAKE, ET AL., | Civ. No. 19-00578 JMS-RT |
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY |
| vs. | JUDGMENT AND DENYING DEFENDANT'S COUNTER |
| CLARE E. CONNERS, | MOTION FOR SUMMARY JUDGMENT |
| Defendant. | |

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S COUNTER MOTION FOR SUMMARY JUDGMENT

## I. <u>INTRODUCTION</u>

Plaintiffs Todd Yukutake and David Kikukawa ("Plaintiffs") are firearm owners living on Oahu. They bring suit against State of Hawaii Attorney General Clare E. Conners in her official capacity ("Defendant" or "the Government") arguing that two State of Hawaii firearm laws violate the Second Amendment. The first, Hawaii Revised Statutes ("HRS") § 134-2(e), requires, in relevant part, that individuals purchase a handgun (i.e., a pistol or revolver) within 10 days of obtaining a permit to acquire. The second, HRS § 134-3(c), requires, in relevant part, that individuals physically bring their firearm to the police department for in-person inspection and registration within five days of acquiring

it.  ECF No. 85.  Currently before the court are Plaintiffs' Motion for Summary

Judgment and Defendant's Counter Motion for Summary Judgment, ECF No. 91.

    The challenged provisions in both HRS § 134-2(e) and HRS § 134-

3(c) are not longstanding and impose only a moderate burden on the right to bear

arms.  As such, both provisions are subject to intermediate scrutiny.  And because

the Government has entirely failed to demonstrate how each law effectuates its

asserted interest in public safety, neither law can pass constitutional muster under

this standard of review.  Plaintiffs' Motion for Summary Judgment is GRANTED

and Defendant's Counter Motion for Summary Judgment is DENIED.

    To be clear, this Order affects only these two discrete provisions of

the State of Hawaii's firearm scheme; no other aspect of the State's firearm

regulatory scheme is challenged or addressed in this Order.

## II.  <u>BACKGROUND</u>

    Plaintiffs are residents of the City and County of Honolulu.  ECF No.

78 at PageID # 557.  Both legally own multiple firearms and wish to legally

acquire additional guns, including handguns.  *Id.* at PageID ## 567-69.  They

allege that certain provisions of two State of Hawaii firearm laws, HRS §§ 134-

2(e) and 134-3(c), violate their Second Amendment right to bear arms.  *Id.* at

PageID # 570.

HRS § 134-2(e) provides, in relevant part, that "[p]ermits issued to acquire any pistol or revolver [i.e., handguns] shall be void unless used within ten days after the date of issue."  And HRS § 134-3(c) provides, in relevant part, that firearms "shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration."[1]  Plaintiffs allege that both laws infringe on the Second Amendment right to bear arms because "people who wish to own a firearm, including the litigants in this matter, must take time off work to complete the lengthy application process."  ECF No. 78 at PageID # 562. To legally possess a firearm, applicants must complete that application process,[2] which consists of the following steps:

(1) In the case of handguns, acquire all necessary identifying information about the firearm from the seller, including its make, model, and serial number;

(2) Physically visit the police station to apply for a permit to acquire the firearm, including by providing personal identifying

---

[1] Firearms dealers licensed under State of Hawaii law or by the United States Department of Justice are exempt from this in-person registration and inspection requirement.  See HRS § 134-3(c) ("Dealers licensed under section 134-31 or dealers licensed by the United States Department of Justice shall register firearms pursuant to this section on registration forms prescribed by the attorney general and shall not be required to have the firearms physically inspected by the chief of police at the time of registration.").

[2] Before undertaking the listed steps, first-time applicants for a firearm are required to take a safety course.  Individuals applying for additional guns need not take the safety course again.  HRS § 134-2(g).

information, including name, address, and physical appearance;
and, in the case of handguns, the gun's make, model, and serial
number;

(3) Wait 14 days while the police department reviews the application,
conducts a background check to ensure that the individual is
qualified to possess a gun, and issues the permit;

(4) Return to the seller to present the permit and finalize the purchase
of the firearm.  Applicants must purchase the firearm within 10
days of permit issuance in the case of a handgun and within a year
of permit issuance in the case of a long gun.  HRS § 134-2(e);[3] and

(5) Within five days of acquiring the firearm, bring the firearm back
to the police station for a physical inspection and registration,
including by providing the firearm's make, model, and serial
number.  HRS § 134-3(c).[4]

On October 30, 2020, Plaintiffs filed a First Amended Complaint
against Defendant in her official capacity as State Attorney General, challenging

---

[3] Plaintiffs do not challenge the constitutionality of the one-year permit use period for long guns.

[4] At the June 28, 2021 hearing, both Plaintiffs' counsel and Defendant's counsel agreed that these are the steps an applicant must complete to acquire a firearm in the State of Hawaii. ECF No. 102.

the constitutionality of HRS § 134-2(e)'s 10-day permit use period for handguns and HRS § 134-3(c)'s in-person inspection and registration requirement for firearms.[5]  ECF No. 78.  That same day, the court stayed and administratively closed the case pending issuance of the Ninth Circuit's en banc opinion in *Young v. State of Hawaii*, No. 12-17808.  ECF No. 79.

