IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TODD YUKUTAKE, ET AL., <br><br>                 Plaintiffs, <br><br>    vs. <br><br> CLARE E. CONNORS, <br><br>                Defendant. | CIV. NO. 19-00578 JMS-RT <br><br> ORDER (1) CLARIFYING REMEDIES; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR STAY PENDING APPEAL, ECF NO. 113 |

## ORDER (1) CLARIFYING REMEDIES; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR STAY PENDING APPEAL, ECF NO. 113

## I. INTRODUCTION

In this case, Plaintiffs Todd Yukutake and David Kikukawa ("Plaintiffs") sued State of Hawaii Attorney General Clare E. Connors in her official capacity ("Defendant"), arguing that two State of Hawaii firearm laws violate the Second Amendment. ECF No. 78. The first, Hawaii Revised Statutes ("HRS") § 134-2(e), specifies, in relevant part, that permits to acquire handguns (i.e., a pistol or revolver) expire after 10 days. The second, HRS § 134-3(c), requires, in relevant part, that individuals physically bring their firearm to the police department for in-person inspection and registration.

In a prior order, the court held unconstitutional the two challenged portions of Hawaii's firearm statutes.  ECF No. 107; *Yukutake v. Connors*, 2021 WL 3625307, at *13 (D. Haw. Aug. 16, 2021) (granting summary judgment to Plaintiffs).  But with agreement of the parties, the court delayed entry of judgment until September 22, 2021.  ECF No. 112.  Defendant subsequently filed a motion requesting that the court stay its order pending appeal, ECF No. 113 ("Motion for Stay Pending Appeal").

Because the court's prior order did not specifically address whether the unconstitutional portions of Hawaii's firearm statutes are severable—i.e., whether just those portions are invalid or whether all of §§ 134-2 and 134-3 are invalid—this Order analyzes severability and clarifies the remedies:  Both the 10-day permit use period, and the requirement of in-person inspection and registration, are severed from their respective statutes and stricken.  This Order also grants in part and denies in part Defendant's Motion for Stay Pending Appeal.  A stay is GRANTED for the injunction against the enforcement of the 10-day permit use period.  A stay is DENIED for the injunction against the enforcement of the in-person inspection and registration requirement.

## II.  <u>BACKGROUND</u>

Plaintiffs, residents of Honolulu, own multiple firearms and wish to legally acquire additional guns, including handguns.  ECF No. 78 at PageID

## 557, 567–69.  They allege that HRS §§ 134-2(e) and 134-3(c) violate their Second Amendment right to bear arms.  *Id.* at PageID # 570; *see also* ECF No. 85. Section 134-2(e) provides, in relevant part, that "[p]ermits issued to acquire any pistol or revolver [i.e., handguns] shall be void unless used within ten days after the date of issue."  Section 134-3(c) provides, in relevant part, that firearms "shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration."

To lawfully acquire and possess a firearm in Hawaii, an applicant must complete the following steps:  First, in the case of handguns, the applicant must obtain from the seller information identifying the firearm, including its make, model, and serial number.[1]  Second, the applicant must visit the police station to apply for a permit to acquire the firearm.  *See* https://www.honolulupd.org/ information/firearms/.  The applicant must provide personally identifying information and, in the case of handguns, the gun's make, model, and serial number.  *See* HRS § 134-2(e).  Third, the applicant must wait 14 days while the police department reviews the application, conducts background checks, and issues the permit.  *Id.*  The police department retains one copy of the permit.  *Id.*

---

[1] When "[c]omplet[ing] the permit to acquire application," applicants must provide the "make, model, caliber, type, barrel length, and the serial number of all handguns."  https:// www.honolulupd.org/information/firearms/ (click on "Apply For Permit" tab) (last visited September 22, 2021).

Fourth, the applicant must return to the seller to present the permit and finalize the purchase of the firearm. *Id.* Applicants must purchase the firearm within 10 days of permit issuance in the case of a handgun and within one year of permit issuance in the case of a long gun. *Id.* Fifth, for handguns, the applicant signs the permit and delivers it to the seller, who verifies the identity of the applicant and the information identifying the handgun. HRS § 134-2(f). The seller signs the permit and delivers it in person or by mail to the police department. *Id.* Sixth, the applicant must register the firearm within 5 days of acquisition. HRS § 134-3(a). Firearm dealers licensed under State of Hawaii law or by the United States Department of Justice can register without an in-person inspection using "forms prescribed by the attorney general." HRS § 134-3(c). All other applicants must bring their firearm to the police station for registration and physical inspection, including to confirm the firearm's make, model, and serial number. *Id.*

The court agreed with Plaintiffs that the 10-day use period for handgun permits, and the requirement of in-person inspection and registration for all firearms, are unconstitutional on their face. *Yukutake*, 2021 WL 3625307, at *13. The court found that the Plaintiffs are burdened by those requirements because the Plaintiffs must take time off work in order to complete their firearm purchases in quick succession. *Id.* at *6, *11. But that burden is not severe, and thus intermediate scrutiny is the appropriate standard of review. *Id.*

4

The court held that the Defendant failed to show that those requirements were reasonably tailored to a substantial government interest. *Id.* at *8, *12. The Defendant asserted that the 10-day permit use period promotes public safety, but the Defendant provided no evidence and gave no meaningful explanation in support of that assertion. *Id.* at *8. Likewise, the Defendant's assertions concerning the in-person inspection and registration requirement lacked supporting evidence; the Defendant relied on "common sense" and hypothetical "conjecture" to support her assertion that the in-person requirement increases public safety. *Id.* at *11–12. After ruling that the challenged statutory provisions were unconstitutional, the court ordered that Defendant and her agents be enjoined from enforcing those provisions. *Id.* at *13. But the court delayed entry of judgment on its holdings until September 15, 2021. *Id.*

Following the court's decision, Defendant indicated her intent to appeal, and the court granted the parties' joint request that the entry of judgment be further delayed until September 22, 2021. ECF Nos. 111, 112. Defendant filed her Motion for Stay Pending Appeal on August 31, 2021, requesting that this court stay the effect of its prior order for the duration of any appeal to the Ninth Circuit or, alternatively, to administratively stay this case until the Ninth Circuit decides whether a stay is warranted. *See* ECF Nos. 113, 113-1. Plaintiffs filed a Response

on September 13, 2021, opposing entry of any stay.  ECF Nos. 114, 114-1.  This matter is decided without a hearing pursuant to Local Rule 7.1(c).

