```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3
     TODD YUKUTAKE and           )  CIVIL NO. 19-00578JMS-RT
 4   DAVID KIKUKAWA,             )
                                 )  Honolulu, Hawaii
 5            Plaintiffs,        )  June 28, 2021
                                 )
 6        vs.                    )
                                 )  [54] PLAINTIFFS' MOTION FOR
 7   CLARE E. CONNORS, in her    )   SUMMARY JUDGMENT
     Official Capacity as the    )  [60] DEFENDANT CLARE E.
 8   Attorney General of the     )   CONNORS, IN H ER OFFICIAL
     State of Hawaii,            )   CAPACITY AS THE ATTORNEY
 9                               )   GENERAL OF THE STATE OF
              Defendant.         )   HAWAII'S COUNTER MOTION FOR
10   _____)   SUMMARY JUDGMENT

11
                     TRANSCRIPT OF PROCEEDINGS
12           BEFORE THE HONORABLE J. MICHAEL SEABRIGHT,
                CHIEF UNITED STATES DISTRICT JUDGE
13
     APPEARANCES:
14
      For the Plaintiffs:       ALAN ALEXANDER BECK, ESQ.
15                              (By video teleconference)
                                Law Office of Alan Beck
16                              2692 Harcourt Drive
                                San Diego, California  92123
17

18    For the Defendant:        KENDALL J. MOSER, ESQ.
                                Department of the Attorney General,
19                               State of Hawaii
                                425 Queen Street
20                              Honolulu, Hawaii   96813

21
      Official Court            Cynthia Fazio, RMR, CRR, CRC
22    Reporter:                 United States District Court
                                300 Ala Moana Blvd., C-270
23                              Honolulu, Hawaii  96850

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

```
 1   MONDAY, JUNE 28, 2021                        10:02 A.M.
 2            THE COURTROOM MANAGER:  Civil Number 19-00578JMS-RT,
 3   Todd Yukutake and David Kikukawa versus Clare E. Connors, in
 4   her official capacity as the Attorney General of the State of
 5   Hawaii.
 6            This case has been called for a hearing on Plaintiffs'
 7   Motion for Summary Judgment and Defendant's Countermotion for
 8   Summary Judgment.
 9            Counsel, please make your appearances for the record.
10            MR. BECK:  Alan Beck for the plaintiffs.
11            THE COURT:  Yes, good morning, Mr. Beck.
12            MR. BECK:  Morning, Your Honor.
13            MR. MOSER:  Good morning, Your Honor.  Kendall Moser
14   for defendant Clare Connors.
15            THE COURT:  All right.  Thank you.
16            All right.  Well, I think the motion, although we have
17   cross-motions, Mr. Beck filed first.  So I think he should as
18   plaintiff probably argue first as well.
19            So, let me just say a few things.  I'm going to sort
20   of frame a little bit of the argument here.  And certainly I'll
21   let you make your arguments.  But there's one area I think I'm
22   pretty unmovable on given what I've looked at and I really
23   don't think argument will help, and that is if we get past the
24   sort of longstanding history, the historical record and get to
25   a level of scrutiny, I'm convinced this is intermediate
```

1    scrutiny, not strict scrutiny.  And so I really don't want

2    argument on that because it's just not necessary.

3           So I want both sides to limit your comments to

4    application note and intermediate scrutiny test.  I understand

5    you argue otherwise, Mr. Beck, but I just don't see that.  And

6    so I don't need argument on that.

7           Okay.  So with that, Mr. Beck, I'll turn it over to

8    you.

9           MR. BECK:  Yes, thank you, Your Honor.

10          Morning, Your Honor.  Today we're here on behalf of my

11   plaintiffs, my clients' challenge to the HRS 134-2 and HRS

12   134-3's provisions that a long arm -- that a handgun permit

13   expires after ten days.  Whereas, a long arm permit lasts for

14   one year.  And the requirement that a applicant for a firearm

15   take the firearm to the police station.

16          I will begin with the ten-day expiration date, Your

17   Honor.

18          Here the statute is not longstanding.  And we know

19   this because in *Young v. State of Hawaii*, the court recently

20   said very explicitly, as I stated in my briefing, that we're

21   not going to look to 20th century laws to see whether a

22   provision is longstanding because it doesn't give any

23   illumination to the original public meaning of the Second

24   Amendment.  So if you take that snippet from the en banc panel,

25   that what this -- what the current precedent requires in this

1   circuit is for this Court to look at what was longstanding,

2   what was prohibited at the time of the ratification of the

3   second amendment.

4           And other precedent supports this.  Here I'll start

5   with the out-of-circuit precedent that's been relied upon by

6   the State.  They've cited to both the Fifth Circuit and the

7   D.C. Circuit.  And a closer examination of both those cases,

8   appeals demonstrate that those opinions actually support a

9   application of looking to colonial law to see whether something

10  is longstanding.

11          In the D.C. court, the -- they found there was a --

12  that here the only reason they would find that the registration

13  laws were longstanding was simply because the laws at issue, as

14  I explain in my briefing, were de minimis.  And in the Fifth

15  Circuit they expressly looked to colonial laws to find that

16  prohibitions on 18 through 20-year-olds were around at the time

17  of the ratification of the Second Amendment.

18          So, the State simply has not cited to any precedent.

19          THE COURT:  What's your -- what's your view on the

20  amicus brief, what's laid out by Everytown in their amicus

21  brief?  Because obviously they do go back to that time period,

22  but you're arguing that should be examined.  So what's your

23  view on that?

24          MR. BECK:  Yes, Your Honor.  The amicus brief about

25  Everytown does not support the proposition that every firearm

1   could be registered or inspected at 1791.  This is -- maybe a

2   closer analogy is the bottom of the military or maybe -- and

3   also the reserve post.  If -- at 1791 there were militia laws

4   in place that required that all able-bodied men go to muster in

5   order to show that they were, you know, able to effectively

6   defend the community.  And all the colonies, I believe, have

7   that.  And so every single statute that's been cited to in the

8   amicus brief of Everytown are statutes that say, look, the

9   firearm that you bring to formation in order to satisfy your

10  duty as a member of the militia, we get a chance to look at it

11  simply because this is a firearm that, you know, we're going to

12  use in this military setting.  And there were no laws, not a

13  single law that Everytown cited to goes to the proposition that

14  you could look at -- that the government could go into your

15  home and look at your additional firearms.