On March 24, 2021, the Ninth Circuit issued its decision in *Young*.  992 F.3d 765 (9th Cir. 2021).  The next day, March 25, 2021, the court lifted the stay and reopened this case.  ECF No. 80.  On April 28, 2021, Plaintiffs filed a Motion for Summary Judgment, ECF No. 85.  And on May 28, 2021, Defendant filed a Counter Motion for Summary Judgment, ECF No. 91.  Plaintiffs filed a "Reply and Opposition" to Defendant's Counter Motion on June 7, 2021, ECF No. 95, and Defendant filed a Response in support of the Counter Motion and in Opposition to Plaintiff's Motion on June 14, 2021, ECF No. 99.  On June 15, 2021,

---

[5] Plaintiffs' initial Complaint asserted facial and as-applied challenges against both Defendant and the City and County of Honolulu.  ECF No. 1 (filed October 24, 2019).  When Plaintiffs initiated their lawsuit, HRS § 134-3(c) did not expressly require in-person inspection and registration of firearms.  But the Honolulu Police Department ("HPD") had implemented § 134-3 by requiring applicants to register their firearms in person.  *See* ECF No. 1 at PageID # 4.

On June 9, 2020, Plaintiffs and the City and County of Honolulu reached a settlement agreement, with the City and County agreeing to extend the hours of the Firearms Unit and to issue permits via email rather than requiring applicants to come to the station to physically pick up their permits.  ECF No. 52; ECF No. 78 at PageID # 561 (describing conditions of settlement).  On June 12, 2020, the parties stipulated to dismissal with prejudice of all claims against the City and County, ECF No. 53.  Shortly thereafter, on July 10, 2020, the Hawaii State Legislature amended HRS § 134-3(c) to affirmatively require in-person inspection and registration of firearms.  *See* H.B. 2744, H.D. 1 S.D. 2, 30th Leg., Reg. Sess. (enacted Sept. 16, 2020).

the court granted Everytown for Gun Safety ("Everytown") leave to file a brief as amicus curiae.  ECF No. 100.  A hearing was held on June 28, 2021.  ECF No. 102.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also, e.g.*, *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

"The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact."  *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex*, 477 U.S. at 323).  Where the moving party does not have the ultimate burden of persuasion at trial, they bear both the initial burden of production and the ultimate burden of persuasion on their motion for summary judgment.  *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (citing *Nissan Fire*, 210 F.3d at 1102).

"'[W]hen the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts,'" but must come forward with specific facts showing that there is a genuine dispute for trial.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  "'[A]t least some 'significant probative evidence'" must be produced. *Hexcel Corp. v. Ineos Polymers, Inc.,* 681 F.3d 1055, 1063 (9th Cir. 2012) (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)).  "'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'"  *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329-30 (9th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."); *see also Friedman*, 833 F.3d at 1185 (citing *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016)).

For purposes of Rule 56(a), a dispute is genuine only if there is a sufficient evidentiary basis on which "a reasonable jury could return a verdict for the nonmoving party," and a dispute of fact is material only if it could affect the outcome of the suit under the governing law.  *Momox-Caselis v. Donohue*, 987

F.3d 835, 841 (9th Cir. 2021) (citing *Anderson*, 477 U.S. at 248).  When

considering the evidence on a motion for summary judgment, the court must draw

all reasonable inferences in the light most favorable to the nonmoving party.

*Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).

## IV.  <u>ANALYSIS</u>

Plaintiffs challenge the constitutionality of both the State of Hawaii's

10-day use period for permits to acquire handguns under HRS § 134-2(e) and its

requirement that all firearms be inspected and registered in-person under HRS

§ 134-3(c).  Both requirements are subject to intermediate scrutiny, and both fail to

pass constitutional muster under that standard of review.[6]

### A.     **Second Amendment Standards**

The Second Amendment states: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed."  In *District of Columbia v. Heller*, 554 U.S. 570

---

[6] Plaintiffs assert that they are bringing both facial and as-applied challenges, while Defendant argues that Plaintiffs relinquished their as-applied challenges when they settled their claims against the City and County of Honolulu.  But, as set forth in more detail below, both challenged provisions are facially unconstitutional.  Thus, the court need not consider whether Plaintiffs have preserved their as-applied challenges.  *See Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (explaining that because "'[f]acial and as-applied challenges differ *in the extent* to which the invalidity of a statute need be demonstrated' . . . the substantive legal tests used in the two challenges are 'invariant'" (quoting *Legal Aid Servs. of Oregon v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010))); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (explaining that the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint," with an as-applied challenge offering a "'narrower remedy'" than a facial challenge (quoting *United States v. Treasury Emps.*, 513 U.S. 454, 478 (1995))).