### III.  <u>STANDARDS OF REVIEW</u>

**A.    Severability**

If a court holds a portion of a statute unconstitutional, the court should conduct a severability analysis to see if it should invalidate only the unconstitutional portion of the legislative enactment, as opposed to the entire enactment.  *See Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1282–83 (9th Cir. 2003).  The severability of a state statute is a matter of state law. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996).  "The general rule of law [in Hawaii] concerning the concept of severability is that if any part of a statute is held invalid, and if the remainder is complete in itself and is capable of being executed in accordance with the apparent legislative intent, then the remainder must be upheld as constitutional."  *State v. Bloss*, 62 Haw. 147, 153, 613 P.2d 354, 358 (1980).  If the "legislative history of the [statutory scheme] yields the conclusion that 'the legislature [would] have preferred what is left of its statute to no statute at all,'" then the court should sever the unconstitutional portions of the statute from the constitutional portions.  *State v. Pacquing*, 139 Haw. 302, 320, 389 P.3d 897, 915 (2016) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006)).

"Severability of portions of the HRS is generally authorized by HRS § 1-23." *Id.* at 319, 389 P.3d at 914.  Section 1-23 states that "[i]f any provision of the [HRS], or the application thereof to any person or circumstances, is held invalid, the remainder of the [HRS], or the application of the provision to other persons or circumstances, shall not be affected thereby."  But HRS § 1-23 is not dispositive of the severability analysis.  *See, e.g.*, *Hawaii Pac. Health v. Takamine*, 2013 WL 1858554, *2 (D. Haw. May 1, 2013) (citing § 1-23 but declining to sever); *see also Nelson v. Miwa*, 56 Haw. 601, 611, 546 P.2d 1005, 1013 (1976) (declining to sever, although not citing HRS § 1-23, which was enacted before the date of decision, *see* L. 1955, ch. 57, sec. 1(f)).

The in-person inspection and registration requirement was added to HRS § 134-3 by Act 74, Session Laws of Hawaii 2020 (H.B. 2744, H.D. 1, S.D. 2) ("the 2020 Act").  The 2020 Act contains a more specific severability clause: "If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the invalidity does not affect other provisions or applications of the Act that can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable."  H.B. 2744, pt. III, sec. 7.  The 10-day permit use period was added by 1933 Haw. Sess. Laws, Act 26 (H.B. 70) ("the 1933–34 Act") (codified at Revised Laws of Hawaii §§ 2540–2553 (1935 ed.)).  The 1933–34 Act also contains a more specific severability clause:  "If any section,

subsection, sentence, clause or phrase of this Act is, for any reason, held to be

unconstitutional or invalid, such decision shall not affect the validity of the

remaining portions of this Act.  The Legislature hereby declares that it would have

approved this Act . . . irrespective of the fact that any one or more other sections,

subsections, sentences, clauses or phrases be declared unconstitutional."  H.B. 70,

sec. 16.

**B.    Stay Pending Appeal**

When a court issues final judgment granting an injunction and an

opposing party appeals that judgment, the court may stay the injunction on terms

that secure the opposing party's rights.  *See* Fed. R. Civ. P. 62(d).  "The party

requesting a stay bears the burden of showing that the circumstances justify an

exercise of that discretion."  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 (9th Cir.

2020) (quoting *Nken v. Holder*, 556 U.S. 418, 433–34 (2009)).  Courts consider

the following factors when deciding whether to issue a stay pending appeal:

"(1) whether the stay applicant has made a strong showing that he is likely to

succeed on the merits; (2) whether the applicant will be irreparably injured absent a

stay; (3) whether issuance of the stay will substantially injure the other parties

interested in the proceeding; and (4) where the public interest lies."  *Nken*, 556

U.S. at 434 (internal quotation marks omitted).

The first and second factors are most important.  *Id.*  For the first factor, the movant must show that there is a "substantial case for relief on the merits," i.e., that the appeal has a "reasonable probability" of success.  *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (describing various formulations of the standard as interchangeable).  The movant does not have to show that it is more likely than not to succeed on its appeal.  *Id.*  For the second factor, the movant must show that "irreparable injury is likely to occur during the period before the appeal is decided."  *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020); *see also Al Otro Lado*, 952 F.3d at 1007 ("[The movant] must show that an irreparable injury is the more probable or likely outcome.").  A "possibility of irreparable injury" is insufficient.  *Nken*, 556 U.S. at 434–35.  The Ninth Circuit applies a flexible "sliding scale" test to the first two factors; a weak showing of irreparable harm requires a strong showing of likelihood of success, and vice versa.  *Al Otro Lado*, 952 F.3d at 1007, 1010.

The last two factors—balance of the equities, and public interest—are relevant only if the movant satisfies the first two factors.  *Id.* at 1007 (citing *Nken*, 556 U.S. at 434–35).  When assessing the balance of the equities, courts must ask "whether the other parties to the litigation will be substantially injured if the district court's preliminary injunction is stayed pending appeal."  *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 837 (9th Cir.