16         THE COURT:  Okay.  Let me interrupt.  I mean I

17  understand that.  So let's move to the intermediate scrutiny

18  now.  Like I say, I don't want you to argue strict scrutiny

19  because I just am not going to find that applies, if I get to

20  this point.

21         MR. BECK:  Yes, Your Honor.

22         THE COURT:  So we have this ten-day period.  You spend

23  a fair amount of time talking about under inclusiveness and

24  comparing it to the ten-day period with handguns to the sort of

25  one-year period for long guns under inclusiveness.  But under

1   the intermediate scrutiny test, we don't have to have the least

2   restrictive law possible.  And in the *Pena* case the Ninth

3   Circuit sort of swatted away an argument under inclusiveness.

4       So I guess I'm trying to understand what law would be

5   acceptable in your view?  You know, when is it not a burden?

6   Would a 30-day period be such that it would pass muster, would

7   a 60-day, 90-day?  I mean what's your view on what -- I mean

8   obviously a permit can't last a lifetime.  So there has to be

9   some line that can be drawn that's reasonable, right?

10      MR. BECK:  Just to my application under intermediate

11  scrutiny, Your Honor.

12      THE COURT:  Yes.

13      MR. BECK:  Yes.  I -- look, the core argument that my

14  clients and -- have is they have to take a considerable amount

15  of time off work in a relatively short period of time to the

16  point that it becomes a huge burden for them to repeatedly tell

17  their employers that they need to take time off in -- during

18  that period.

19      I don't -- I'm not -- I can't commit to a exact time

20  frame, but for the purposes of this challenge under

21  intermediate scrutiny it would be enough time where it's -- you

22  know, whether -- where it's -- it would be convenient for them,

23  just somebody, okay, I'm taking one day off today, you know.

24  Say couple months, you know, I take another day off.

25      You know, it's -- here the substantial burden is the

1   fact that, you know, this is really interfering with your

2   day-to-day lives in order to exercise an inalienable right.  So

3   it's -- I mean I don't think that same burden would come into

4   place with the year, you know.  I don't -- I'd be sort of

5   uncomfortable saying 30 to 60.  But certainly the year doesn't

6   have the same impediment on their -- just their ability to take

7   time off so they can --

8           THE COURT:  So you -- you accept that a time period is

9   legitimate, it's just the ten-day period is too short; is that

10  fair?

11          MR. BECK:  What I will say is that the crux of my

12  clients' challenge --

13          THE COURT:  That's not my question though.  No, I want

14  you to answer my question, not what -- I don't want you to say

15  what you want to say, I want you to answer my question.

16          MR. BECK:  I -- I will accept that -- that a certain

17  amount of time for a permit is acceptable under intermediate

18  scrutiny.

19          THE COURT:  All right.  Okay.  That's all.  And you're

20  just saying given the mechanisms by which you go about getting

21  the firearm, you know, you have to first go purchase it, but

22  you don't get it, then you fill out the paperwork, you submit

23  that and then you have only that ten-day period to get back to

24  the station.

25          MR. BECK:  Yes, Your Honor.  I mean taken in total

1    together, I mean this is a five-day -- this is a five-step

2    process that has to be done just in a matter of weeks.

3         THE COURT:  Walk me through that five-step process.

4    Let's make sure we're on the same page with that process.  I'll

5    let Mr. Moser comment on this.  But no one lays that out in

6    like a bullet point, so I think it would be useful actually to

7    hear that five-step process.

8         MR. BECK:  Okay.  Let's -- first off let's assume that

9    this is their second gun.  So they've gone through, you know,

10   just all the normal stuff that you have to do for somebody to

11   purchase a gun.  So, we're on the second gun here because both

12   of my clients are --

13        THE COURT:  Well, okay, let me back up.  I mean are

14   you making just an as-applied challenge here?  That's what it

15   sounds like you're saying.

16        MR. BECK:  No, we're making both a facial and

17   as-applied challenge, Your Honor.

18        THE COURT:  All right.  Okay.  Go ahead.  So let's

19   just talk about generically.  I don't want to talk about your

20   clients.  Let's just talk generically if you buy a handgun.

21   What is the process?

22        MR. BECK:  Okay.  First you have to take the state

23   mandated handgun course.  After you've satisfied those

24   requirements, you have to go to the gun store and basically

25   pick out your gun.  After that you go to the station and you

1    fill out a -- the application.  Then --

2          THE COURT:  Let me stop you.  And that has to be at

3    the station?

4          MR. BECK:  Yes, Your Honor.  And after that, you wait

5    14 days.  And assuming that everything's okay after the 14-day

6    waiting period, you come back to pick up the -- the permit and

7    then you take the permit and go back -- you know, you go to the

8    gun store.  In the case of a handgun, you get ten days to use

9    it --

10         THE COURT:  Okay, wait, wait.  Stop, stop, stop.  I

11    thought the permit was being e-mailed now?

12         MR. BECK:  That has not been implemented yet, Your

13    Honor.  We're not sure when that will be.

14         THE COURT:  Okay.  All right.

15         MR. BECK:  And then you pick up the permit, go to the

16    gun store, and then finally you go to the -- back to HPD for

17    the -- for the -- to register the firearm.

18         THE COURT:  And that requires the physical inspection?

19         MR. BECK:  Yes, Your Honor.

20         THE COURT:  Okay.  So, you're saying first you have to

21    have a safety course.  You go to the gun store and purchase or

22    put a downpayment, whatever it is, on a firearm, you don't pick

23    it up, but you get all of the relevant information, the serial

24    number, the make, model, et cetera, the information you need.

25    You then fill out an application for a permit at the police

1    station.  And for handguns each gun is a separate permit, as I

2    understand it, there's not a permit for several firearms, it's

3    individual.