(2008), the Supreme Court engaged in its "first in-depth examination of the Second Amendment." *Id.* at 635. The Court determined that "the right to keep and bear arms is an individual right held by the people, and not limited by the prefatory clause—'a well regulated Militia'—only to 'the right to possess and carry a firearm in connection with militia service.'" *Young*, 992 F.3d at 782 (quoting *Heller*, 554 U.S. at 596, 577, 599). The Court further determined that the right to bear arms was not created by the Constitution, but rather that the Second Amendment codified a pre-existing right "inherited from our English ancestors." *Heller*, 554 U.S. at 599. And the Court identified the "core" of the Second Amendment as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

*Heller* also set forth a framework for determining whether a law impermissibly infringes on Second Amendment rights. First, *Heller* indicated that "'determining the scope of the Second Amendment's protections requires a textual and historical analysis of the amendment.'" *United States v. Chovan*, 735 F.3d 1127, 1133 (9th Cir. 2013) (summarizing *Heller*). And while the Court declined to undertake such an "exhaustive historical analysis" in its opinion, it identified certain "longstanding prohibitions" on the possession of firearms as "presumptively lawful," including "bans on possession by felons and the mentally

ill; bans on possession in sensitive places; and regulations on the commercial sale of firearms." *Young*, 992 F.3d at 782 (citing *Heller*, 554 U.S. at 626-27).

Second, *Heller* provided guidance for courts reviewing laws that do not qualify as longstanding and presumptively lawful. The Court explained that an outright ban of firearms in the home violates the Second Amendment under any level of scrutiny. *Heller*, 554 U.S. at 628. And while the Court left discussion of the precise level of scrutiny applicable to Second Amendment challenges to a later day, it expressly "reject[ed] a rational basis standard of review, thus signaling that courts must at least apply intermediate scrutiny." *Silvester v. Harris*, 843 F.3d 816, 820 (9th Cir. 2016) (summarizing *Heller*).

The Ninth Circuit—along with the majority of other circuit courts—has adopted a two-step inquiry to implement the *Heller* framework. At the first step, courts "ask if the challenged law affects conduct that is protected by the Second Amendment." *Young*, 992 F.3d at 783. That is, courts ask whether the law "is one of the presumptively lawful . . . measures identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the [law] at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (internal quotation and citation omitted).

If the law is found to burden conduct protected by the Second Amendment at step 1, courts proceed to step 2 to determine what level of scrutiny to apply.  In undertaking this inquiry, courts assess "(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right."  *Id.* at 1221-22.  A law is unconstitutional under any level of scrutiny if it so severely restricts the "core" right of self-defense of the home that it "amounts to a destruction of the Second Amendment right."  *Id.* at 1222.  "Further down the scale," a law that "implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny."  *Id.* "Otherwise, intermediate scrutiny is appropriate."  *Id.*  The Ninth Circuit's "post-Heller decisions generally have applied intermediate scrutiny to firearms regulations."  *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (collecting cases).

## B.    HRS § 134-2(e)'s 10-Day Permit Use Period

### 1.    *The 10-Day Permit Use Period Is Not Longstanding and Presumptively Valid*

Defendant argues that HRS § 134-2(e)'s 10-day permit use period is longstanding and presumptively valid because it is a "condition[] and qualification[] on the commercial sale of arms" that "dates back to 1933-1934."

ECF No. 91-1 at PageID ## 712-13.[7]  In support of this argument, Defendant points to "similar laws" that were passed in four other states—Arkansas, Massachusetts, Missouri, and Michigan—"during that [same] era" (i.e., the 1930s). ECF No. 91-1 at PageID # 713; *see also* ECF Nos. 92-16, 92-17, 92-18, 92-19. But a handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a "longstanding" historical tradition of "presumptively lawful" firearm prohibitions.  *Young*, 992 F.3d at 783.

*Young* clarified the test for whether a law is "longstanding and presumptively lawful," explaining that the *purpose* of conducting the historical analysis is to determine whether the challenged law falls within the scope of the right as it was understood during the founding era.  *Id.*  That is, "[l]aws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis."  *Id.* (quoting *Silvester*, 843 F.3d at 821).  Evidence of similar restrictions found in ancient English law, founding era laws, and early post-ratification laws provide persuasive evidence of the historical understanding of the scope of the

---

[7] To the extent Defendant argues that the 10-day permit use period is presumptively lawful simply because it is a "condition[] and qualification[] on the commercial sale of arms," this argument fails.  The Ninth Circuit has held the phrase "conditions and qualifications on the commercial sale of arms" "'sufficiently opaque'" to prohibit reliance on it alone, instead opting to conduct a "full textual and historical review" of the scope of the Second Amendment. *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 683 (9th Cir. 2017) (en banc).  The court follows that approach here.

right.  *Id.*  By contrast, "twentieth-century developments . . . may be less reliable as evidence of the original meaning of the American right to keep and bear arms."  *Id.* at 811.