2020).  When a public program is being challenged, the public interest is often in favor of ensuring the stable administration of that public program.  *See Doe #1*, 957 F.3d at 1068.

Finally, when considering staying an injunction that enjoins a government from enforcing a law, a court may stay the injunction in part, e.g., by permitting enforcement of the law under certain circumstances.  *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (staying, in part, a preliminary injunction against the federal government's enforcement of an executive order, by permitting the government to enforce that immigration order as to "foreign nationals who lacked any bona fide relationship with a person or entity in United States").

## IV.  <u>ANALYSIS</u>

The court begins by clarifying the remedies for the Second Amendment violations:  The 10-day permit use period is severed from HRS § 134-2(e) and is stricken.  The in-person inspection and registration requirement is severed from HRS § 134-3(c) and is also stricken.  The court then analyzes the four factors governing the Defendant's Motion for Stay Pending Appeal.  Those four factors dictate a different result for the two constitutional violations:  The court stays its Order with respect to the 10-day permit use period.  But the court

does not stay its Order with respect to the in-person inspection and registration requirement.

## A.   Severability and Remedies

### 1.   *The 10-Day Permit Use Period Is Severable from HRS § 134-2.*

The court has held unconstitutional the requirement in HRS § 134-2(e) that "[p]ermits issued to acquire any pistol or revolver shall be void unless used within ten days after the date of issue." *Yukutake*, 2021 WL 3625307, at *5–9. The remaining question is whether, if the 10-day permit use period is severed, the remainder of § 134-2 is complete in itself and is capable of being executed in accordance with the apparent legislative intent. *See Bloss*, 62 Haw. at 153, 613 P.2d at 358.

In addition to the general severability clause in HRS § 1-23, the 1933–34 Act that introduced the 10-day period contains a more specific severability clause. *See* 1933 Haw. Sess. Laws, Act 26, sec. 16 (H.B. 70). The court thus starts with a strong presumption in favor of severability.

As a practical matter, removing the 10-day permit use period from § 134-2(e) creates a void in the statutory scheme. There is no background rule in the HRS, nor any language remaining in chapter 134, that specifies an expiration date for handgun permits. There is a provision in § 134-2(e) that limits handgun permits to a single transaction. But that provision and the remaining language in

chapter 134 do not cap the time period in which a permit must be used.  As the

Defendant argues, *see* ECF No. 113-1 at PageID # 1034, if the 10-day permit use

period is removed, one could read the statute as implicitly authorizing handgun

permits that do not expire.  The court finds that possibility—and, more generally,

the lack of an expiration date for permits acquired through an otherwise thorough

process—to be akin to assigning homework without a due date.  Such as scheme is

so unnatural and unexpected that any reasonable person would see a void in that

scheme.

The remaining question is whether the Hawaii legislature would have

preferred that impractical result over no statute at all.  *See Pacquing*, 139 Haw. at

320, 389 P.3d at 915.  The purpose behind the 1933–34 Act that introduced the 10-

day permit use period was to "give the law enforcing agencies of the Territory [of

Hawaii] a better means of controlling the sale, transfer and possession of firearms

and ammunition."  ECF No. 92-9 at PageID # 774 (Journal of the House of

Representatives of the 17th Legislature of the Territory of Hawaii, Special Session

1933).  The purpose behind the 1933–34 Act—increasing public safety by

maintaining better control and tracking of firearms—is undoubtedly a purpose

underlying many of the subsequent acts by the Hawaii legislature that have

modified the firearm statutes and left in place the 10-day permit use period.  *See,*

*e.g.*, ECF No. 92-16 at PageID ## 827–28 (Journal of the Senate of the 15th

Legislature of the State of Hawaii, Regular Session of 1990) (increasing penalties for firearm offenses and noting that "our entire community should be a safe place to live and learn and that everyone deserves to feel free from the threat of harm wherever they go").

Invalidating all of HRS § 134-2 would leave Hawaii without a permitting process for firearms. That result would likely produce a significant increase in gun violence. For example, the Defendant would have less control over the acquisition of firearms by persons with mental-health issues, *see* HRS § 134-2(b) and (c), and by persons with threatening criminal histories, *see* HRS § 134-2(e). And the Defendant would lose some ability to prevent the acquisition of guns by individuals that have been arrested for a felony or crime of violence. *See id.* Invalidating all of § 134-2 would, therefore, be directly contrary to the intent of the 1933–34 Legislature and to the intent of subsequent legislatures that have maintained the 10-day permit use period.

It is evident that the Hawaii legislature—whether now, in 1933–34, or anytime in between—would have preferred to remove the 10-day permit use period versus invalidating all of HRS § 134-2, even if removing the 10-day period leaves an apparent void in the statutory scheme. The court concludes that the void concerning the duration of handgun permits does not render the statute incapable of being fairly executed by the Defendant. Although the court does not decide

what the proper interpretation of HRS § 134-2 will be, the court notes that the void might be filled through a legislative fix, a patchwork of county regulations, official guidance issued by the Defendant, subsequent litigation, or some combination of those options. In sum, severing the 10-day period from § 134-2 will likely generate some degree of legal uncertainty, but the Defendant is not incapable of navigating that uncertainty and enforcing the remainder of § 134-2.

The intent of the Hawaii legislature, and the strong presumption of severability provided by HRS § 1-23 and the 1933–34 Act, dictate that the 10-day permit use period be severed from HRS § 134-2. Accordingly, the requirement in § 134-2(e) that "[p]ermits issued to acquire any pistol or revolver shall be void unless used within ten days after the date of issue" is severed from the statute and declared unconstitutional in violation of the Second Amendment. Defendant's officers, agents, servants, employees, and all persons in active concert or participation with Defendant are permanently enjoined from enforcing HRS § 134-2(e)'s 10-day permit use period for handguns. To be clear, no other language in HRS § 134-2 is found unconstitutional.