4              Then HPD, or if it's HPD, whatever police department

5    it is, will do the background check, the relevant background

6    check.  There is a 14-day waiting period which allows that to

7    happen, perhaps a cooling off period.  And then you're notified

8    and you get the permit.  Right now it's in person, but you're

9    saying maybe in the future it will be by e-mail, that's still

10   to be worked out.  You then go to the gun store, back to the

11   store, get the firearm.  And then I think it's five days you

12   have to bring it to the police station for physical inspection.

13   Is -- did I get that right, Mr. Beck, from your perspective?

14             MR. BECK:  You did, Your Honor.  Yes, Your Honor.

15             THE COURT:  Let me turn to Mr. Moser just on that and

16   see if he agrees with that general process.

17             MR. MOSER:  We do agree, Your Honor, yes.

18             THE COURT:  All right.  And what's the status of the

19   e-mail?  Just -- I mean it may not be that relevant to me, but

20   that's being worked on right now?

21             MR. MOSER:  Well, Your Honor, that's the City and

22   County's process.  They said, if I recall correctly, and if I

23   do not, perhaps Mr. Beck knows, that they would have that

24   process available by December 31st of this year.

25             THE COURT:  I see.  Okay.  So it's the plan for the

1   future anyways.

2          MR. MOSER:  That is my understanding, yes, Your Honor.

3          THE COURT:  Okay.  All right.  And you agree that you

4   have to fill out the application at the police station?

5          MR. MOSER:  Yes, Your Honor.

6          THE COURT:  Okay.  All right.  Thank you.  That's

7   useful to have that bullet point sort of understanding.

8          All right.

9          MR. BECK:  Should I continue, Your Honor?

10          THE COURT:  Yes, I'm sorry, go ahead, yes.

11          MR. BECK:  So, the bottom line here is under

12   intermediate scrutiny, that requires the State to present

13   evidence that these are -- satisfy important government

14   interests.  And throughout their briefing there's been legal

15   argument, there hasn't actually been a presentation of evidence

16   that demonstrates the ten-day waiting period actually

17   accomplishes anything.

18          It's -- for example, the State reports, which the

19   State has stipulated are true, shows that not a single handgun

20   permit has been voided for malfeasance.  There have been quite

21   a few where people simply weren't able to pick up which -- in

22   the time, and that's cited to in the brief.  But there's not a

23   single cited example of a person either -- of not being able

24   to -- of having it voided in that time period.

25          And this is the -- both laws at issue and they are

 1    sort of prophylactic on prophylactic reasoning that the laws

 2    that the Supreme Court in -- sorry, *McCutcheon* -- I'm sorry, I

 3    cited that in my briefing.  I'm having a problem pronouncing

 4    it -- but had said needs to be looked at even under --

 5    extremely -- with quite a bit of scrutiny, with a heightened

 6    eye.

 7              Here there just -- there hasn't been any presentation

 8    of evidence --

 9              THE COURT:  All right.  Let me do this, Mr. Beck.  I

10    want to break this argument up into the two -- the two

11    provisions that are being challenged.  And I think I've heard

12    enough from you on the first.  So I want to hear from Mr. Moser

13    on that.  I'll give you a little rebuttal time and then we'll

14    go to the in-person --

15              MR. BECK:  Yes, thank you, Your Honor.

16              THE COURT:  -- inspection.  I think it's best we break

17    it up like that.  So I'm going to go ahead and turn to you,

18    Mr. Moser.

19              MR. MOSER:  Okay.  May I remain here, Your Honor?

20              THE COURT:  It's totally up to you.  With COVID time

21    people are free to sort of wherever you're comfortable.

22              MR. MOSER:  Thank you.  I don't want to talk about

23    things that the judge -- Your Honor doesn't really want to

24    hear.  So I think --

25              THE COURT:  Well, let me say this:  I am having

1    trouble with this historical record.

2         MR. MOSER:  Oh.

3         THE COURT:  You know, I do think *Young* suggests it's

4    not that relevant.  It's not saying it's not -- it's not

5    totally irrelevant.  I mean they didn't go that far, but, you

6    know, *Young* did certainly suggest that it's -- it's less

7    reliable evidence of the original meaning.  And what you have

8    is Hawaii laws from the '30s and a handful of other states that

9    have repealed those laws, I'm not sure of the relevance of

10   that, maybe none, but, you know, only a handful of other

11   states.  So I have to say it's not overwhelming.  I think you

12   probably recognize that, Mr. Moser, as far as the quantum of

13   evidence you presented in that regard.

14        MR. MOSER:  Well, I'd like to begin, Your Honor, by

15   saying -- stating a rebuttal, if you call it that, to something

16   that Mr. Beck said about the *Young versus Hawaii* case.  I think

17   he's, with respect, I think Mr. Beck is overstating that

18   portion of the *Young* hearing.  Yeah, they do say that it's not

19   really that -- how shall I put this most succinctly?

20        *Young* primarily relied on the statute of Northampton

21   from England which was enacted in 1328.  So, I can fully

22   understand the Ninth Circuit saying in passing, Well, we don't

23   really need to look at things that happened only a hundred

24   years ago.

25        THE COURT:  Well, but they also say it's less reliable

 1    as evidence of the original meaning, right?  So they're going

 2    back to, you know, this after-the-fact evidence has to be

 3    evidence that relates back, right?  So I can accept that it may

 4    be relevant.  The Ninth Circuit didn't say you ignore it.

 5            MR. MOSER:  That's true.

 6            THE COURT:  Right?

 7            MR. MOSER:  Yes.

 8            THE COURT:  I'm just saying I don't think you have

 9    enough here to convince me.

10            MR. MOSER:  All right.  Well, the Everytown did submit

11    their amicus brief.

12            THE COURT:  Right.  Right.

13            MR. MOSER:  One can analogize.  And I understand the

14    difference between a militia and a private citizen owning

15    firearms, but one can analogize to -- somewhat to those militia

16    cases -- or, I'm sorry, to the militia laws that existed around

17    the time of the founding that there were registration

18    requirements.  So the concept at least of a registration

19    requirement did not --

20            THE COURT:  Well, Everytown really deals with the

21    physical inspection, right?  I mean that's really what that

22    brief is about, is the physical inspection.