Here, Defendant puts forth *only* laws of this less reliable caliber.  And while early Twentieth Century laws "might . . . demonstrate a history of longstanding regulation *if their historical prevalence and significance is properly developed in the record*," *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (emphasis added), Defendant has failed to satisfy these conditions.  The sparse handful of laws Defendant puts forth does not demonstrate the requisite "historical prevalence."  *Young*, 992 F.3d at 783 ("We are looking for 'historical prevalence.'") (quoting *Fyock*, 779 F.3d at 997)).  Moreover, there is no evidence in the record suggesting that these laws are tethered—in any way—to the "original meaning of the American right to keep and bear arms."  *Id.* at 811.  Indeed, Defendant does not provide *any* historical context for these laws.  Instead, Defendant asserts that their mere existence is evidence that the State of Hawaii's 10-day permit expiry period is presumptively valid.  This meager showing is not enough.

Finally, it is worth noting that three of the four laws Defendant relies upon have been repealed.  ECF No. 95-1 at PageID ## 931-32.  And the only law that remains on the books, Michigan's, imposes a 30-day rather than 10-day time

limit on permit holders. *Id.* at PageID # 931. Thus, even if these laws *did* provide evidence of founding-era understanding of lawful firearm prohibitions, it is not clear that their existence supports Defendant's argument that the State of Hawaii's law falls within that historical tradition.

Simply put, the court cannot conclude that HRS § 134-2(e)'s 10-day permit use period is longstanding and presumptively valid.

### 2. *Intermediate Scrutiny Applies*

Having determined that HRS § 134-2(e)'s 10-day permit use period implicates the right to bear arms, the court next considers the appropriate level of scrutiny to apply. As both parties agree, the 10-day permit use period does not "amount to destruction" of the right to bear arms. ECF No. 85-1 at PageID # 603; ECF No. 91-1 at PageID # 715. This leaves a choice between strict and intermediate scrutiny. Strict scrutiny is appropriate only when a law "implicates the core of the Second Amendment right *and* severely burdens that right." *Silvester*, 843 F.3d at 821 (emphasis added). Otherwise, intermediate scrutiny is appropriate. *Id.* Defendant concedes that "the core of the Second Amendment is presumably implicated since Plaintiffs state that they want to purchase handguns." ECF No. 91-1 at PageID # 714. Thus, the appropriate level of scrutiny to apply turns on the severity of the burden imposed by the law.

In weighing the severity of a law's burden on the right to bear arms, courts are "guided by a longstanding distinction between laws that regulate the manner in which individuals may exercise their Second Amendment right, and laws that amount to a total prohibition of the right." *Pena*, 898 F.3d at 977.  HRS § 134-2(e)'s 10-day permit use period falls into the former category.  It merely regulates when an individual may purchase handguns—requiring them to take possession of the weapon within ten days of acquiring a permit.  It does not prohibit individuals from possessing or acquiring handguns.  Indeed, the only burden alleged by Plaintiffs is that they "are required to take time off work to make their firearms purchase in quick succession."  ECF No. 85-1 at PageID # 605.  This is not a severe burden on the right.  *See Silvester*, 843 F.3d at 827 ("[L]aws which regulate only the '*manner* in which persons may exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely" (quoting *Chovan*, 735 F.3d at 1138)); *see also id.* ("The burden of [a] 10-day waiting period . . . is less than the burden imposed by contested regulations in other Ninth Circuit cases applying intermediate scrutiny.").  Intermediate scrutiny applies.

///

///

///

### 3.    *Application of Intermediate Scrutiny*

"In the context of Second Amendment challenges, intermediate scrutiny requires: '(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective.'" *Fyock*, 779 F.3d at 1000 (quoting *Chovan*, 735 F.3d at 1139).[8]   Intermediate scrutiny "does not require the least restrictive means of furthering a given end." *Bauer*, 858 F.3d at 1221.  Rather, the law must merely "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Fyock*, 779 F.3d at 1000 (quotation and citation omitted).  It is the government's burden to prove that both prongs of the test are satisfied.  *See Chovan*, 735 F.3d at 1140-41.

The nature and quantity of the showing required by the government "will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000); *see also United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) ("[T]he Constitution does not mandate a specific method by which the government must satisfy its burden under

---

[8] This test is "imported . . . from First Amendment cases" and courts rely on First Amendment jurisprudence when applying intermediate scrutiny to Second Amendment challenges.  *Silvester*, 843 F.3d at 821; *see also Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014) ("Both *Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010)] suggest that First Amendment analogies are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context" (quoting *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011))).

heightened judicial scrutiny.").  To meet its burden, the government may resort to a wide range of sources, including "legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require."  *Carter*, 669 F.3d at 418; *Jackson*, 746 F.3d at 966 (pointing to case law, empirical studies, and legislative history as appropriate bases for demonstrating the reasonable fit between a government interest and a challenged law); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (recognizing that, in some cases, restrictions on constitutional rights may be justified "based solely on history, consensus, and 'simple common sense'" (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995))).  But "the government must present more than anecdote and supposition."  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000).  Courts owe substantial deference to a legislature's policy judgments; their "sole obligation is to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence."  *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997).

The Government has not met its burden here.  Defendant states that the 10-day permit use period furthers the "important government interest" of public safety "in that such requirements provide more effective supervision and control over the sale, transfer, and possession of firearms."  ECF No. 91-1 at PageID

# 715.  It is "self-evident" that public safety is a substantial and important

government interest.  *Fyock*, 779 F.3d at 1000.  But Defendant has failed to

demonstrate *how* the 10-day permit use period furthers that interest.