**2.    *The In-Person Inspection and Registration Requirement Is Severable from HRS § 134-3.***

The court has held unconstitutional the requirement in HRS § 134-3(c) that "[a]ll other firearms and firearm receivers registered under this section [besides those registered by certain dealers] shall be physically inspected by the

respective county chief of police or the chief's representative at the time of registration." *Yukutake*, 2021 WL 3625307, at *9–12.  The remaining question is whether, if the in-person requirement is severed, the remainder of § 134-3 is complete in itself and is capable of being executed in accordance with the apparent legislative intent.  *See Bloss*, 62 Haw. at 153, 613 P.2d at 358.

In addition to the general severability clause in HRS § 1-23, the 2020 Act that introduced the in-person inspection and registration requirement contains a more specific severability clause.  *See* H.B. 2744, H.D. 1, S.D. 2, Session Laws of Hawaii 2020, pt. III, sec. 7.  The court thus starts with a strong presumption in favor of severability.

Unlike with the 10-day permit use period, removing the in-person inspection and registration requirement does not leave a void in the statutory scheme.  Removing that requirement leaves in place the background rule that "[e]very person who acquires a firearm pursuant to section 134-2 shall register the firearm in the manner prescribed by this section within five days of acquisition." HRS § 134-3(b).  And the rules that registrations be conducted "on forms prescribed by the attorney general" that are "uniform throughout the State" and include certain information, *see id.*, would also remain in place.  With those rules in place, and without the more specific in-person requirement, the statute would

mandate firearm registration via prescribed forms but without specifying the medium through which those forms can be delivered to the police departments.

That lack of specificity would presumably allow for in-person registration and possibly registration by other mediums, such as by drop box, mail, or over the Internet.[2]  Indeed, that would be the most reasonable reading of HRS § 134-3, considering the court's holding that the *mandatory in-person* aspect of the post-acquisition procedures violates the Second Amendment.  *See Yukutake*, 2021 WL 3625307, at *9–12.  That reading is further reinforced by the fact that remote registrations were not barred by § 134-3 before the 2020 Act.[3]  Hence, the absence of a provision specifying the medium through which registration can take place is not so unexpected or unnatural that it constitutes a void in the statutory scheme.

Moreover, relative to invalidating all of § 134-3, severing the in-person requirement is more compatible with the intent of the 2020 Hawaii Legislature.  Invalidating all of § 134-3 would erase Hawaii's post-acquisition

---

[2] Of course, the Defendant and the county police departments would choose the appropriate mediums and implement registration by those mediums.

[3] *See* HRS § 134-3 (2019 ed.) (stating, in subsection c, that licensed dealers "shall not be required to have the firearms physically inspected by the chief of police at the time of registration," but not specifying whether in-person inspection is required for non-dealers); ECF No. 60-1 at PageID # 268 n.3 (Defendant's Motion for Summary Judgment) ("[T]he fact that the Legislature felt compelled to amend HRS § 134-3(c) so as to provide for in-person inspection suggests that the statute previously did not require it."); ECF No 70-1 at PageID # 517 n.7 (Plaintiffs' Opposition to Defendant's Motion for Summary Judgment) ("HB2744[, H.D. 1, S.D. 2, Session Laws of Hawaii 2020] . . . clarifies that in-person registration is required.").

registration process.  It would eliminate the requirement that citizens of other states register their firearms when moving to Hawaii, *see* HRS § 134-3(a).  And it would eliminate the provisions added by the 2020 Act concerning the regulation of "ghost gun[s]," firearms assembled "from a prepackaged kit requiring only minimal expertise and, thus, bypass background checks, registration, and other legal requirements," such as the permitting requirements in § 134-2.  Quite clearly, the 2020 Hawaii Legislature would have preferred severing the in-person requirement over invalidating all of § 134-3 because the latter would be more likely to hinder "Gun Violence Prevention," the principal purpose of the 2020 Act.  *See* H.B. 2744, H.D. 1, S.D. 2, Session Laws of Hawaii 2020 (titled "A Bill for an Act Relating to Gun Violence Prevention").

In sum, there is a strong presumption of severability, severing does not leave a void in the statutory scheme or otherwise render the statutory scheme incapable of execution, and severing is more consistent with the 2020 Legislature's intent.  Accordingly, the requirement in HRS § 134-3(c) that "[a]ll other firearms and firearm receivers registered under [HRS Chapter 134] shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration" is severed from the statute and declared unconstitutional in violation of the Second Amendment.  Defendant's officers, agents, servants, employees, and all persons in active concert or participation with Defendant are

permanently enjoined from enforcing HRS § 134-3(c)'s in-person firearm

inspection and registration requirement.  To be clear, no other language in HRS

§ 134-3 is found unconstitutional.

**B.    Stay Pending Appeal**

**1.    *The Injunction Concerning the 10-day Permit Use Period Is Stayed Pending Appeal.***

**a.    *Likelihood of Success on the Merits***

Defendant contends that she is likely to succeed on the merits before

the Ninth Circuit.  ECF No. 113-1 at PageID # 1030.  In support of that contention,

Defendant submits many of the same arguments she submitted in support of her

Counter Motion for Summary Judgment and Opposition to Plaintiffs' Motion for

Summary Judgment.  *Compare id.* at PageID ## 1030–32, *with* ECF No. 91-1 at

PageID ## 712–19.  As for Defendant's arguments concerning the 10-day permit

use period, the court continues to find those arguments unpersuasive.  *See*

*Yukutake*, 2021 WL 3625307, at *5–9.