23            When did Hawaii first pass a law requiring physical

24    inspection?  Not what the practice may have been actually, but

25    actually passed a law?  That is the language in 134-3 --

1    there's a subsection here -- (c), as in Charlie, the last

2    paragraph says:  "All other firearms and receivers registered

3    under this section shall be physically inspected by the

4    respective county chief of police or their representative at

5    the time of registration."  Mr. Beck says that's 2020.

6              MR. MOSER:  Yeah, I'm looking, if I might, Your Honor,

7    at the brief we submitted to find out when that law first --

8              THE COURT:  I don't think your brief says it.  I think

9    Mr. Beck's does.  Unless I missed it, Mr. Moser.

10             MR. MOSER:  The statute in 1930 -- during the 1933,

11   1934 special session refers to registration within ten days.  I

12   don't immediately find the inspection --

13             THE COURT:  Right, because that's core of his

14   argument, right, the burden is the having to get whether it be

15   in a car or a bus or whatever it is and get, you know,

16   physically to, in the case of Oahu, HPD.

17             MR. MOSER:  Well --

18             THE COURT:  I mean I can figure that out myself, but

19   he says it's 2020 and -- so the way I looked at it is you were

20   sort of arguing, and tell me if I'm wrong, that the validity of

21   the permit for ten days, that goes back to 1933 and you cited

22   some other courts that had -- I'm sorry, some other states that

23   had similar laws.  You were arguing from that there's a

24   historical record from which I can draw a conclusion.

25             MR. MOSER:  I am and not only --

1          THE COURT:  Let me -- I just want to make sure I

2   understand your argument.  And then for the physical inspection

3   requirement, it's really more Everytown's argument, I think,

4   that takes me back historically.

5          Now, overlaying all of that you talk about generic

6   findings of the legislature about safety of the public and so

7   forth.

8          MR. MOSER:  Yes.

9          THE COURT:  So is that fair as far as what your

10  arguments are?

11         MR. MOSER:  It is, Your Honor.

12         THE COURT:  Okay.  All right.  Okay.

13         MR. MOSER:  I would say that in addition to the

14  cases -- I'm sorry, the states that we cited to that had laws

15  dealing with registration and acquisition in our brief, and

16  those specifically are Massachusetts, Missouri, Arkansas and,

17  -- I'm sorry, I'm blanking on the other one.  But there is in

18  the *Heller* case, which we did cite and I guess we'll call this

19  *Heller 2*, this is the one from 2011 from the district court,

20  they did cite a number of other states which had registration

21  laws.  So I didn't want the Court to -- to think that we could

22  only find four.  We did find four other ones.

23         THE COURT:  Yeah, but I think saying a registration

24  law is just too broad.  I mean it's the -- it's the ten-day,

25  the validity of a permit being ten days that's in challenge

1    here, not the need for a permit is not challenged.

2            MR. MOSER:  Yes, and I will -- I will admit that there

3    are not a plethora of state statutes --

4            THE COURT:  Right.

5            MR. MOSER:  -- from a hundred years ago which talk

6    about -- although we did find one or two, and one was specific

7    and is the same as Hawaii's, you have ten days to acquire.

8            But I have to, I do admit that there are not a lot of

9    other state statutes from that period of time.

10           THE COURT:  Okay.  So let's turn to the intermediate

11   scrutiny then on the ten-day period.

12           MR. MOSER:  Yes.  So --

13           THE COURT:  And help me understand.  First of all,

14   it's true, you present no evidence, right?  You don't present

15   legislative history, you don't present an expert witness,

16   anything, you don't present declaration from a chief of police,

17   you don't present -- I mean it's -- you're asking me to rely on

18   common sense essentially; is that fair?

19           MR. MOSER:  We do cite some statutory history, but,

20   but yes, you're right, we don't have the other categories of

21   evidence.

22           THE COURT:  But again, that's really broad about

23   safety.  There's no legislative history that you cited at least

24   that says this ten-day period is important because here's what

25   can happen outside of ten days, you know, anything of that

1    sort.

2            MR. MOSER:  That's correct.

3            THE COURT:  Right?  It's not your fault, it's just

4    what it is.  Right?

5            MR. MOSER:  Thank you, Your Honor, yes.

6            THE COURT:  And so, the way I read it at least, what

7    you're really arguing is for me to draw sort of common sense

8    reasonable inferences from the law and the overreaching goal of

9    the law to provide safety.

10           MR. MOSER:  Yes.  That -- yes.

11           THE COURT:  Okay.  So let's now bear down on that a

12   little bit and tell me what that common sense -- because I'm

13   not sure I fully understand it, Mr. Moser, the staleness

14   argument that you're making.  So maybe you can help me with

15   that.

16           MR. MOSER:  Well, if we're talking about intermediate

17   scrutiny, Your Honor, I would say this:  HRS 134-2 and -3 do

18   not constitute a ban on the possession of firearms.  Nowhere,

19   speaking of evidence, do the plaintiffs present any evidence or

20   even allege that the provisions at issue prevent them from

21   obtaining firearms.

22           THE COURT:  Right, and that's why I said intermediate

23   scrutiny applies and that's why you argue intermediate scrutiny

24   applies.

25           MR. MOSER:  Because the inconvenience, which they

 1   referred to as inconvenient, very convenient, not very easy,

 2   depends where you look in the brief, inconvenience is not a

 3   substantial burden.  Having to take off -- time off work is not

 4   a substantial burden.

 5        THE COURT:  Right, and that's why I agree with you

 6   intermediate scrutiny applies.  So I'm not sure what your

 7   argument is there.  I mean I'm agreeing with you on that.

 8        MR. MOSER:  All right.  Then I will move on, Your

 9   Honor.

10        Well, going back to the legislative history, in as

11   early as 1919, the -- with regard to permits to acquire, the

12   legislature said that this amendment will enable the police

13   authorities to have a better supervision and check over the

14   sale of firearms.

15        THE COURT:  But again, the ten-day -- that doesn't

16   answer the ten-day period, right?  That's the challenge.