To begin, the Government does not show that the legislature

considered *any* evidence—let alone substantial evidence—prior to enacting the

law.  The Government cites only to legislative history that pronounces the public

safety purpose of gun regulation generally, but provides no legislative history

addressing why HRS § 134-2(e)'s 10-day permit use period, in particular, was

enacted.  *See* ECF No. 91-1 at PageID ## 706-09.  The Government also fails to

provide any legislative history addressing what evidence the legislature considered

prior to enacting that requirement.[9]  Likewise, the Government provides no

empirical evidence or case law suggesting that a 10-day permit use period would

enhance public safety.  Indeed, as the Government conceded during oral argument,

its arguments boil down to simple "common sense."

The Government's primary common-sense argument is that a short

expiry period is necessary to ensure that the information provided when an

individual applies for a permit to acquire a specific handgun remains accurate

---

[9] Upon independent review, the court was unable to find any legislative history addressing the purpose behind this particular statutory provision.

18

when that person acquires that gun.[10]  ECF No. 91-1 at PageID ## 718-19.

Specifically, the Government points out that information provided when an

applicant applies for a permit, including the person's name, address, or appearance

could change over time; or an applicant could become disqualified from owning a

gun after the background check has been completed and the permit issued—

including by becoming subject to a civil protective order, committing certain

crimes, or being diagnosed with a significant mental disorder.  *Id.*  Because such

changes are unlikely to occur within a mere 10 days of acquiring a permit, such a

"relatively short expiration date will ensure that the information remains accurate

when the person acquires [their] firearm."  *Id.* at PageID # 719.  Put differently, the

10-day permit use period minimizes the probability that any changes—

---

[10] As a reminder, the handgun permitting process proceeds as follows.  An applicant must:

(1) Acquire all necessary identifying information about the firearm from the seller, including its make, model, and serial number;

(2) Physically visit the police station to apply for a permit to acquire the firearm, including by providing the gun's make, model, and serial number, as well as personal identifying information including name, address, and physical appearance;

(3) Wait 14 days while the police department reviews the application, conducts a background check to ensure that the individual is qualified to possess a gun, and issues the permit;

(4) Return to the seller to present the permit and purchase the firearm within 10 days of permit issuance; and

(5) Within five days of acquiring the firearm, bring the firearm back to the police station for a physical inspection and registration.

The Government maintains that by allowing applicants only ten days to acquire a handgun after receiving the permit, the law ensures that the information provided at step 2 and step 3 will be accurate at step 4.  But the Government does not explain *how* this promotes public safety.

disqualifying or otherwise—will occur between the time that the permit issues and the time that the applicant makes use of that permit to purchase a gun.[11]

But the Government makes no effort to explain *how* this promotes public safety—that is, why the law is a reasonable fit to its asserted objective.  In absence of an explanation, the court's best guess as to the Government's reasoning is that the law ensures that individuals do not make use of a permit to acquire after they become disqualified from owning a gun.  But that this promotes public safety is not a common-sense conclusion.  In fact, the opposite could be true.  By shortening the permit use period to reduce the likelihood that disqualifying changes occur before the applicant obtains the handgun, the law arguably increases the likelihood that individuals will *already* be in possession of a gun should a disqualifying change occur.[12]  This outcome could negatively impact public safety by increasing the probability that unqualified individuals may be in possession of

---

[11] The Government additionally argues that the short permit period "minimizes the risk of an unauthorized person using [the permit] if it is lost or stolen."  ECF No. 91-1 at PageID # 716.  The Government does not flesh out this argument beyond the quoted sentence—let alone provide evidence suggesting that lost or stolen permits pose a problem.  Taken on its face, this argument does not make sense.  HRS § 134-2(f) requires the seller to verify the permit holder's identity prior to transferring the gun, and the Government does not explain how an unauthorized individual could make use of a permit in another's name.

[12] And as Plaintiffs point out, virtually all applicants *do* make use of their permits within the 10-day period.  For example, in 2020, 95.8% of permits were used to acquire a gun within the 10-day period, while only 1.4% were voided (and 2.8% of permit applicants were denied).  ECF No. 86-3 at PageID # 635.  The same trend held true in 2017, 2018, and 2019.  *See* ECF Nos. 86-4, 86-5, 86-6.

guns.  Of course, in the absence of any *evidence* addressing the effect of the law on public safety, this is mere conjecture.  Nevertheless, this conjecture demonstrates that it is not a simple matter of common sense that the 10-day permit use period promotes public safety.  Finally, it is worth noting that if it really were common sense that a 10-day permit use period promoted public safety, Hawaii likely would not be the *only* state in the nation to maintain such a restrictive requirement.[13]

The Government has failed to show that there is a reasonable fit between their stated objective of promoting public safety and the 10-day permit use period imposed by HRS § 134-2(e).  The 10-day permit use period for handguns does not survive intermediate scrutiny.[14]

---

[13] To be clear, the court is not suggesting that *any* permit use period would violate the Second Amendment.  And, as Plaintiffs' counsel conceded at oral argument, some greater time period could pass constitutional muster.  This Order, however, does not attempt to define the boundaries of a constitutional versus unconstitutional permit use period.