One fact tending to support the success of Defendant's appeal is that

the Second Amendment is a fledgling area of constitutional law.  *See Dist. of*

*Columbia v. Heller*, 554 U.S. 570, 625–26 (2008) ("It should be unsurprising that

such a significant matter [(interpreting the Second Amendment)] has been for so

long judicially unresolved. . . .  For most of our history the question did not present

itself."); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir. 2014)

("Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun . . . is an issue that is just beginning to receive judicial attention."); Shawn E. Fields, *Stop and Frisk in A Concealed Carry World*, 93 Wash. L. Rev. 1675, 1691 n.100 (2018) ("Prior to the 1960's, the Second Amendment was rarely litigated and broadly viewed as an archaic military amendment . . . .").  When addressing such an area of the law, the court lacks significant guidance as to the scope and application of the Second Amendment (relative to other constitutional rights), and that lack of guidance increases unpredictability on appeal.  As an example, courts have not addressed in any detail when regulations on the commercial sale of firearms qualify for the "longstanding prohibitions on the possession of firearms."  *See Heller*, 554 U.S. at 626–27.  Moreover, the court is not aware of any decisions from the Ninth Circuit or any other Circuits in factually similar cases that would be highly persuasive to the Ninth Circuit in deciding Defendant's appeal.

The court also recognizes that assessing the constitutionality of the 10-day permit use period involves difficult questions concerning the relationship between a statutory provision and public safety.  In holding that requirement unconstitutional, the court ruled against the Defendant principally because she failed to provide any evidence or meaningful explanation as to how the 10-day period promotes public safety.  *See Yukutake*, 2021 WL 3625307, at *6–9

(describing the Defendant's showing as consisting of an unpersuasive "common-sense argument" and general statements of purpose in the legislative history). Despite those deficiencies, it is not inconceivable that the Ninth Circuit would disagree with this court.

For those reasons, the court finds that the Defendant's appeal has at least a reasonable probability of success with respect to the 10-day permit use period.  The first factor weighs in Defendant's favor.

### b.   *Irreparable Injury*

For the irreparable-injury factor, the relevant question is whether, assuming the Ninth Circuit reverses this court's invalidation of the 10-day permit use period, the Defendant will suffer an irreparable injury in the meantime.  The Defendant first asserts that a "state suffers irreparable injury whenever an enactment of its people or representatives is enjoined."  ECF No. 113-1 at PageID ## 1032–33 (quoting *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997)).

As Plaintiffs point out, however, the Ninth Circuit has called into doubt the principle that irreparable harm occurs every time a court enjoins a state statute.  *See Indep. Living Ctr. of S. California, Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009), *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012).  "To the

20

extent that [principle] is true, . . . it is not dispositive of the balance of harms analysis.  If it were, then the [injunction] rule requiring 'balance' of 'competing claims of injury,' [*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)], would be eviscerated." *Maxwell-Jolly*, 572 F.3d at 658.  The court recognizes that enjoining the enforcement of provisions in Hawaii's firearm statutes is a serious matter, but the court does not view that injunctive relief as creating an abstract harm that, by itself, satisfies the showing required of Defendant on the irreparable-injury factor.

The Defendant next asserts that invalidating the 10-day permit use period will "creat[e] chaos for the State of Hawaii and all four counties," and that the consequences of that chaos will be irreversible.  ECF No. 113-1 at PageID ## 1033–34.  More specifically, the Defendant identifies three types of harms associated with that "chaos":  First, there will be legal uncertainty as to how law enforcement should treat handgun permits.  *See id.*  Second, a flood of new applications will drown the county police departments.  *See id.* at PageID # 1033.  And third, "people will be acquiring and registering firearms who would not ordinarily be able to do so under the prior regulations," "result[ing] in an increased threat to public safety."  *Id.* at PageID # 1034.  In other words, there will be an increase in the possession of handguns by unfit individuals, damaging public safety in a way that the Defendant cannot "un-ring."  *Id.*

21

As to the first type of harm, the court agrees that the absence of the 10-day permit use period will cause legal uncertainty.  As stated earlier, removing the 10-day period leaves a void in the statutory scheme.  *See* discussion *supra* Part IV.A.1.  Although that void could potentially be fixed in various ways, the more permanent fix of a legislative amendment is unlikely to occur for at least four months, as the 2021 Regular and Special Sessions of the Hawaii Legislature have ended, and the 2022 Regular Session will not begin until January 2022.  *See* Haw. Const. art. III, § 10 ("The legislature shall convene annually in regular session at 10:00 o'clock a.m. on the third Wednesday in January.").  While not certain, it is possible the void can be fixed through official guidance by the Defendant or through a patchwork of county regulations.  But both of those possible fixes require the Defendant to dedicate significant resources to coordinating permitting standards across the counties.[4]  Moreover, the legality of those fixes is not clear, which could generate further litigation.

As to the second type of harm—the drain on police-department resources—the court agrees with the Defendant that removing the 10-day permit

---

[4] The Defendant would have to decide whether the law permits an expiration date for handgun permits, and, if one is selected, whether the Second Amendment is satisfied.  The Defendant would also have to assess how the court's ruling affects permits issued on a previous date, e.g., permits issued three days before the issuance of this order.  It is also likely that if the Defendant's guidance was not promptly issued, the counties would take divergent approaches, and the Defendant would have the additional burden of handling permits issued before and after the guidance.