17   There's not a challenge as to registration, as to permit.  It's

18   that it expires in ten days.  You have the 14-day cooling off

19   period, background check period, whatever you want to call it,

20   and then tacked on to that is ten days, after that the permit

21   is invalid and you have to start the process over again.

22        MR. MOSER:  Yes.  Well, the plaintiffs did present to

23   the Court in their moving papers the firearms reports for the

24   last four years, 2020, '19, '18 and '17.  And they said right

25   off the bat that, well, look, last year, for example, 357

1    permits were voided because the people didn't come back to pick

2    them up within the ten days.  And initially that looks kind

3    of -- it looks like a lot.  And then when you look at how many

4    people applied, however, there were 20 -- or how many permits

5    were issued, there were over 26,000.  So when we talk about 357

6    permits being voided for the applicant failing to go back

7    within the ten days to pick up the permit, we're only talking,

8    depending on the year, an average of 2 percent.  The lowest

9    that they cited was 1.4 percent, the highest as I recall off

10   the top of my head was two point --

11          THE COURT:  And what do I do with that evidence?  What

12   does that mean as far as application of intermediate scrutiny?

13          MR. MOSER:  Well, what that means is that it is not a

14   substantial burden.  98 percent of the Hawaii applicants are

15   able to go down to HPD or whichever county they live in and

16   applied to --

17          THE COURT:  Wait a minute, are you arguing that no

18   scrutiny applies at all now?  Are you making a different

19   argument?

20          MR. MOSER:  No, I'm not, and I'm sorry if I'm --

21          THE COURT:  So I don't understand what the substantial

22   burden argument is.  I mean the intermediate scrutiny test is

23   that the statutory objective must be significant, substantial

24   or important, and there's a reasonable fit between the law and

25   that objective.  So I'm just asking where does this 2 percent

1    figure, how does that play into this intermediate scrutiny

2    test?

3              MR. MOSER:  Well --

4              THE COURT:  See, here's what I'm having trouble with,

5    let me just lay it out for you, okay, which is -- and I don't

6    have the exact language you had in your brief in front of me

7    here.  Let me see if I can find it.

8              So, the State interest, you say at least in part,

9    right, is to make sure the information is not stale on the

10   permit, right?

11             MR. MOSER:  Yes.

12             THE COURT:  And that somebody could become

13   disqualified, therefore we have a short period that the permit

14   is valid.  Do I have that essentially right?

15             MR. MOSER:  Yes, Your Honor.

16             THE COURT:  But aren't you by having a ten-day -- I

17   mean it just seems to me by having a 10-day period you're just

18   forcing people into getting that gun sooner and then you could

19   have somebody -- so let's say you have a -- normally we have a

20   90-day period in which a permit is valid, right?

21             MR. MOSER:  Yes.

22             THE COURT:  And is one option.  Right now the law says

23   ten.

24             MR. MOSER:  Yes.

25             THE COURT:  And let's say they -- you know, 30,

1   somewhere in between those, somebody becomes disqualified for

2   some reason, whatever that reason is.  It just seems to me more

3   people are going to have guns who are disqualified under the

4   ten-day permit period because you're forcing people to get the

5   guns within ten days and they've become disqualified

6   afterwards, they have the gun.  And that certainly isn't a

7   substantial interest for the State nor a good fit.

8          So I just have trouble understanding the staleness

9   argument other than it's just a statement but without any sort

10  of support in reality.  It sort of seems a little untethered to

11  in real life it seems to me.

12         MR. MOSER:  Well, Your Honor, I'm sorry, I don't know

13  what I can add to what we've submitted in writing.

14         THE COURT:  Okay.  So, is there -- the other thing in

15  my mind I'm kicking around, and this may or may not apply to

16  one or both of these, is if I do grant the motion at all,

17  Mr. Moser, do you have a view on what I should do, if anything,

18  regarding the timing, the effectiveness of that order?  In

19  other words, I don't want to throw a whole system into

20  disarray.  If I were to say, for instance, there is no

21  sufficient fit that has been described for this ten-day period,

22  it would be up to the legislature to fix that, however they see

23  fit, right?

24         MR. MOSER:  And we would hope that they would do so,

25  although as I think Your Honor will recall in some other Second

```
 1   Amendment cases that Mr. Beck and I have worked on, that
 2   sometimes we get rulings and then we go to the legislature and
 3   submit bills to -- to make the statute in conformity with the
 4   Court's rulings and, you know, we can only do what we in the
 5   executive branch --
 6           THE COURT:  Well, I understand that and I think you're
 7   talking about the issue of the, like, green card holders and --
 8           MR. MOSER:  And the national -- the U.S. national --
 9           THE COURT:  U.S. nationals in American Samoa, right.
10   But I guess I'm just saying in the normal course the way this
11   would work is if I were to strike down the ten-day period,
12   would you be asking for a stay?  I mean what -- how would you
13   see us proceeding?
14           MR. MOSER:  Yes, I -- since Your Honor asked, I
15   believe that is what our office would do is we would ask for a
16   stay and then --
17           THE COURT:  So I mean maybe the conservative course
18   for me, I can hear from you on this, Mr. Beck, maybe the
19   conservative course is I could put out a ruling, not make it
20   effective immediately but ask for briefing on the stay issue is
21   one thing I could do if I grant on this -- on this ten-day
22   period.
23           MR. BECK:  Do you want me to respond, Your Honor?
24           THE COURT:  Yeah, yeah, go ahead.  Go ahead.
25           MR. BECK:  Sorry.  Sorry.  So I'd direct the Court to
```

1   *Moore v. Madigan*, which is a Seventh Circuit case that -- where

2   there was a complete ban on handgun carrying and the Seventh

3   Circuit struck that as unconstitutional.

4          I believe they -- it was at least six months that the

5   legislature was given.  And I don't remember off the top of my

6   head whether the State filed for a stay or whether that was

7   something the court did sua sponte, but I would direct the

8   Court to the Seventh Circuit's opinion in *Moore v.  Madigan* to

9   use as a template for what it could use, assuming that it's

10  amenable to grant this motion.