[14] Both parties spill considerable ink discussing "Rap Back"—an FBI service that informs state and local law enforcement officers when an individual subject to a criminal history record check is arrested for a criminal offense anywhere in the country.  ECF No. 85-1 at PageID # 612; ECF No. 91-1 at PageID ## 717-19.  Plaintiffs argue that "if the Defendant's stated interest [in the 10-day permit use requirement] is blocking a person from using a permit after committing a felony, it is unnecessary and an additional unjustifiable burden because Rap Back provides the same 'service.'"  ECF No. 85-1 at PageID # 612.  Defendant responds that Rap Back falls short of providing this service because some criminal offenses can fall through the cracks and because Rap Back does not inform law enforcement of other disqualifying events, including diagnosis with a disqualifying mental condition or entry of a civil protective order or restraining order. ECF No. 91-1 at PageID ## 717-18.  But these arguments are largely irrelevant.  The law does not pass intermediate scrutiny for the more fundamental reason discussed above—that the state has failed to show how the 10-day permit use period promotes public safety.

**C.**   **HRS § 134-3(c)'s In-Person Firearm Inspection and Registration Requirement**

**1.**   ***The In-Person Firearm Inspection and Registration Requirement Is Not Longstanding and Presumptively Valid***

HRS § 134-3(c) was amended in 2020 to require in-person inspection and registration of all firearms within five days of acquiring them.  The Government argues that this new in-person inspection and registration requirement is longstanding and presumptively valid because it is "part of the registration process" and "[i]n Hawaii, registration and permitting requirements, *in general*, date back to 1907 and 1919, respectively."  ECF No. 91-1 at PageID ## 722-23 (emphasis added).  This argument fails.  Although certain registration requirements may be longstanding, it does not follow that *all* registration requirements are.  And the Government has provided absolutely no evidence suggesting that in-person inspection and registration was historically understood as an appropriate regulation on the right to bear arms.

In its Amicus Brief, Everytown argues that the State's in-person inspection and registration requirement falls outside the scope of the Second Amendment as "part of a longstanding regulatory tradition" because it is of a kind with 18th century militia laws.  ECF No. 94-1 at PageID # 866.  Those laws required individuals enlisted in state militias—"white men in a specified age range"—to maintain their own arms and "provided for in-person inspection to

22

ensure that militiamen were prepared and properly armed if called up to fight." *Id.* at PageID ## 871, 873. Everytown cites to a variety of state militia laws, as well as federal Militia Acts. *Id.* at PageID ## 872-77. In general, as Everytown explains, these laws required periodic inspections of militiamen's weaponry, with some laws requiring military officials to keep a record of the weapons held by men in their company. *Id.* Everytown concludes that "[t]he ubiquity of these militia inspection laws means that ordinary citizens in the founding era would have understood a requirement to present arms for inspection to be well within the government's power—and thus outside the scope of the Second Amendment." *Id.* at PageID # 877.

But the purpose and scope of these colonial-era militia laws are too dissimilar to the State of Hawaii's current registration requirement to support such a finding. Although a law need not have a "precise founding-era analogue" in order to be deemed presumptively valid, *Fyock*, 779 F.3d at 997 (quotation and citation omitted), the law must be sufficiently similar to historical regulations to demonstrate that the law's restrictions accord with historical understanding of the scope of the Second Amendment right. *Young*, 992 F.3d at 783.

In the 18th century, state militias were a primary part of the United States armed forces. And, as Everytown itself explains, the purpose of the militia laws was to ensure that the armed forces maintained weapon stockpiles suitable for

the nation's defense and warfare needs.  ECF No. 94-1 at PageID # 873.

Accordingly, many of these laws did not require individuals to register their

weapons upon acquiring them, but instead to periodically demonstrate that they

maintained weapons of appropriate caliber for military activity.  *Id.* at PageID

## 873-75.  Moreover, each law that Everytown cites applied *only* to individuals

who were enlisted in the militia and to the guns that they possessed for military

purposes; Everytown has pointed to no law that required in-person inspection and

registration of firearms held by civilians in their personal capacity.

HRS § 134-3(c)'s in-person inspection and registration requirement

does not fall within the historical tradition of these 18th century militia laws.

Whereas militia laws applied only to militiamen, HRS § 134-3(c)'s requirement

applies to all civilians who wish to acquire a handgun for personal use.  Likewise,

the purpose of the militia inspection laws was to ensure that soldiers had the

correct weapons for duty and that those weapons were appropriately maintained for

battle.  ECF No. 94-1 at PageID ## 872-77.  In contrast, HRS § 134-3(c)'s

requirement is meant to serve the Government's interest—not in military

preparedness—but in protecting public safety through "more effective supervision

and control over the sale, transfer, and possession of firearms."  ECF No. 91-1 at

PageID # 724.  And, most significantly, the militia laws did not place a burden on

any individual's ability to *acquire* a weapon.  Indeed, militiamen were *required* to

possess weapons.  In contrast, the State of Hawaii's law places a burden on the right to acquire handguns by requiring compliance with the in-person inspection and registration requirement in order for civilians to legally possess firearms in the first instance.