use period will more likely than not cause an influx of applications for handgun permits. Plaintiffs have consistently asserted that the 10-day period is a substantial obstacle to acquiring a handgun. *See, e.g.*, ECF No. 1 at PageID # 5 ("[T]he applicant has ten days . . . to return to HPD to pick up his or her issued permit to acquire during the aforementioned business hours *and* to pick up the firearm from the store."); ECF No. 78 at PageID # 562 ("The ten-day expiration increases the burden on Plaintiffs and all other law-abiding citizens who wish to exercise their rights to armed self-defense with a handgun inside their home."); *id.* at PageID # 564 ("[Plaintiff] went to the gun shop to complete paperwork, but the shop was closed and the sign on the door stated it would be closed through January 9, 2019. This exceeded the 10-day expiration date on the permit to acquire."); ECF No. 95-1 at PageID # 933 ("The ten-day expiration date of a handgun permit forces Plaintiffs to take an additional day off in quick succession to use it or lose it."). The court thus finds that, if that obstacle were removed, there will likely be a significant increase in the number of applications for handgun permits. That influx of applications could strain the finite resources of the county police departments, which will already be handling the uncertainty associated with permit expiration.[5]

---

[5] Plaintiffs argue that the police departments, once freed of the burden of administering in-person inspections and registrations, will have plenty of resources to dedicate to the influx of permit applications. ECF No. 114-1 at PageID # 1065. Plaintiffs fail to realize that the Defendant and the county police departments may continue to provide in-person registration, and that citizens may choose to register in-person rather than through some other medium. Also,

(continued . . . )

As to the third type of harm—increase in the possession of handguns by unfit individuals—the court disagrees with Defendant.  The Defendant argues that the court's injunction will "encourage more people to apply for permits and registrations," and that, "[a]s a result, people will be acquiring and registering firearms who would not ordinarily be able to do so under the prior regulations," "result[ing] in an increased threat to public safety."  ECF No. 113-1 at PageID ## 1033–34.  But, as the Plaintiffs correctly respond, an increase in gun ownership is a Second Amendment right, and any increase would be tied to the removal of an unconstitutional restriction on Second Amendment rights.  *See* ECF No. 114-1 at PageID # 1064 ("[Defendant's] statement is shocking because we are dealing with an enumerated fundamental right."); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010) (stating that the Second Amendment is not "a second-class right").  Moreover, it is speculative that gun possession by unfit individuals will increase simply because gun ownership will increase.  The police departments will still be conducting thorough investigations of applicants' mental health histories, *see* HRS § 134-2(b) and (c), and applicants' criminal histories, *see* HRS § 134-2(e).

---

regardless of the medium used, police departments still must process registrations, and registrations will logically increase with an influx of applications.

In sum, removing the 10-day permit use period leaves a void in the permitting statute, and there is no clear answer as to how the Defendant can accomplish meaningful, orderly enforcement of the statute within a short period of time.[6] The resulting uncertainty and the drain on Defendant's resources constitute significant, irreparable harms that the court finds are likely to occur during Defendant's appeal.  Finally, the court finds that the Defendant is likely to suffer at least a minor degree of irreparable harm due to the strain on law enforcement resources and due to the mere fact that a Hawaii statute is being enjoined.  The second factor weighs strongly in Defendant's favor.

      *c.*     *Balance of the Equities*

As discussed above, the Defendant is likely to suffer irreparable harm absent a stay of the court's order enjoining enforcement of the 10-day permit use period.  But if the stay is granted, Plaintiffs will be injured—the deprivation of a constitutional right is itself an irreparable harm.  *See Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir.1984) ("An alleged constitutional

---

[6] When analyzing the severability of the 10-day period, *see supra* Part IV.A.1, the court concluded that Defendant is not incapable of fairly enforcing the remainder of HRS § 134-2. The crucial distinction for the stay analysis is that, although Defendant can eventually sort out § 134-2, its very unlikely Defendant can do so in a short period of time.  During the intervening period, orderly enforcement is unlikely, and Defendant is likely to suffer irreparable injury as a result.

infringement will often alone constitute irreparable harm." (citing Wright & Miller, 11 *Federal Practice and Procedure* § 2948 at 440 (1973))).

The court finds that the sum of Defendant's harms—legal uncertainty, drain on resources, and restriction of a duly enacted statute—is roughly equal to the sum of Plaintiffs' harms, which includes taking time off work, making multiple visits to the Honolulu Police Department and gun stores, and the deprivation of a fundamental constitutional right. *See Silvester v. Harris*, 2014 WL 6611592, at *4 (E.D. Cal. Nov. 20, 2014) (declining to stay injunction against unconstitutional 10-day waiting-period law because the law "caused additional expense and inconvenience, and . . . caused individuals to forego exercising their Second Amendment rights," and noting that the "deprivation of constitutional rights, for even minimal periods of time, unquestionably constitutes irreparable injury").

Although the court previously held that Plaintiffs' rights were "not severely burden[ed]," the court analyzed the Plaintiffs' burdens for the purposes of selecting a level of scrutiny. *See Yukutake*, 2021 WL 3625307, at *11. But for the balance of the equities, the court cannot focus on the burdens while ignoring that there is persistent deprivation of constitutional rights. *See Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) ("Here, the [district court] judge zeroed in on the occasional expense and inconvenience of having to travel to a firing range in the suburbs, but that's not the relevant constitutional harm. . . . [The firing-range ban]

26

violates [appellants'] Second Amendment rights every day it remains on the books. These are not application-specific harms calling for individual remedies.").

The court also finds that the likelihood of Defendant's harms is roughly equal to the likelihood of Plaintiffs' harms. Plaintiffs have already experienced the inconveniences associated with 10-day permit use period. And one of the Plaintiffs alleges that he is a "firearms instructor" that "routinely must take time off work to purchase and register handguns." ECF No. 78 at PageID # 567. Moreover, if a stay is granted, Plaintiffs will experience a deprivation of constitutional rights "every day." *See Ezell*, 651 F.3d at 698. The court thus finds it likely that Plaintiffs will suffer substantial injury if a stay is granted.

After weighing the relative degree and likelihood the parties' harms, the court finds that the equities in favor of granting the stay are roughly equal to those in favor of denying the stay. This factor is neutral.