11         THE COURT:  Okay.  I appreciate that, Mr. Beck.  I'll

12  take a look at that.  And if I need help from you folks in

13  writing on this I'll let you know, if this is where I go.  I

14  can sort of be back in touch with you and ask for more.  And

15  maybe you folks could agree on something, too.  I mean, you

16  know, that's another way to -- to look at this and just see if

17  there's any agreement as to process going forward if I strike

18  down one or both of these provisions.  Okay.

19         MR. BECK:  Yes, Your Honor.  We'd be happy to --

20         THE COURT:  All right.  All right.  What I don't want

21  to do, I'm pretty conservative on this, I don't want to throw a

22  whole registration process into disarray and no one know what

23  to do.  That's what I don't want to have happen if I strike

24  down any of this, Mr. Moser.  And I'm letting you know that,

25  that's not my intent here to do.  Instead -- and I think

1   Mr. Beck probably agrees with this as well, you know, you want

2   an orderly process by which things can be fixed if there's a

3   problem.

4        Now, if the legislature refuses to do it, then that's

5   a whole different matter.  I mean that's sort of on the

6   legislature at that point in time if we get there, but I have

7   no reason to believe they wouldn't do what's appropriate if

8   they understand, you know.  Because the other issue deals with

9   the limited number of people.  This deals with everyone just

10  trying to get a firearm, right, and the registration process.

11  And so you'd think the legislature would want to take a hard

12  look at that and -- and, you know, consult with your office as

13  to what would be constitutional, all those things, right, that

14  should happen.  But I have no interest in throwing a whole

15  system into disarray where no one knows how to then go about a

16  permitting or registration process.

17       MR. MOSER:  I understand, Your Honor.  Thank you.

18       THE COURT:  Okay.  All right.  Let's move on then to

19  the second -- the second part of the challenge, which is the

20  in-person inspection of the firearm.  Mr. Beck, your -- you

21  said that was enacted just in 2020, is that your understanding?

22       MR. BECK:  Yes.  Yes, it is, Your Honor.

23       THE COURT:  And before that the law didn't have

24  that -- the language that I read earlier, it was -- it was --

25  I've not gone back to look as to what the law was before.

1          MR. BECK:  That is correct.  That was enacted by the

2    legislature in 2020.  Prior to that it did not mention that.

3          THE COURT:  And is there no legislative history as to

4    the reason for this?

5          MR. BECK:  Not that I'm aware of.  Perhaps Mr. Moser

6    might be able to comment on that, but I'm aware of.

7          THE COURT:  Mr. Moser, are you aware of any

8    legislative history as to this 2020 change, have you looked?

9          MR. MOSER:  I have looked and I'm not aware of the

10   history, any legislative history on that.  It seems, but I

11   don't want to speculate, that this issue came up in connection

12   with ghost guns, as they're called.  And that the legislature

13   seemed to feel that it was necessary to, since the invention,

14   if you will, of ghost guns that those need to be inspected.  So

15   the language did change.  It was amended in 2020.

16         THE COURT:  Okay.  All right.  But you don't think

17   there's legislative history that says, you know, we have a

18   problem with ghost guns?

19         MR. MOSER:  Not that we found, no, Your Honor.

20         THE COURT:  Okay.  All right.  Okay.  Go ahead,

21   Mr. Beck.

22         MR. BECK:  Yes, Your Honor.  In order to purchase a

23   firearm from a FFL in Hawaii, after you purchase it, the FFL

24   will submit the information to the respective county office,

25   police station.  And if you're doing a person to person -- if

1    me and Mr. Moser are exchanging guns, is what a person to

2    person is -- then both parties have to submit the information

3    to HPD.  So, in order to sell -- I'm aware that the State takes

4    the position that we need this in-person registration to -- in

5    order to verify that a mistake has been made, but that's just

6    -- again, under intermediate scrutiny there has to be

7    substantial evidence.  There's absolutely no evidence of that.

8    And in every state in the union FFL's who are under pretty

9    strenuous requirements by the ATF are able to successfully, you

10   know, do this.  And it's something that isn't an issue.

11          And again, you'd have to expect that both people --

12   and person-to-person transfers are the -- I don't know how much

13   that is exactly in Hawaii but just as a general rule is, you

14   know, for a very small portion, you still would have to believe

15   that both parties are given that information.  That's just

16   something that isn't the case.  I mean -- and if it had been,

17   the State would have been able to produce some type of

18   evidence.

19          And, you know, I don't want to rehash too much what's

20   already in the briefing, but, you know, the D.C. Court of

21   Appeals has already looked at this exact same thing and just

22   found it's not an issue under intermediate scrutiny, which is

23   what the court applied in *Heller*.  So --

24          THE COURT:  So I think, you know, Mr. Moser is, as he

25   sort of admitted, you know, in part relying on just sort of

1   asking me to draw some common sense conclusions.  And there is

2   some law, I'm not sure in the Ninth Circuit but other circuits,

3   that say intermediate scrutiny you can at some level look at

4   common sense.  And that does ring true.  I mean you could have

5   a very common sense gun law.

6         Let me just give you an example.  Firearms need to

7   have serial numbers, for instance.  And, you know, I don't know

8   if anyone has challenged that or not, I don't remember, but

9   just that basic thing that every firearm has to have a serial

10  number, you know, do you need more than just the common sense,

11  Well, that's how we trace crimes in the United States, gun

12  crimes in the United States, by serial numbers, and therefore

13  it's important every gun have a serial number.  And you don't

14  need actual evidence.  You don't need, whether it be, you know,

15  a legislative history, whether it be, you know, a declaration

16  from the chief of police saying there's a problem, whether it

17  be a, you know, expert report or studies, whatever the case may

18  be.  So -- but is -- first of all, do you disagree with that,

19  Mr. Beck, as a general rule as far as how I look at this?

20        MR. BECK:  I do, Your Honor.  I believe the Supreme

21  Court's precedent just within the context of intermediate

22  scrutiny, it's fairly clear the burden is on the State to

23  produce some evidence.

24        THE COURT:  Right.  And that evidence can be common

25  sense, but it's just here you're saying that's not the case.