Given these considerable differences, the State of Hawaii's in-person inspection and registration requirement for civilian firearms cannot be said to fall within the historical tradition of colonial-era laws requiring inspection of what were effectively the military weapon stockpiles of the day.  On the record before the court, HRS § 134-3(c)'s in-person inspection and registration requirement cannot be considered longstanding and presumptively valid at the first step of the analysis.  *See, e.g.*, *Bauer*, 858 F.3d at 1221.

### 2.    *Intermediate Scrutiny Applies*

Having determined that HRS § 134-3(c)'s in-person inspection and registration requirement implicates the right to bear arms, the court next considers the appropriate level of scrutiny to apply.  As with the 10-day permit use period, the parties agree that the law does not destroy the core of the Second Amendment right, and Defendant concedes that "the core of the Second Amendment is presumably implicated since Plaintiffs state that they want to purchase handguns." ECF No. 91-1 at PageID # 723.  Thus, the choice is again one between strict and intermediate scrutiny.

Intermediate scrutiny is plainly the appropriate standard to apply because the law does not severely burden the right to bear arms.  HRS § 134-3(c) is a gun registration requirement.  The Ninth Circuit has consistently held that "gun-registration requirements do not severely burden the Second Amendment because they do not 'prevent an individual from possessing a firearm in his home or elsewhere.'"  *Pena*, 898 F.3d at 977 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) ("*Heller II*")).  Finally, factually, the only burden alleged by Plaintiffs is, again, that they "are required to take time off work to make their firearms purchase in quick succession."  ECF No. 85-1 at PageID # 605.  This is not a severe burden.  Intermediate scrutiny applies.

### 3.   *Application of Intermediate Scrutiny*

To survive intermediate scrutiny, the Government must demonstrate a "significant, substantial, or important" government interest and must show that there is a "reasonable fit between the challenged regulation and the asserted objective."  *Fyock*, 779 F.3d at 1000.  Here, the Government's asserted interest is once again public safety.  "More specifically, the 'significant, substantial, or important' government objective in requiring people to bring the firearm to the registration is that it ensures that the registration information is accurate, it ensures that the firearm complies with Hawaii law, and it confirms the identity of the

firearm so as to facilitate tracing by law enforcement."  ECF No. 91-1 at PageID ## 724-25.

But, once again, while public safety interests are legitimate, *Fyock*, 779 F.3d at 1000; *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010), the Government wholly fails to demonstrate *how* the in-person inspection and registration requirement furthers these interests.  It merely states that "ensuring that the registration information is accurate, ensuring that the firearm complies with Hawaii law, and confirming the identity of the firearm can be easily accomplished simply by bringing the firearm to the registration for inspection."  ECF No. 91-1 at PageID # 725.

This bald statement is not enough to meet the Government's burden. "To survive intermediate scrutiny, the defendants must show '*reasonable* inferences based on *substantial* evidence' that the statutes are substantially related to the governmental interest."  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015) (quoting *Turner Broad.*, 520 U.S. at 666); *Heller II*, 670 F.3d at 1259 (same).  Here, the Government has provided no evidence whatsoever in support of its position.  The Government has provided no legislative history speaking to the legislature's reasons for amending the statute.[15]  It has not

---

[15] Though not proffered by the Government, the court has reviewed the legislative history related to the 2020 amendment of HRS § 134-3(c).  This history reveals that the legislature

(continued . . . )

shown that inaccurate registration was a problem affecting public safety (or even a problem at all) prior to enactment of the 2020 in-person inspection and registration requirement, nor has it provided any studies, examples from other jurisdictions, or any other type of evidence suggesting that an in-person inspection and registration requirement would ameliorate such a problem.

In absence of concrete evidence, the only support that the Government offers is conjecture. Defendant asserts that in-person inspection and registration promotes public safety by requiring that the police directly inspect the serial number on the gun itself, rather than the number as reported by the buyer and (separately) by the seller on the permit. *See* HRS § 134-2(f). Specifically, the Government speculates that "[s]ome people might innocently make mistakes in transcribing serial numbers or other identifying information" or may be unaware that their gun's identifying marks or other attributes have been impermissibly

---

amended § 134-3 in 2020 primarily to address concerns around ghost guns—firearms that are assembled "without serial numbers or other identification markings." Stand. Com. Rep. No. 685-20 (Feb. 19, 2020). The legislature was concerned because "individuals who are otherwise prohibited from owning or possessing firearms under state law can assemble these 'ghost guns,' thereby bypassing background checks, registration, and other legal requirements." *Id.* But while the legislature made two amendments specifically related to ghost guns, the amendment to require in-person inspection and registration appears unrelated. It addresses requirements for individuals who register their firearms legally, not the issue of individuals attempting to bypass legal registration with ghost guns. Rather, this amendment appears to fall into a separate, secondary reason for amending the statute: to "[a]mend certain requirements relating to firearms registration." *See* Stand. Com. Rep. No. 3557 (May 19, 2020); Stand. Com. Rep. No. 3729 (June 30, 2020). But this does not reveal the purpose of the in-person inspection and registration requirement, nor could the court locate any additional legislative history—whether from 2020 or previous sessions—addressing the purpose of this requirement.