### d.    Public Interest

The public interest weighs slightly in favor of granting the stay. If the stay is denied and the 10-day permit use period is not enforced for the duration of Defendant's appeal, Hawaii's citizens will be harmed by the lack of clarity as to the permitting process. *See id.* On the other hand, if the stay is granted and the 10-day permit use period is enforced, Hawaii's citizens will experience continued infringement of their Second Amendment rights. *See Preminger v. Principi*, 422

27

F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.").

Importantly, the other harms that are likely to occur to Defendant if the stay is denied—namely, legal uncertainty, drain on resources, and restriction of a duly enacted statute—also affect Hawaii's citizenry, albeit indirectly. Those harms undermine the Defendant's ability to operate the firearm permitting and registration system. The public has a strong interest in the stable administration of a public-safety program, such as a firearm permitting and registration system. *See Doe #1*, 957 F.3d at 1068 ("In this case, the public interest lies with maintaining the status quo while the appeal is pending. For countless decades, a stable immigration system has provided for families to be united through a visa system . . . .").

The public interest thus favors Defendant. Because the first two factors strongly favor the Defendant, the fourth factor also favors Defendant, and the third factor is neutral, the Defendant has satisfied her burden of showing that the circumstances of this case justify a stay of the court's order enjoining enforcement of the 10-day permit use period. Defendant's Motion for Stay Pending Appeal is GRANTED with respect to the court's injunction against enforcement of the 10-day permit use period.

2.  ***The Injunction Concerning the In-Person Inspection and Registration Requirement Is Not Stayed Pending Appeal.***

  a.   *Likelihood of Success on the Merits*

Defendant contends that she is likely to succeed on the merits before the Ninth Circuit.  ECF No. 113-1 at PageID # 1030.  Again, Defendant submits many of the same arguments she submitted in support of her Counter Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.  *Compare id.* at PageID ## 1030–32, *with* ECF No. 91-1 at PageID ## 712–19.  As for the arguments concerning the in-person inspection and registration requirement, the court continues to find those arguments unpersuasive.  *See Yukutake*, 2021 WL 3625307, at *9–12.

The court recognizes that assessing the constitutionality of the in-person inspection and registration requirement involves difficult questions concerning the relationship between a statutory provision and public safety.  In holding that requirement unconstitutional, the court ruled against the Defendant principally because she failed to provide any evidence or meaningful explanation as to how the in-person requirement promotes public safety.  *See id.* at *10–12 (describing the Defendant's showing as being grounded on a "bald statement" of purpose in the legislative history and on "common-sense conclusions" based on hypothetical "conjecture").  Despite those deficiencies, it is not inconceivable that the Ninth Circuit would disagree with this court.

29

Ultimately, however, the prospects of Defendant's appeal regarding the in-person requirement are diminished by *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller IV*"), a decision in a factually similar case that provides strong support for this court's ruling.  In *Heller IV*, the D.C. Circuit held unconstitutional the District of Columbia's statutory "requirement that the firearm be made available for inspection."  801 F.3d at 277.  Like the Defendant in this case, the District "offered no evidence—let alone substantial evidence—from which it can be inferred that verification will promote public safety."  *Id.*  And, like this court, the D.C. Circuit found that the asserted "common-sense inference" that in-person inspection increases public safety was not so common or sensible:  "On the contrary, common sense suggests that bringing firearms to the [police department] would more likely be a threat to public safety; as [appellant] maintains, there is a 'risk that the gun may be stolen en route or that the would-be registrant may be arrested or even shot by a police officer seeing a 'man with a gun' (or a gun case).'"  *Id.*

There is thus a highly persuasive decision on the books from a sister Court of Appeals, and that decision supports the court's ruling on the in-person inspection and registration requirement.  On balance, and giving consideration to the D.C. Circuit's decision in *Heller IV*, the court finds that the Defendant's appeal does not have a reasonable probability of success with respect to the in-person

inspection and registration requirement. The first factor is not in the Defendant's favor.

### b.    Irreparable Injury

For the irreparable-injury factor, the Defendant continues to assert that a "state suffers irreparable injury whenever an enactment of its people or representative is enjoined." ECF No. 113-1 at PageID ## 1032–33 (quoting *Wilson*, 122 F.3d at 719). The court recognizes that Defendant is harmed by the injunction against a portion of the Hawaii firearm statute, but the court declines to treat that harm as sufficient, by itself, to satisfy the showing required for the irreparable-injury factor.

Unlike with the 10-day permit use period, invalidating the in-person inspection and registration requirement will not cause legal uncertainty. That is because removing the in-person requirement from HRS § 134-3 does not leave a void in the statute. *See* discussion *supra* Part IV.A.2. Because in-person registrations can still occur, Defendant will not have to dedicate significant resources to reorganizing the registration process. At worst, Defendant and the county police departments will need to decide whether they will implement registration by means other than visiting the police station. That is a negligible harm.

31

Defendant identifies three other harms that will flow from enjoining the in-person inspection and registration requirement for the duration of the appeal: First, Defendant will be harmed because applicants will be "acquiring firearms even though the information their permits were based on is inaccurate." ECF No. 113-1 at PageID # 1034. Second, Defendant will be harmed because applicants will be "registering firearms with inaccurate serial numbers or other identifying information." *Id.* And third, Defendant will be harmed because applicants will be "registering firearms that violate Hawaii law, such as by having barrel lengths that are too short, that constitute assault pistols, or that have illegal accessories, such as bump fire stocks." *Id.*

Contrary to Defendant's suggestion, those three harms are not likely to occur. As to the first and second types of harm—errors in permit data and gun-tracking data—the court finds those alleged harms to be speculative at best and, in any event, obviated by other requirements in Hawaii's firearm statutes.