1   They need to present actual evidence, not just supposition; is

2   that sort of what you're --

3          MR. BECK:  That's correct, Your Honor.

4          THE COURT:  Okay.  All right.  Okay.  I mean that's

5   what I thought your argument was, I just wanted to make sure.

6          All right.  Let me turn to Mr. Moser then on this.

7          MR. MOSER:  Well, I think --

8          THE COURT:  I mean the problem I'm having, Mr. Moser,

9   you know, you didn't present anything from the chief of police,

10  for instance, just even a declaration saying here's the

11  problem.  Right?  You're just asking us, me, to draw sort of a

12  common sense conclusion without actual evidence.

13         MR. MOSER:  Yes, Your Honor, that's correct.  But, you

14  know, I don't think that a declaration -- a declaration could

15  be helpful.  I don't and wouldn't disagree with that, but I

16  think it is certainly common sense.  And we can't -- we can't

17  assume that everyone who wants a firearm is a law-abiding

18  citizen like I understand these two plaintiffs to be.  It sort

19  of ignores reality to think that, oh, someone who gets a gun,

20  so and so is going to provide accurate information to HPD.

21         So I think that the in-person inspection protects

22  public safety by ensuring that, you know, the information is

23  correct.  It's, you know, the right serial number and so forth,

24  that it complies with Hawaii law, that it's not --

25         THE COURT:  Isn't there some case law that says we do

1    assume the buyers are law-abiding?  I thought there was some

2    case law like that?

3              MR. MOSER:  I'm sorry, Your Honor, I'm not --

4              THE COURT:  I can take a look and if I need help I'll

5    let you know.  I may be thinking of something else, but it

6    just -- in the back of my mind, Mr. Moser, I think -- and I

7    don't even know if it was the Ninth Circuit, I just remember

8    reading somewhere that you work under the assumption that you

9    have a law-abiding citizen going through this process.

10             MR. MOSER:  And Your Honor has already mentioned about

11   the need to facilitate tracing by law enforcement.  And we --

12             THE COURT:  But what you don't have is, has there ever

13   been a problem with this, right?  In other words, have serial

14   numbers ever gotten transposed.  I have nothing.  I don't know.

15   And if the answer is no, then your whole argument sort of falls

16   apart.  So that's the problem I'm having.

17             But I'm also wondering if you didn't present enough,

18   and I don't know, to deny both Motions for Summary Judgment,

19   say there has to be a trial on this issue.  But I don't know if

20   there's more evidence you could present if the case went to

21   trial or if what you have is sort of all there is, Mr. Moser.

22             MR. MOSER:  I don't know the answer to that, Your

23   Honor, and I'm embarrassed to say that, but I don't know what

24   declaration we might have gotten from, as you say, Your Honor,

25   the chief of police or somebody within the HPD firearms unit.

```
1    It wouldn't have been impossible to approach them and get
2    something, but of course this is not a as-applied challenge
3    anymore.  It might be --
4              THE COURT:  Well, Mr. -- Mr. Beck says it is an
5    as-applied challenge.  Why don't you address that.
6              MR. MOSER:  With all due respect to Mr. Beck, he's
7    wrong.  It is abundantly clear, if nothing else that I've
8    talked about this morning is clear, one thing that is clear is
9    these are state statutes which very clearly say that it is the
10   chiefs of police who issue the permits to acquire and to whom
11   you -- with whom you register your firearm and have your
12   firearm inspected.  At one time in this litigation these men,
13   these plaintiffs who are from Oahu, sued not only the State
14   through the Attorney General in her official capacity but the
15   City and County as well and chose for whatever reason to settle
16   with them and to dismiss them with prejudice.
17             THE COURT:  "Them" meaning HPD?
18             MR. MOSER:  I'm sorry?
19             THE COURT:  You say "them," you mean HPD?
20             MR. MOSER:  Yes.  I'm sorry.
21             THE COURT:  Yes.
22             MR. MOSER:  And more specifically the City and County
23   of Honolulu.
24             THE COURT:  Or the City and County.  Okay.
25             MR. MOSER:  Yes, Your Honor.  I apologize.
```

1          So again, it's clear that on the face of these

2     statutes that it is the City and County of Honolulu which

3     executes these statutes.  So I don't believe there -- there

4     is -- there can't be an as-applied challenge any longer.  There

5     was a viable one and not one against the State of Hawaii.  It's

6     our statute.  It's a State statute, but it's the City and the

7     County chiefs of police who execute the statutes.

8          THE COURT:  All right.  Well, take your best shot at

9     articulating then the significant, substantial or important

10    objective the government has in the physical inspection and

11    then how that's a reasonable fit.  Go ahead and give me your

12    best shot on that.

13         MR. MOSER:  Okay.  Thank you, Your Honor.

14         Well, the objective which courts have found is --

15    is -- survives a -- an intermediate scrutiny is public safety.

16    And I think the way that it promotes public safety is cited in

17    the legislative history which we have cited in our briefs and

18    as we've discussed a little bit this morning.

19         There was an amendment to HRS 134-2 and -3 in 1990.

20    And the legislative history, which we've attached to our

21    concise statement as Exhibit O, just says in a sentence, this

22    is the Senate Standing Committee Report:  "While your

23    Committee" -- and this was an amendment, proposed amendment to

24    keep firearms away from schools, you know, whatever it was, a

25    hundred yards or 500 feet or whatever it was.

1          And the Senate committee said, quote:  While your
2     Committee strongly agrees that our educational institutions
3     should be places of sanctuary, we believe just as strongly that
4     our entire community should be a safe place to live and learn
5     and that everyone deserves to feel free from the threat of harm
6     wherever they go.

7          And I think we've already discussed and cited in our
8     brief that it's -- it promotes public safety by making sure
9     that the firearm that the person says they have is the firearm
10    that they have, that it's registered to them, that the serial
11    number is correct.  In the unfortunate event that it's used in
12    a crime, then law enforcement can trace it.  And we've cited
13    the case called *U.S. versus Mobley* which talks --

14         THE COURT:  I guess the question I have is, is that
15    enough?  And that's what I'm struggling with on this one.  This
16    is where I'm struggling.  Is that enough without any evidence
17    behind that?  That this is a problem or is it a perceived
18    problem.  And if it's a perceived problem, then I'm not sure
19    you can prevail.