altered.  ECF No. 91-1 at PageID # 720.  And, the Government hypothesizes, individuals may not be aware of these errors or inconsistencies until they bring their firearm to the police station to have it physically inspected.  *Id.*  But this hypothetical falls short under intermediate scrutiny.  To meet its burden, the Government must "present some meaningful evidence, not mere assertions, to justify its predictive judgments."  *Heller II*, 670 F.3d at 1259 (striking down a gun registration law where the government failed "to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote . . . the important governmental interests it has invoked").[16]

Thus, it once again appears that the Government's only permissible argument is that common sense shows the law is reasonably related to its interest in promoting public safety.  But the notion that in-person inspection and registration promotes public safety is not a matter of common sense.  First, as stated above, in the absence of any evidence to that end, it is not a common-sense conclusion that mistakes in registration were a problem prior to enactment of the

---

[16] The Government also argues that the in-person inspection and registration requirement provides a benefit to new gun owners in that it affords them a presumption of innocence in the event the firearm's identifying marks are discovered to be altered after the registration process is complete.  Again, this argument is based on mere supposition.  *See* ECF No. 91-1 at PageID ## 725-26 (speculating that a "new owner could be accused of the alteration at some point in the distant future when the alteration is finally discovered" and that "in-person inspection at registration sets a 'base line' that protects the new owner").  Moreover, any secondary benefits the law allegedly affords gun owners is irrelevant in the context of this constitutional challenge; the question is only whether the law is reasonably tailored to meet the asserted government interest.

in-person inspection and registration requirement.  Indeed, there is redundancy built into the registration process even without the in-person requirement—both the firearm seller and buyer must provide the serial number and other identifying information about the firearm.  As Plaintiffs point out, "it strains credulity that both a firearms store and a buyer would both fail to properly transcribe numbers or realize" that the gun has been impermissibly altered.[17]  ECF No. 95-1 at PageID # 941.

Second, as the D.C. Circuit pointed out in *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller IV*"), requiring individuals to bring firearms into the police station for in-person inspection and registration may "more likely be a threat to public safety [because] there is a risk that the gun may be stolen en route or that the would-be registrant may be arrested or even shot by a police officer seeing a 'man with a gun.'"  *Id.* at 277 (internal citation and quotation omitted).  While these possibilities—like the Government's hypothetical about mistaken transcription—are no more than conjecture, they demonstrate that it is not a simple matter of common sense that in-person inspection and registration promotes public safety.

---

[17] This is especially true given that the Second Amendment protects the rights of "law-abiding, responsible citizens."  *Heller*, 554 U.S. at 635.

Finally, it is again worth noting that Hawaii is the *only* state in the country to require in-person inspection and registration of firearms.  ECF No. 85-1 at PageID # 614.  As in the case of the 10-day permit use period, if it were truly a matter of common sense that in-person inspection and registration promoted public safety—or that misidentification in the absence of in-person inspection and registration was a problem—one would expect additional states to maintain similar requirements.  The Government has failed to show that the in-person inspection and registration requirement is reasonably tailored to a significant, substantial, or important government interest.  HRS § 134-3(c)'s in-person inspection and registration requirement does not survive intermediate scrutiny.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is GRANTED and Defendant's Counter Motion for Summary Judgment is DENIED.

HRS § 134-2(e)'s requirement that "[p]ermits issued to acquire any pistol or revolver shall be void unless used within ten days after the date of issue" is declared unconstitutional in violation of the Second Amendment.  Defendant's officers, agents, servants, employees, and all persons in active concert or participation with Defendant are permanently enjoined from enforcing HRS

§ 134-2(e)'s 10-day permit use requirement for handguns.  To be clear, no other language in HRS § 134-2(e) is found unconstitutional.

HRS § 134-3(c)'s requirement that, with the exception of certain licensed dealers, "[a]ll other firearms and firearm receivers registered under [HRS § 134] shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration" is unconstitutional in violation of the Second Amendment.  Defendant's officers, agents, servants, employees, and all persons in active concert or participation with Defendant are permanently enjoined from enforcing HRS § 134-3(c)'s in-person firearm inspection and registration requirement.  To be clear, no other language in HRS § 134-3(c) is found unconstitutional.

///

///

///

///

///

///

///

///

///

Pursuant to the parties' Stipulation, ECF No. 106, and Federal Rule of Civil Procedure 58(b), entry of separate judgment in this action will be delayed until September 15, 2021. The Order shall not take effect and shall not be appealable until the separate judgment is entered. The Clerk's Office shall not close the case file at this time.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 16, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Yukutake v. Connors*, Civ. No. 19-00578 JMS-RT, Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendant's Counter Motion for Summary Judgment