When applying for a handgun permit, applicants must provide the police department with the handgun's identifying information—its make, model, and serial number. *See* HRS § 134-2(e). Applicants must also provide personally identifying information. *Id.* After the permit issues, the applicant visits the seller to acquire the handgun, and the applicant surrenders the permit to the seller. HRS § 134-2(f). The seller then verifies the handgun's identifying information, verifies

the applicant's identifying information, writes that information on the permit, signs the permit, and delivers it to the police department.  *Id.*  Finally, the applicant must register the firearm using "forms prescribed by the attorney general," which must include the handgun's identifying information.  HRS § 134-3(b).  Presumably, those forms also include the applicant's identifying information. *See id.*

Thus, even without in-person inspection and registration, there are three separate sources of information that police departments can use to verify the identity of an applicant and the identity of that applicant's handgun: the information on the permit application, the information on the permit delivered by the seller, and the information on the applicant's registration form.  With those three sources of information in hand, it is very unlikely that police departments will overlook permitting errors and registration errors for handguns.  To suggest otherwise is simply speculation.

The permitting and registration process for long guns (i.e., rifles and shotguns) is slightly different, but that process still provides meaningful checks on erroneous permit data and gun-tracking data.  The applicant does not have to provide the long gun's identifying information when applying for a permit. *See* HRS § 134-2(b).  But whenever the applicant acquires a long gun with that permit, the seller must verify the long gun's identifying information, verify the applicant's identifying information, and send that information, in writing, to the police

department.  HRS § 134-2(f).  As with handguns, an applicant acquiring a long gun must register that long gun using "forms prescribed by the attorney general," which must include the long gun's identifying information.  *See* HRS § 134-3(b). Presumably, those forms also include the applicant's identifying information.  *See id.*

Thus, even without in-person inspection and registration, there are two sources of information that police departments can use to verify the identity of an applicant and the identity of that applicant's long gun: the information delivered by the seller and the information on the applicant's registration form.  Those two sources of information make it unlikely that permitting errors and registration errors will occur for long guns.

The third alleged harm is the increased registration of illegal firearms. The court recognizes it is at least possible that two individuals could conspire to give the authorities false information about a firearm being sold or transferred, and that the sale or transfer could be validated when it might otherwise be thwarted by an inspection.  But that is not likely to occur—Hawaii's firearm statutes have legal safeguards against such malfeasance.  First, as described above, for sales of both long guns and handguns, the seller must deliver firearm identifying information to the police department after a sale has occurred.  HRS § 134-2(f).  The seller must also include in that delivery his or her identity.  *Id.*  That transparency and

34

accountability measure puts pressure on the seller to be truthful and to not sell illegal firearms—if the illegal firearm is later discovered, the seller could be within the scope of a criminal investigation.

Second, regarding illegal accessories, such as bump stocks and barrel modifications, the Defendant has the authority to cut off the upstream supply of those accessories.  Defendant can vigorously enforce HRS § 134-8.5(a), which makes it a felony to manufacture, import, sell, or offer for sale any "bump fire stock, multiburst trigger activator, or trigger crank."  Defendant can also vigorously enforce HRS § 134-8, which makes it a felony to manufacture, sell, or transfer "assault pistols," "automatic firearms," "silencers," and long guns with certain barrel lengths, among other things.

Third, assuming that a substantial portion of firearm sales occur through licensed dealers, *see* HRS § 134-31, the Defendant can reduce sales of illegal firearms by regulating licensed dealers using HRS § 134-32.  That statute conditions licensing on the dealer's compliance with all applicable firearm laws, which provides a motivating force against illegal sales.  *See* HRS § 134-32(1) and (5).  Further, Defendant can supervise the licensed dealers by periodically inspecting their inventory for illegal firearms.  *See* HRS § 134-32(4) ("[A]ll firearms in the possession and control of the licensee or registered . . . shall be

subject to physical inspection by the chief of police of each county during normal business hours at the licensee's place of business.").

In sum, the court finds that the three types of harm identified by Defendant are unlikely to occur during the Defendant's appeal. If the stay is denied as to the in-person requirement, and the Defendant is enjoined from enforcing that requirement, the only injuries that Defendant is likely to suffer are a negligible sink in resources and the abstract harm of enjoining a state statute. The court holds that those harms are insufficient for purposes of the irreparable-injury factor. That factor is not, therefore, in Defendant's favor.

Because the Defendant has made a weak showing on the first two factors, the third and fourth factors are irrelevant. *See Al Otro Lado*, 952 F.3d at 1007. The Defendant has *not* satisfied her burden of showing that the circumstances of this case justify a stay of the court's order enjoining enforcement of the in-person inspection and registration requirement. Defendant's Motion for Stay Pending Appeal is DENIED with respect to the court's injunction against enforcement of the in-person inspection and registration requirement. For the same reasons the court has denied that stay, the court also denies the Defendant's request for an administrative stay. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in

36

every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

## V. <u>CONCLUSION</u>

The 10-day permit use period and the in-person inspection and registration requirement are severed from their respective statutes and invalidated. The Defendant is enjoined from enforcing those provisions.  Defendant's Motion for Stay Pending Appeal is GRANTED with respect to the court's injunction against enforcement of the 10-day permit use period in HRS § 134-2(e). But Defendant's Motion for Stay Pending Appeal is DENIED with respect to the court's injunction against enforcement of the in-person inspection and registration requirement in HRS § 134-3(c).  The clerk of court is directed to enter Judgment in favor of Plaintiffs and close the case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 23, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Yukutake v. Connors*, Civ. No. 19-00578 JMS-RT, Order (1) Clarifying Remedies; and (2) Granting in Part and Denying in Part Defendant's Motion for Stay Pending Appeal, ECF No. 113