20         MR. MOSER:  And just for clarification, Your Honor,
21    when you say "it" being the problem, what --

22         THE COURT:  The physical inspection.  In other words,
23    the need to match up the firearm with what's on that permit or
24    the registration, right, I guess is what it would be.

25         MR. MOSER:  Well, then I guess that then takes us back

1    to the common sense that we were talking about earlier.

2              THE COURT:  Right.  And then my question becomes, you

3    know, is that enough to get you over the hurdle to get you to

4    trial, just that part of it?  In other words, is there a

5    genuine issue of material fact?  Now, if you say there's no

6    other evidence I would have, then, you know, I don't know why I

7    wouldn't just rule on summary judgment if that's the case.  But

8    if you think there could be other evidence, I'm not sure where

9    I go with that.

10             MR. MOSER:  Well, I -- I think that's all that we can

11   say at this point, Your Honor.

12             THE COURT:  Okay.  All right.

13             MR. MOSER:  What we have is what we've given to the

14   Court.

15             THE COURT:  Okay.  All right.

16             MR. MOSER:  I'm not aware of any other evidence.

17             THE COURT:  And you just don't know if there would be

18   other evidence at this stage?

19             MR. MOSER:  That's correct, Your Honor.

20             THE COURT:  Okay.  All right.  So I'll give you a few

21   minutes for rebuttal, Mr. Beck, and then we'll wrap up here.

22             MR. BECK:  Yes, thank you, Your Honor.  The first

23   thing I would like to rebut is the fact that the -- there could

24   be other people undergoing this process that aren't

25   law-abiding.  You have to go through a 14-day, you know,

1   background check to undergo this process.  We've already

2   covered that, so I don't want to -- but that's pretty

3   comprehensive.  I mean sort of by definition.  By the time you

4   got to this change you are a law-abiding citizen.

5          I don't know off the top of my head, off the top of my

6   head to answer the question that was being asked to Mr. Moser.

7   I think that might be available in *United States v. Chovan*,

8   which is the Ninth Circuit's *Lautenberg* case.  But -- and

9   again, that's off the top of my head regarding whether there's

10  a presumption that people need to be law-abiding.

11         As to the as-applied issue, I think the most striking

12  thing with their argument is they didn't cite to any case law

13  on this that was relevant that I could see.  There's -- a

14  pretty broad law that allows you to sue the -- sue the State

15  for their laws and you're suing based upon that implementation.

16  And I wasn't able -- and, you know, we cited to some law to

17  support our position.  They didn't cite to anything.  And based

18  upon that I think that's a failure -- that's a basis to say

19  that argument has been waived.

20         THE COURT:  Well, you know, I guess I'm -- I'll take a

21  look at this as to whether I think there's an as-applied

22  challenge.  I mean my instinct right now is there's not,

23  Mr. Beck, I'll say that, that makes sense to me at least as

24  opposed to just a facial challenge, but I will take a hard look

25  at that.

1           MR. BECK:  Yes, thank you, Your Honor.  And as to the

2   inspection, I mean this is the number one problem with the

3   common sense issue.  If it's common sense, there needs to be

4   some indication that this is an issue somewhere.  I mean even

5   if you don't need to do a deep dive into -- I mean it would be

6   a problem somewhere else in the country, whether it be just

7   some indication here this being a problem.  That's why common

8   sense can't be applied here because common sense says

9   otherwise.  I mean it's just simply counterintuitive that just

10  based upon what we know of the firearms industry in, you know,

11  every state of the union.  So I mean beyond anything else,

12  that's why because common sense does not say that this is an

13  issue.

14          THE COURT:  Mr. Moser, let me ask you, how do you

15  address that?  I mean if no other state in the country has

16  this, it does sort of cut against the common sense argument,

17  right?  Because you think at least, even putting aside the, you

18  know, territories, I mean you think at least -- and the

19  District of Columbia, you think at least 49 other states, out

20  of them there would be a handful at least that would have this,

21  but apparently there's not.

22          MR. MOSER:  Well, you know, I think Hawaii and

23  Michigan are the only two left out of that list that we've

24  provided to the Court from, you know, a hundred years ago.

25          THE COURT:  No, I'm talking about the physical

 1   inspection though, right?  Are there any other states that
 2   require physical inspection?
 3           MR. MOSER:  Not that I'm aware of, Your Honor.
 4           THE COURT:  Yeah, okay.  All right.  All right.
 5           MR. BECK:  I think Michigan actually repealed that
 6   law, Your Honor.
 7           THE COURT:  Okay.
 8           MR. BECK:  I'm -- outside of -- I'm happy to answer
 9   any other questions that the Court might have.  But if the
10   Court does not, I'm willing to rest at this point, Your Honor.
11           THE COURT:  All right.  Thank you, Mr. Beck.
12           Given there were cross-motions Mr. Moser, I'll let you
13   have the last word here if there's anything further you have.
14           MR. MOSER:  Nothing further.  Thank you.
15           THE COURT:  All right.  Thank you both very much.  I
16   don't know if I'll need anything more from either of you.  If I
17   do, certainly I'll let you know.  And if I do end up at a point
18   where I'm considering granting, I might ask -- reach out to
19   both of you and ask you if you can agree to some language as to
20   maybe how we can make sure if I grant in part or in whole that
21   we don't, you know, disrupt the overall permitting and
22   registration process.  Okay?  And so you can give some thought
23   to that.  Okay?
24           MR. MOSER:  Yes.
25           THE COURT:  All right.  Thank you all very much.

```
 1              MR. BECK:  Thank you, Your Honor.  Have a good day.
 2              (The proceedings concluded at 10:56 a.m.,
 3     June 28, 2021.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing pages is a

6    complete, true, and correct transcript of the stenographically

7    reported proceedings held in the above-entitled matter and that

8    the transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10         DATED at Honolulu, Hawaii, September 30, 2021.

11

12

13                        */s/ Cynthia Fazio*
                          CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25