**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| TODD YUKUTAKE; DAVID KIKUKAWA, | No. 21-16756 |
| *Plaintiffs-Appellees*, | D.C. No. 1:19-cv-00578-JMS-RT |
| v. | |
| ANNE E. LOPEZ, in her Official Capacity as the Attorney General of the State of Hawaii, | OPINION |
| *Defendant-Appellant*, | |
| and | |
| CITY AND COUNTY OF HONOLULU, | |
| *Defendant*. | |

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted February 14, 2023
Honolulu, Hawaii

Filed March 14, 2025

Before:  Carlos T. Bea, Daniel P. Collins, and Kenneth K.
              Lee, Circuit Judges.

                   Opinion by Judge Collins;
                   Concurrence by Judge Lee;
                      Dissent by Judge Bea

---

## SUMMARY[*]

---

### Second Amendment

The panel affirmed the district court's summary
judgment for Todd Yukutake and David Kikukawa in their
action seeking declaratory and injunctive relief to prevent
the Attorney General of Hawaii from enforcing two
provisions of Hawaii's firearms laws on the ground that the
provisions violate the Second Amendment.

First, plaintiffs challenged the constitutionality of
Hawaii Revised Statutes § 134-2(e), which provides a
narrow time window (originally 10 days, and now 30 days)
within which to acquire a handgun after obtaining the
requisite permit.  The permit application process includes a
background check.  Second, plaintiffs challenged § 134-3 to
the extent that, as part of Hawaii's firearms registration
process, it requires a gun owner, within five days of
acquiring a firearm, to physically bring the gun to a police
station for inspection.  The district court concluded that the
challenged aspects of both provisions were facially

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

unconstitutional under the Second Amendment and permanently enjoined their enforcement.

The panel denied the State's motion to dismiss the appeal as moot due to recent legislative amendments to both of the challenged provisions. The amended versions were sufficiently similar to the previous versions that any presumption of mootness was rebutted.

The panel affirmed the district court's judgment that § 134-2(e)'s short timeframe for completing a firearms purchase after obtaining a permit was unconstitutional under the Second Amendment. The purchase and acquisition of firearms is conduct protected by the plain text of the Second Amendment. Because § 134-2(e) regulates conduct covered by the Second Amendment's plain text, the Second Amendment presumptively protects that conduct. The burden therefore fell on the State to justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation.

The panel evaluated the State's justifications for § 134-2(e) pursuant to the guidance provided in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 38 (2022), footnote 9, which acknowledged that background checks can serve the historically based valid purpose of ensuring that firearms are possessed by law-abiding, responsible citizens. In Section IV(B)(3) of the opinion, which Judge Lee did not join, Judge Collins interpreted *Bruen's* footnote 9 as drawing on First Amendment jurisprudence to assess the constitutionality of specific aspects of a background-check-based permitting system. Such a permitting system must be guided by narrow, objective and definite standards and not employ abusive features, such as lengthy wait times, to deny ordinary citizens their Second Amendment rights. Applying

se 1:19-cv-00578-JMS-RT    Document 129    Filed 03/14/25    Page 4 of
4                          Yᴘᴀᴀᴀᴋᴅ ᴠ. ᴌᴏᴘᴇᴢ
                           Page ID 1246

this guidance, Judge Collins determined that the State did
not carry its burden to justify the very short temporal limit
on firearms acquisition permits. Although the State
presumably has a valid interest in ensuring that the
background-check results are not stale, the State pointed to
no evidence that anything over 10 days or 30 days counts as
stale. In Section IV(B)(4) of the opinion, the panel
concluded that the temporal limitation was "abusive" within
the meaning of *Bruen* and remanded for the district court to
revise its permanent injunction, as appropriate, in light of the
recent amendment to § 134-2(e) and to conform to the
panel's ruling.

The panel affirmed the district court's conclusion that
§ 134-3's in-person inspection requirement violates the
Second Amendment. Even assuming arguendo that
Hawaii's basic system of registering firearms by owner,
type, serial number, etc., was valid under *Bruen*—a point the
panel did not decide—Hawaii's broad in-person inspection
requirement could not be justified as merely a proper
ancillary logistical measure in support of such a system. The
government failed to point to evidence supporting its
conclusion that the addition of a broadly applicable and
burdensome physical inspection requirement will materially
advance the objectives of the registration system. As with
plaintiffs' challenge to § 134-2(e), the panel remanded to the
district court to revise its permanent injunction, as
appropriate, in light of the recent amendment to § 134-3 and
to conform to the panel's ruling.

Concurring, Judge Lee joined in the opinion except for
the discussion on how to interpret the opaque dicta in
footnote 9 of *Bruen*. Without more guidance from the
Supreme Court, Judge Lee is reluctant to say that even a
limited means-ends inquiry is appropriate, especially given

the Court's emphatic rejection of such analysis in *Bruen*. He would construe footnote 9 to require the government to provide a historical analogue to justify the temporal limit on firearm permits. The state of Hawaii failed to do so. It thus could not restrict the Second Amendment right of its people.

Dissenting, Judge Bea stated that neither the text of the Second Amendment nor precedent presumptively prohibit the government from imposing facially neutral ancillary regulations on the acquisition of firearms. The majority's critical error was its conclusion that the acquisition of a firearm by an individual, through purchase or otherwise, is conduct covered by the plain text of the Second Amendment. This conclusion conflicts with controlling Circuit precedent and creates a split between this Circuit and at least two others over how to apply *Bruen*'s still-novel historical test to cases like this one. Moreover, on this facial challenge, plaintiffs had neither alleged nor proven that they or anyone else is in practice denied their rights to keep and carry arms. They failed to carry their burden of proving that the regulations were abusive within the meaning of *Bruen* footnote 9 and this court's precedents. Judge Bea would reverse the district court's judgment and vacate the permanent injunction.

## COUNSEL

Alan A. Beck (argued), Law Offices of Alan Beck, San Diego, California; Stephen D. Stamboulieh, Stamboulieh Law PLLC, Olive Branch, Mississippi; for Plaintiffs-Appellees.

Robert T. Nakatsuji (argued), First Deputy Solicitor General; Kalikoonalani D. Fernandes, Deputy Solicitor

General; Caron M. Inagaki and Kendall J. Moser, Deputy Attorneys General; Kimberly T. Guidry, Solicitor General; Holly T. Shikada, Hawaii Attorney General; Office of the Hawai'i Attorney General, Honolulu, Hawai'i; for Defendants-Appellants.

Kevin O'Grady, Law Office of Kevin O'Grady LLC, Honolulu, Hawai'i, for Amicus Curiae Hawai'i Rifle Association.

Donald E.J. Kilmer Jr., Law Offices of Donald Kilmer, Caldwell, Idaho, for Amici Curiae The Second Amendment Foundation and The Madison Society Foundation, Inc.

Erin M. Erhardt and Michael T. Jean, National Rifle Association of America, Institute for Legislative Action, Fairfax, Virginia, for Amicus Curiae National Rifle Association of America, Inc.

Jeremiah L. Morgan, William J. Olson, and Robert J. Olson, William J. Olson PC, Vienna, Virginia; Rick Boyer, Integrity Law Firm PLLC, Lynchburg, Virginia; John I. Harris, Schulman Leroy & Bennett PC, Nashville, Tennessee; Joseph W. Miller, Law Offices of Joseph Miller LLC, Fairbanks, Alaska; for Amici Curiae Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Heller Foundation, Oregon Firearms Federation, Tennessee Firearms Association, Virginia Citizens Defense League, Grass Roots North Carolina, America's Future, Inc., Conservative Legal Defense and Education Fund, and Restoring Liberty Action Committee.

se 1:19-cv-00578-JMS-RT   Document 129   Filed 03/14/25   Page 7 of
                    Y̶u̶k̶u̶t̶a̶k̶e̶ ̶v̶.̶ ̶L̶o̶p̶e̶z̶
                    P̶a̶g̶e̶I̶D̶ ̶#̶:̶ ̶1̶2̶4̶9̶                        7

# **OPINION**

COLLINS, Circuit Judge:[1]

Plaintiffs-Appellees Todd Yukutake and David Kikukawa filed this action seeking declaratory and injunctive relief preventing the Attorney General of Hawaii from enforcing two provisions of Hawaii's firearms laws on the ground that those provisions violate the Second Amendment, as incorporated against the States by the Fourteenth Amendment. First, Plaintiffs challenge the constitutionality of Hawaii Revised Statutes § 134-2(e), which provides only a narrow time window (originally 10 days, and now 30 days) within which to actually acquire a handgun after obtaining the requisite permit. *See* HAW. REV. STAT. § 134-2(e). Second, Plaintiffs challenge § 134-3 to the extent that, as part of Hawaii's firearms registration process, it requires a gun owner, within five days of acquiring a firearm, to physically bring the gun to a police station for inspection. The district court granted summary judgment to Plaintiffs, concluding that the challenged aspects of both provisions were "facially unconstitutional" under the Second Amendment and permanently enjoining their enforcement. *See Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1080 n.6 (D. Haw. 2021); *see also id*. at 1090–91. We affirm.

# **I**

Plaintiffs Todd Yukutake and David Kikukawa are firearm owners who reside in Honolulu County and who wish to acquire additional firearms in the future. They brought this action against the Hawaii Attorney General

---

[1] Judge Lee joins all but Section IV(B)(3) of this opinion.

(hereinafter simply "Hawaii" or "the State"), seeking declaratory and injunctive relief against the enforcement of two Hawaii statutes concerning the permitting and registration of firearms.[2]  Plaintiffs' operative complaint alleged that the two challenged provisions unconstitutionally infringed the Second Amendment right to keep and bear firearms for self-defense, both as applied to Plaintiffs and as a facial matter.

Specifically, Plaintiffs first challenged one particular aspect of the permitting process that is described in § 134-2 of the Hawaii Revised Statutes.  Importantly, Plaintiffs' complaint did *not* contest Hawaii's general requirement that, before "acquir[ing] the ownership of a firearm," a person must "first procure[] from the chief of police" of the relevant county "a permit to acquire the ownership of a firearm as prescribed in this section." HAW. REV. STAT. § 134-2(a). To acquire such a permit, a person must submit an application that includes specified identifying information, information about the applicant's mental health history, and a signed waiver allowing the police to obtain mental health records. *Id*. § 134-2(b)–(c). The applicant must also be fingerprinted and photographed by the police department, unless the department already has such information on file. *Id*. § 134-2(b).    To allow the police department to conduct a background check, "no permit shall be issued to an applicant earlier than fourteen calendar days after the date of the application." *Id*. § 134-2(e).    The one aspect of the permitting process that Plaintiffs challenged below is the following provision of § 134-2(e): "Permits issued to

---

[2] Plaintiffs' original complaint asserted additional claims against the City and County of Honolulu, but the parties later stipulated to the City and County's dismissal from this action with prejudice pursuant to a settlement agreement.

acquire any pistol or revolver shall be void unless used within ten days after the date of issue."[3]   HAW. REV. STAT. § 134-2(e) (2018). This short period of time to acquire the firearm applies only to permits concerning a "pistol or revolver," and there must be "a separate application and permit for each transaction" involving a pistol or revolver. *Id*. With respect to a "rifle or shotgun," by contrast, the statute states that such permits generally "shall entitle the permittee to make subsequent purchases of rifles or shotguns for a period of *one year* from the date of issue without a separate application and permit for each acquisition." *Id*. (emphasis added). Yukutake alleged that, on one occasion in early 2019, he was unable to acquire a permitted handgun within the 10-day window, and he therefore had to start all over again with a new application.

The second challenge asserted by Plaintiffs involves one aspect of the post-acquisition firearm "registration" process set forth in § 134-3. Section 134-3(b) provides that "[e]very person who acquires a firearm pursuant to section 134-2 shall register the firearm in the manner prescribed by this section within five days of acquisition." HAW. REV. STAT. § 134-3(b). The registrant must complete a standard form that includes, *inter alia*, the "name of the manufacturer and importer; model; type of action; caliber or gauge; serial number; and source from which receipt was obtained, including the name and address of the prior registrant." *Id*. Plaintiffs' complaint did not challenge either the underlying requirement to register a firearm or the obligation to provide this specific information in connection with such registration. Rather, they challenged only § 134-3's requirement that, as part of the registration process, an

---

[3] As we shall explain, this provision was subsequently amended by replacing "ten days" with "thirty days."

individual firearms purchaser had to bring the gun to the local police station for a physical inspection. Specifically, Plaintiffs challenged § 134-3(c) to the extent that, at the time of the district court's ruling in this case, that subsection provided that, except for firearms registered by authorized dealers, all firearms "registered under this section shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration." *Id*. § 134-3(c) (version effective Sept. 15, 2020).**[4]** According to the complaint, this "requirement that Plaintiffs bring their firearm[s] to the police station to register them violates Plaintiffs' Second Amendment rights."

The parties filed cross-motions for summary judgment, and on August 16, 2021, the district court granted summary judgment to Plaintiffs. *See Yukutake*, 554 F. Supp. 3d at 1090. Applying the "intermediate scrutiny" then applicable under Ninth Circuit law, the district court facially invalidated both challenged provisions. Specifically, the court first concluded that Hawaii had "failed to show that there is a reasonable fit between [its] stated objective of promoting public safety and the 10-day permit use period imposed" by § 134-2(e). *Id*. at 1086. The district court also held that "§ 134-3(c)'s in-person inspection and registration requirement does not survive intermediate scrutiny." *Id*. at 1090. The court entered a permanent injunction prohibiting enforcement of both "§ 134-2(e)'s 10-day permit use requirement for handguns" and "§ 134-3(c)'s in-person firearm inspection and registration requirement." *Id*. at 1090–91.

---

[4] As noted below, this provision was also amended after the district court ruled in this case.

In a subsequent September 23, 2021 order, the district court clarified that it had not invalidated § 134-2 or § 134-3 *in toto* and that, instead, the "10-day permit use period, and the requirement of in-person inspection and registration, are severed from their respective statutes and stricken."  In the same order, the district court also partially granted the State's motion for a stay pending appeal, holding that the injunction against "the 10-day permit use period in HRS § 134-2(e)" would be stayed but that the injunction against "the in-person inspection and registration requirement in HRS § 134-3(c)" would not.  The district court entered final judgment the same day, and Hawaii timely appealed.

Shortly after the completion of briefing in this court, the Supreme Court issued its decision in *New York State Rifle & Pistol Ass'n, v. Bruen*, 597 U.S. 1 (2022), which rejected the then-existing framework in the circuit courts (including this court) for evaluating Second Amendment claims.  *Id*. at 17–24.  A motions panel of this court denied the State's motion to vacate and remand for reconsideration in light of *Bruen* and instead granted the State's alternative request for supplemental briefing.

## II

We first address the State's contention that recent legislative developments have mooted this case. *See Ahlman v. Barnes*, 20 F.4th 489, 493 (9th Cir. 2021) (stating that mootness raises a jurisdictional issue that must be addressed before the merits).

Not long after oral argument in this court, the Hawaii Legislature passed a bill that would amend both of the provisions challenged by Plaintiffs here.  While that bill was awaiting the Governor's anticipated signature, the State moved to dismiss this appeal as moot in light of this

legislative development and to vacate the district court's judgment.   Plaintiffs have opposed the State's motion, arguing that, even if the bill is approved by the Governor, the case is not moot.   The bill was subsequently signed by the Governor on June 2, 2023, and it contains two relevant amendments that have now both taken effect.

First, with respect to § 134-2(e)'s specification that permits to purchase handguns are only valid for 10 days, § 4 of Act 52 amends that provision by simply replacing "ten days" with "thirty days." *See* Act 52, § 4, 2023 Haw. Sess. Laws 113, 121.   Section 18(1) of Act 52 provides that this amendment changing the validity of purchasing permits from 10 days to 30 days would take effect on January 1, 2024. *Id*. at 136.   Although Act 52 makes a number of other changes to § 134-2(e), the State does not contend that any of them are relevant to assessing whether Plaintiffs' challenge to that statute is moot.

Second, with respect to § 134-3's in-person inspection and registration requirement, Act 52 makes permanent a set of temporary changes that the Hawaii Legislature had adopted shortly after the district court refused to stay its injunction with respect to § 134-3.   Specifically, § 2 of Act 30 of the 2022 Hawaii Session Laws struck the provision of § 134-3(c) that imposed the in-person inspection requirement and instead added new language to § 134-3(b) that imposed a more limited in-person inspection and registration requirement.   This more limited requirement mandates physical inspection "at the time of registration" only (1) if "the firearm is acquired from a person who is not a dealer licensed" by either the State of Hawaii or the Federal Government;  (2) if the firearm has an "engraved or embedded registration number[]" that was added, as required, when a gun is "assembled from parts created using

a three-dimensional printer"; or (3) if the firearm is brought into Hawaii from outside the State. *See* Act 30, § 2, 2022 Haw. Sess. Laws 50, 52–54. Because these amendments to § 134-3 were intended as a temporary measure while the State pursued this appeal, § 5 of Act 30 provided that these amendments would automatically be repealed on June 30, 2025, at which time the prior version that had been partially invalidated by the district court would be restored. *Id*. at 54. In 2023, § 13 of Act 52 amended § 5 of Act 30 by eliminating the 2025 sunset provision and instead making the amendments to § 134-3 permanent. *See* Act 52, § 13, 2023 Haw. Sess. Laws at 136. The elimination of that sunset provision took effect on July 1, 2023. *Id*.

We have held that "the repeal, amendment, or expiration of legislation" will be presumed to "render an action challenging the legislation moot, unless there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it." *Board of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc). Where, as here, the challenged provisions have been amended rather than repealed, the question whether the Legislature may reasonably be expected to enact a "similar" law turns, in the first instance, on whether the amended law that the Legislature *did* enact is sufficiently similar to the original law with respect to the alleged constitutional deficiency at issue. *See Teter v. Lopez*, 125 F.4th 1301, 1307 (9th Cir. 2025) (en banc).

With respect to the Legislature's changing of the validity of firearm-purchasing permits from 10 days to 30 days, the issue of mootness is ultimately intertwined with the merits of Plaintiffs' Second Amendment challenge. As we shall explain, we conclude that Hawaii's short timeframe for

completing firearms purchases violates the Second Amendment, and our reasons for reaching that conclusion fully apply both to the new 30-day period as well as the prior 10-day period. *See infra* Section IV. Because Hawaii thus *has* adopted a substantially "similar" provision to the challenged one, there is more than a "reasonable expectation" that the Legislature "will reenact" a "similar" law; it has already done so. *Chambers*, 941 F.3d at 1199. Any presumption that Plaintiffs' challenge to § 134-2(e) is moot under *Chambers* has therefore been rebutted. *See Teter*, 125 F.4th at 1307.

As to Plaintiffs' challenge to § 134-3, the relevant amendment made permanent by Act 52 is that the in-person inspection requirement is no longer included in the registration process if the firearm is purchased from a licensed dealer. At oral argument, the State at one point argued that the pre-2022 law *already* exempted firearms that are purchased from licensed dealers from the in-person inspection requirement. If true, that would mean that § 134-3 had not actually been amended in a relevant respect— which, of course, would mean that Plaintiffs' challenge to § 134-3 was not mooted by the enactment of that immaterial change in wording. But the district court did not read the pre-2022 law that way, and neither do we. Prior to 2022, § 134-3 stated that licensed dealers who were "register[ing] firearms pursuant to this section" were not "required to have the firearms physically inspected by the chief of police at the time of registration." HAW. REV. STAT. § 134-3(c) (2021). On its face, that exemption appears directed to firearms acquired *by* the dealer, rather than firearms acquired by individuals *from* the dealer, and that is how the district court seems to have read the provision. *See Yukutake*, 554 F. Supp. 3d at 1078 n.1. By contrast, the amended version

of § 134-3 very clearly exempts from the in-person inspection requirement any firearm "acquired *from*" a dealer. HAW. REV. STAT. § 134-3(b) (emphasis added); *see id.* (stating that in-person inspection is required "[i]f the firearm is acquired from a person who is *not* a dealer" (emphasis added)). We therefore construe the amendment to have eliminated § 134-3's previous requirement that firearms purchased from licensed dealers must be physically inspected within five days, while leaving the inspection requirement in place as to acquisitions that were not made through licensed dealers.

Nonetheless, even with that change, the amended § 134-3 remains sufficiently similar, in the relevant respects, to the pre-2022 version. That point is confirmed by the fact that the district court's particular reasons for invalidating the in-person inspection requirement under the Second Amendment did not turn, in any relevant respect, on whether the firearm had been purchased from a licensed dealer. Rather, the district court concluded that the in-person inspection requirement did not "fall within the historical tradition" of firearms regulation in this country and that the State had presented no evidence that the requirement served any of the particular interests asserted by the State as justification. *See Yukutake*, 554 F. Supp. 3d at 1088–90. Because the district court's reasons for invalidating the in-person inspection requirement have not been vitiated by the recent amendments, the parties' dispute over the correctness of the district court's conclusions are not moot. Put another way, the amended version of § 134-3 is sufficiently similar to the previous version that any presumption of mootness has been rebutted.

Accordingly, we deny the State's motion to dismiss this appeal as moot.

## III

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an "individual right to keep and bear arms" "for defensive purposes," even if "unconnected to militia service." *Id*. at 598, 601–02. The Court subsequently held that this individual right is applicable against the States under the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 767–80 (2010). In a pair of recent decisions, the Court has set forth the governing legal framework for evaluating challenges to laws on the ground that they infringe the Second Amendment's individual right to keep and bear arms. *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 602 U.S. 680 (2024). We therefore begin by summarizing the applicable standards established in those decisions.

## A

In *Bruen*, the Court squarely rejected the general framework for evaluating Second Amendment challenges that had developed in the lower courts after *Heller* and *McDonald*. As the Court explained, "the Courts of Appeals ha[d] coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Bruen*, 597 U.S. at 17. Under the "first step" of that approach, the government could justify a particular law by showing that it "regulate[d] activity falling outside the scope of the right as originally understood." *Id*. at 18 (citation omitted). "At the second step," a court would apply different levels of means-ends scrutiny depending on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id*. (citation omitted). The Court

rejected that framework, holding that "it is one step too many." *Id.* at 19. Only the first step, the Court explained, was "consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* By contrast, the Court held that the second step was unwarranted, because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*.

Having rejected "means-end scrutiny" as the applicable test for Second Amendment claims, the Court then held:

> [T]he standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 24 (citation omitted). The *Bruen* Court explained that "[t]his Second Amendment standard accords with how [the Court] protect[s] other constitutional rights," including "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Bruen*, 597 U.S. at 24 (citing *Heller*, 554 U.S. at 582). "In that context," the Court explained, the government likewise "bears the burden of proving the constitutionality of its actions," which, in some cases,

"includes showing whether the expressive conduct falls outside of the category of protected speech." *Id.* (citation omitted). "[T]o carry that burden, the government must generally point to *historical* evidence about the reach of the First Amendment's protections," such as by "show[ing] that a type of speech belongs to a historic and traditional category of constitutionally unprotected speech long familiar to the bar." *Id.* at 24–25 (simplified).

The *Bruen* Court then provided the following guidance as to how the courts should "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding":

> In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide

>     some        probative      evidence      of
>     unconstitutionality.

597 U.S. at 26–27. *Heller* itself, the Court noted, had been
a "straightforward" case of this kind. *Id*. at 27. "The District
in *Heller* addressed a perceived societal problem—firearm
violence in densely populated communities—and it
employed a regulation—a flat ban on the possession of
handguns in the home—*that the Founders themselves could
have adopted to confront that problem*." *Id.* (emphasis
added). *Heller*'s conclusion that no founding-era firearms
regulations were "analogous to the District's ban" therefore
straightforwardly doomed the ban. *Id*. A similarly
straightforward analysis applied in *Bruen*, in which the
challenged New York law provided that, to obtain a license
to carry a firearm outside the home, one must demonstrate
"proper cause," which had been construed to require proof
of "a special need for self-protection distinguishable from
that of the general community." *Id*. at 12. As the Court
explained, "New York's proper-cause requirement concerns
the same alleged societal problem addressed in *Heller*:
handgun violence, primarily in urban areas." *Id*. at 27
(simplified). "Following the course charted by *Heller*, [the
Court] consider[ed] whether 'historical precedent' from
before, during, and even after the founding evinces a
comparable tradition of regulation" as the New York law,
and it found "no such tradition in the historical materials that
[the State defendants] and their *amici* have brought to bear
on that question." *Id*. (quoting *Heller*, 554 U.S. at 631).

But not all historical inquiries, the *Bruen* Court
emphasized, would be as simple as those in *Heller* and *Bruen*
itself. In some cases—*e.g.*, due to technological
developments or other unprecedented concerns—the

Founders simply could *not* have adopted, or perhaps even imagined, the modern firearms regulation in question. In such cases, the *Bruen* Court explained, the historical inquiry may become more complicated:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment— "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. [17 U.S.] 316, 415 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

597 U.S. at 27–28. The Court emphasized, however, that "history" continues to "guide [the courts'] consideration of modern regulations that were unimaginable at the founding." *Id*. at 28.

The Court also further explained how the courts should approach "determining whether a historical regulation is a

proper analogue for a distinctly modern firearm regulation."
597 U.S. at 28–29. That inquiry "requires a determination
of whether the two regulations are 'relevantly similar,'"
which entails considering "at least two metrics: how and
why the regulations burden a law-abiding citizen's right to
armed self-defense." *Id*. at 29. Because "individual self-
defense is 'the *central component*' of the Second
Amendment right," two "'*central*' considerations when
engaging in an analogical inquiry" are "[1] whether modern
and historical regulations impose a comparable burden on
the right of armed self-defense and [2] whether that burden
is comparably justified." *Id*. (citations omitted). The Court
underscored, however, that "analogical reasoning requires
only that the government identify a well-established and
representative historical *analogue*, not a historical *twin*." *Id*.
at 30.

In applying these standards to the challenged New York
statute in *Bruen*, the Court exhaustively analyzed the
historical analogues proffered by the parties and concluded
that (1) "[a]part from a few late-19th-century outlier
jurisdictions, American governments simply have not
broadly prohibited the public carry of commonly used
firearms for personal defense"; and (2) apart from "a few
late-in-time outliers, . . . American governments" have not
"required law-abiding, responsible citizens to 'demonstrate
a special need for self-protection distinguishable from that
of the general community' in order to carry arms in public."
597 U.S. at 70 (citation omitted); *see also id*. at 38 (providing
a similar summary at the start of the Court's historical
analysis).

In summarizing its holding, the *Bruen* Court included a
footnote that distinguished New York's "special-need"
discretionary licensing regime from the "'shall-issue'

licensing regimes" that prevailed in 43 other States.  597
U.S. at 38 n.9.  That footnote states, in full:

> To be clear, nothing in our analysis should be
> interpreted to suggest the unconstitutionality
> of the 43 States' "shall-issue" licensing
> regimes, under which "a general desire for
> self-defense is sufficient to obtain a
> [permit]." *Drake v. Filko*, 724 F.3d 426, 442
> (CA3 2013) (Hardiman, J., dissenting).
> Because these licensing regimes do not
> require applicants to show an atypical need
> for armed self-defense, they do not
> necessarily prevent "law-abiding,
> responsible citizens" from exercising their
> Second Amendment right to public carry.
> *District of Columbia v. Heller*, 554 U.S. 570,
> 635 (2008).  Rather, it appears that these
> shall-issue regimes, which often require
> applicants to undergo a background check or
> pass a firearms safety course, are designed to
> ensure only that those bearing arms in the
> jurisdiction are, in fact, "law-abiding,
> responsible citizens." *Ibid.*  And they
> likewise appear to contain only "narrow,
> objective, and definite standards" guiding
> licensing officials, *Shuttlesworth v.
> Birmingham*, 394 U.S. 147, 151 (1969),
> rather than requiring the "appraisal of facts,
> the exercise of judgment, and the formation
> of an opinion," *Cantwell v. Connecticut*, 310
> U.S. 296, 305 (1940)—features that typify
> proper-cause standards like New York's.
> That said, because any permitting scheme can

> be put toward abusive ends, we do not rule
> out constitutional challenges to shall-issue
> regimes where, for example, lengthy wait
> times in processing license applications or
> exorbitant fees deny ordinary citizens their
> right to public carry.

*Id*.

In a two-Justice concurrence for himself and Chief
Justice Roberts—who provided two votes that were
necessary to the six-Justice majority in *Bruen*—Justice
Kavanaugh reiterated the limitations acknowledged by the
Court in footnote 9.    "The Court's decision," Justice
Kavanaugh explained, "addresses only the unusual
discretionary licensing regimes, known as 'may-issue'
regimes, that are employed by 6 States including New York"
(and, incidentally, Hawaii).    *Bruen*, 597 U.S. at 79
(Kavanaugh, J., concurring); *see also id*. at 15 (majority
opinion) (noting that Hawaii was among the five other States
that had "analogues" to the N.Y. law).  As to the "43 States"
that "employ objective shall-issue licensing regimes,"
Justice Kavanaugh noted that these differed from the New
York regime in that they merely "require a license applicant
to undergo fingerprinting, a background check, a mental
health records check, and training in firearms handling and
in laws regarding the use of force, among other possible
requirements." *Id.* at 80.  These regimes, Justice Kavanaugh
explained, "are *constitutionally permissible*, subject of
course to an as-applied challenge if a shall-issue licensing
regime does not operate in that manner in practice."  *Id*.
(emphasis added); *see also id*. at 72 (Alito, J., concurring)
("Our holding decides nothing about who may lawfully

possess a firearm or the requirements that must be met to buy a gun.").

**B**

In *Rahimi*, the Court again addressed how courts should determine whether a law challenged on Second Amendment grounds is supported by a sufficient historical analogue. The criminal defendant in that case brought a facial challenge to the relevant law under which he was being prosecuted, namely, 18 U.S.C. § 922(g)(8)(C)(i). *See* 602 U.S. at 693. That law made it an offense for an individual to possess a firearm if he was subject to a restraining order that "include[d] a finding that he poses 'a credible threat to the physical safety' of a protected person." *Id*. (quoting 18 U.S.C. § 922(g)(8)(C)(i)). In holding that this law survived a facial Second Amendment challenge, the Court held that the law was sufficiently analogous, within the meaning of *Bruen*, to the historical examples of the "surety laws" and the "'going armed' laws." *Id*. at 695–98.

As the Court explained, the "surety laws" generally required "those persons, [of] whom there is a probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance . . . that such offence . . . shall not happen[,] by finding pledges or securities." *Rahimi*, 602 U.S. at 695 (quoting 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 251 (10th ed. 1787) (hereinafter "BLACKSTONE")). Such laws, which also "targeted the misuse of firearms," allowed "magistrates to require individuals suspected of future misbehavior to post a bond" to guarantee their future good behavior. *Id*. at 695–96. "These laws often offered the accused significant procedural protections," including a formal complaint to a court that the complainant had "reasonable cause to fear" the accused, an

opportunity for the accused to respond, and an evidence-based judicial determination "that cause existed for the charge." *Id*. at 696–97.

The "going armed laws," the Court explained, were "a particular subset of the ancient common-law prohibition on affrays," which referred to fighting or "arming oneself to the Terror of the People." 602 U.S. at 697 (simplified). As described by Blackstone, "the going armed laws prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land.'" *Id*. (quoting 4 BLACKSTONE, *supra*, at 149). Because such conduct was likely to "disrupt[] the 'public order'" and lead to violence, such acts were punished with "forfeiture of the arms . . . and imprisonment." *Id*. (citations omitted).

The Court held that, "[t]aken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." 602 U.S. at 698. The Court further concluded that, although § 922(g)(8)(C)(i) was "by no means identical to these founding era regimes," its "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id*. That was true, the Court stated, because the "provision is 'relevantly similar' to those founding era regimes in both why and how it burdens the Second Amendment right." *Id*. (quoting *Bruen*, 597 U.S. at 29).

The Court stated that the "why"—*i.e.*, the objectives—of the various laws were the same, because § 922(g)(8)(C)(i) "restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws

do." *Rahimi*, 602 U.S. at 698. In evaluating "how"
§ 922(g)(8)(C)(i) "burdens the Second Amendment right,"
the Court held that this challenged provision imposes a
burden that "fits within our regulatory tradition." *Id*. Both
this provision and "the surety and going armed laws," the
Court explained, "involved judicial determinations of
whether a particular defendant likely would threaten or had
threatened another with a weapon."[5] *Id*. at 699. And unlike
the provision challenged in *Bruen*, § 922(g)(8)(C)(i) "does
not broadly restrict arms use by the public generally." *Id*. at
698. Two other "relevant aspect[s] of the burden" imposed
by § 922(g)(8)(C)(i)—*viz*., the "duration" of the prohibition
and the "penalty" associated with it—were also "within the
regulatory tradition." *Id*. at 699. Like the "surety bonds"
required under the surety laws, the restriction imposed by the
provision was "of limited duration." *Id*. Moreover, the
burden imposed by the substantive rule in § 922(g)(8)(C)(i)
was, effectively, "temporary disarmament" while the
provision's prohibition was in effect, and that burden
involved a "lesser restriction" than the "imprisonment" that
was imposed by the "going armed laws." *Id*.

---

[5] The Court, however, made clear that it was *not* holding that what was
in that context a *sufficient* ground for falling "within our regulatory
tradition" (*i.e.*, a case-specific *judicial* determination) was a *necessary*
one. The Court thus explicitly stated that it did "not suggest that the
Second Amendment prohibits the enactment of laws banning the
possession of guns by categories of persons thought by a *legislature* to
present a special danger of misuse," citing the portion of *Heller*
discussing laws prohibiting the possession of firearms by felons or the
mentally ill. *Rahimi*, 602 U.S. at 698 (emphasis added) (citing *Heller*,
554 U.S. at 626). And later in its opinion, the *Rahimi* Court reiterated
that prohibitions "on the possession of firearms by 'felons and the
mentally ill,'" even in the home, "are 'presumptively lawful.'" *Id*. at 699
(quoting *Heller*, 554 U.S. at 626, 627 n.26).

Because this nation's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others," § 922(g)(8)(C)(i) could "be applied lawfully to Rahimi," and his facial challenge therefore necessarily failed. 602 U.S. at 700; *see also id*. at 693 (reaffirming that, outside the First Amendment context, a facial challenge generally fails if a law "is constitutional in some of its applications," such as its application "to the facts of Rahimi's own case").

## IV

In applying *Bruen*'s standards, as clarified by *Rahimi*, we first address Plaintiffs' challenge to § 134-2(e)'s provision that a handgun purchasing permit is valid for only a brief period of time (originally 10 days and now 30 days).

## A

The first question, under *Bruen*, is whether "the plain text of the Second Amendment protects" the conduct regulated by the challenged law. 597 U.S. at 32.

Here, the conduct regulated by § 134-2(e) is the acquisition, through purchase or otherwise, of a "pistol or revolver." HAW. REV. STAT. § 134-2(e). In a pre-*Bruen* decision, we held that the "Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to *acquire* arms," and that "[t]he right to keep arms, necessarily involves the right to *purchase* them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Teixeira v. County of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (en banc) (emphasis added) (citations omitted); *see also id*. at 678 ("The right to keep and bear arms for self-defense under the Second Amendment

must also *include* the right to *acquire* a firearm, although that
acquisition right is far from absolute." (first emphasis added)
(simplified)).    Without expressing any view as to whether
any other aspects of our opinion in *Teixeira* have been
abrogated by *Bruen*, we conclude that nothing in *Bruen* calls
into question our specific holding in *Teixeira* that the text of
the Second Amendment must be understood as protecting
the right of individuals to purchase and acquire firearms.
*Bruen* reaffirmed that the Second Amendment right to
"keep" arms "guarantee[d] the individual right to *possess*"
arms, *Bruen*, 597 U.S. at 20 (emphasis added) (quoting
*Heller*, 554 U.S. at 592), and one cannot ordinarily "possess"
an item—particularly something as complex as a firearm—
if he or she cannot acquire it.    Put simply, the right to
"possess" a firearm—which *Bruen* recognized is protected
by the plain text of the Second Amendment—includes
within it the right to *take possession* of a firearm, *i.e.*, to
acquire one.    We therefore reaffirm our prior holding in
*Teixeira* that the purchase and acquisition of firearms is
conduct that is protected by the plain text of the Second
Amendment.    *See Miller v. Gammie*, 335 F.3d 889, 899–900
(9th Cir. 2003) (en banc).

In this regard, it is important to note that the challenged
restriction imposed by § 134-2(e) is part of the permitting
process that generally governs *any* acquisition of a handgun.
HAW. REV. STAT. § 134-2(a).    In addressing the threshold
scope of the Second Amendment, we have distinguished
between laws that govern acquisition *simpliciter* and laws
that merely restrict one particular *means* of acquiring a
firearm.    Thus, for example, we held in *B&L Productions,
Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024), that the "plain
text of the Second Amendment does not cover" the specific
conduct of "contracting for the sale of firearms and

ammunition *on state property*." *Id*. at 117 (emphasis added).
In a footnote, we carefully distinguished that situation from
one in which the object of the statute was "the general
'purchase of firearms.'" *Id*. at 117 n.17.[6]  We thus
acknowledged that *Teixeira* established that such a *general*
regulation of firearms purchasing would restrict conduct
covered by the plain text of the Second Amendment, but we
also noted that *Teixeira* recognized, in contrast, that the same
could not be said of a claimed "right to have a gun store *in a
particular location*." *Id*. at 118 (emphasis added).  Such
narrowly focused "commercial restrictions" on particular
means of acquisition, we explained, implicate the Second
Amendment right to "keep and bear arms" only if the
particular "challenged regulation *meaningfully impairs* an
individual's ability to access firearms." *Id*. at 119 (emphasis
added).  *B&L* thus recognized that particular discrete
commercial restrictions do not stand on the same footing as
an across-the-board regulation of the acquisition of
handguns. *Id*.  Here, Hawaii's challenged restriction applies
generally to all acquisition of handguns, and it therefore
clearly implicates the plain text of the Second Amendment
under *Teixeira*.[7]

---

[6] The dissent simply ignores this explicit limitation on the scope of the
issues considered in *B&L* and thereby misreads that decision as if it
addressed the very issue that it expressly stated that it did *not* address.
*See* Dissent at 76 n.6. And if the dissent believes that the distinction
drawn by *B&L* involves a "manipulation of the 'level of generality'" at
which the right is defined," *see id*., its complaint is with *B&L* itself.

[7] In any event, the broad applicability of the challenged time limit at issue
here and the strict nature of that limit are more than enough to confirm
that it "*meaningfully* constrains" the right to acquire a firearm. *B&L*, 104
F.4th at 119 (emphasis added); *see also Teixeira*, 873 F.3d at 680 n.14
(holding that an ordinance banning only particular types of commercial

The dissent misreads *Bruen* and our precedent as instead narrowly holding that *only* the "two discrete, specific actions" of (1) "*retain[ing]*" possession of firearms and (2) "carry[ing]" them in public are protected by the text of the Second Amendment; the acquisition of a firearm, according to the dissent, is not "conduct protected by the Second Amendment's plain text." *See* Dissent at 66, 68 (emphasis added). This peculiar view of the Second Amendment—as protecting the right to retain guns that you have no right to acquire—is not a fair reading of its text. No reasonable person at the time of the Second Amendment's adoption would have thought that its text only protects the right to maintain the firearms that citizens then happened to possess at the moment of the Amendment's adoption, nor would anyone have reasonably thought that the Amendment's text protects only the possession of those guns that thereafter either suddenly and miraculously appear in one's home or that the state *allows* you to acquire. As we have explained above, *see supra* at 27–28, the right to "keep" firearms "guarantee[s] the individual right to *possess*" a firearm, *Bruen*, 597 U.S. at 20 (emphasis added) (citation omitted), which includes *within it* the right to *take possession* of a firearm. The right to acquire a firearm is thus not separate from, and outside of, the right to possess it; on the contrary, as we recognized in *Teixeira*, the right to "keep" firearms "must also *include* the right to *acquire* a firearm." *Teixeira*, 873 F.3d at 678 (first emphasis added) (citation omitted). The dissent's contrary view—that "[t]he plain text of the Second Amendment does *not* wholly protect the purchase or the acquisition of firearms," *see* Dissent at 66 (emphasis added)—makes no more sense than saying that

---

arms transactions "'meaningfully' burdens" Second Amendment rights if it "actually or really burdens" those rights).

the First Amendment's text does not protect the right to acquire copies of books, audio files, or movies.

The dissent insists that its approach would not, in practice, deny all constitutional protection against restrictions on acquisition, because the dissent would still allow a Second Amendment challenge to a particular acquisition regulation if the plaintiff could show that the regulation "*prevent[s]*" or "effectively . . . *denies* the rights to possess and carry." *See* Dissent at 67, 70 n.2 (emphasis added) (simplified). But this view would still allow all manner of harassing limitations on the acquisition of firearms, *without any constitutional scrutiny whatsoever*, so long as those limitations fall short of ultimately preventing a citizen from possessing firearms for self-defense. Again, that makes no sense. We would not decline to apply *any* First Amendment scrutiny to laws imposing special temporal or procedural restrictions on purchases of available copies of expressive works, merely on the ground that the plaintiff was *ultimately* able to obtain access to the work. *Cf. United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("It is of no moment that the challenged statute does not impose a complete prohibition," for both "laws burdening and laws banning speech . . . must satisfy the same rigorous scrutiny."). Under the dissent's extremely narrow reading, however, the Second Amendment right would wrongly be reduced to "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (citation omitted).

More broadly, the dissent errs by effectively resurrecting the very framework that *Bruen* rejected, in which the pre-*Bruen* lower courts held that restrictions on the "core" of the Second Amendment right are subject to one type of analysis, while restrictions on "ancillary," non-core Second

Amendment rights are subject to a very different analysis. *See* Dissent at 75; *cf*. *Bruen*, 597 U.S. at 18–19 (summarizing, and then explicitly rejecting, this "core"/non-core two-tier approach). Indeed, the dissent adopts an even narrower view of the Second Amendment right than our pre-*Bruen* caselaw, because it would place what it calls "ancillary" rights categorically *outside* the text of that amendment, and it would then subject restrictions imposing what it deems to be incidental prohibitions on "core" rights to an even more permissive review than our pre-*Bruen* caselaw. Thus, while we subjected regulations of "ancillary" Second Amendment rights to intermediate scrutiny before *Bruen*—which at least "on paper" was a meaningful standard, *see* Concurrence at 57—the dissent would not undertake *any* Second Amendment scrutiny unless and until a plaintiff makes a demanding threshold showing that a challenged regulation burdening an "ancillary" right "*effectively . . . denies* ordinary citizens their rights to keep and carry." *See* Dissent at 67 (emphasis added) (simplified). That too-demanding standard ignores the Second Amendment's text, which protects not only against laws that "prevent" or "deny" the exercise of Second Amendment rights, but also against laws that "*infringe*[]" those rights. *See Infringe*, 1 Sᴀᴍᴜᴇʟ Jᴏʜɴsᴏɴ, Dɪᴄᴛɪᴏɴᴀʀʏ ᴏғ ᴛʜᴇ Eɴɢʟɪsʜ Lᴀɴɢᴜᴀɢᴇ (4th ed., rev. 1773) (defining "infringe" to mean "*violate*"; "destroy" or "*hinder*" (emphasis added)).**8**

---

[8] The dissent purports to limit its damage to the Second Amendment by suggesting that only those restrictions on acquisition that are "*facially neutral*" can be said to "*not* regulate conduct covered by the plain text of the Second Amendment." *See* Dissent at 78 (emphasis added); *see also id*. at 65-67, 93. But it is unclear what that limitation even means in this context, much less where it comes from. The challenged provisions here

Because § 134-2(e) regulates conduct—the acquisition of a firearm by an individual, through purchase or otherwise—that is covered by the plain text of the Second Amendment, the Second Amendment "presumptively protects that conduct." *Bruen*, 597 U.S. at 24. The burden therefore falls on the State to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*.

## B

### 1

We next consider whether the State has carried its burden to justify the challenged aspect of § 134-2(e)'s regulation of the acquisition of pistols and revolvers. As noted earlier, Plaintiffs' suit in the district court did not challenge the underlying requirement in § 134-2(a) that, before acquiring a firearm in Hawaii, a person must first obtain a permit to do so. *See supra* at 8. Rather, Plaintiffs only challenged the narrow time limitation for actually obtaining a "pistol or revolver" after the issuance of the permit, which was originally 10 days and is now 30 days. In arguing that this particular detail of its permitting system is justified under *Bruen*, the State's argument proceeds in two steps. First, the

---

are certainly not "facially neutral" in the sense that they apply neutrally to all commercial transactions, *cf. Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015) (stating that a regulation is facially neutral for purposes of the First Amendment if "the statute 'on its face deals with conduct having no connection with speech'" (citation omitted)); on the contrary, they apply *only* to the acquisition of *firearms*—the very object of the Second Amendment's protection. Tellingly, the dissent cites no caselaw to support this arbitrary and unintelligible limitation on its crabbed reading of the Second Amendment. *Cf.* Dissent at 84 n.10 (noting that judges should not "rely on 'the philosophical or policy dispositions of the individual judge'" (citation omitted)).

State argues that a permitting system, as a *general* matter, is adequately justified by relevant historical analogues under *Bruen*. Second, the State argues that *Bruen* does not require that each and every particular operational detail of a permissible historically-validated system—such as the 10- or 30-day time limit contained in the permitting system at issue here—also be separately historically validated. The State also argues that § 134-2(e)'s time limit on the validity of permits is "valid under the approach taken in footnote 9 of *Bruen*."

In evaluating the State's arguments on this score, we begin with footnote 9 of *Bruen*, which is the Supreme Court's latest pronouncement on permitting regimes associated with background checks. We do so because, as we noted earlier, the firearm-acquisition permitting regime set forth in § 134-2 requires the relevant police department, after receiving a permit application, to conduct a background check within a specified period of time in order to determine whether the applicant is prohibited under Hawaii law from possessing firearms. *See* HAW. REV. STAT. § 134-2(e) (requiring various specified background checks); *id*. § 134-2(j) (setting forth certain notification procedures if a permit application is denied because the applicant is prohibited from acquiring a firearm). Footnote 9's discussion of background checks in connection with permits to carry is thus instructive, as a starting point, in analyzing § 134-2's system for conducting background checks in connection with permits to acquire firearms.

In footnote 9, the *Bruen* Court stated that its invalidation of New York's heightened "proper cause" standard for obtaining a permit to carry a firearm did *not* call into question the constitutionality of "'shall-issue' licensing regimes, under which a general desire for self-defense is

sufficient to obtain a permit." *Bruen*, 597 U.S. at 38 n.9
(simplified).   In reaching that conclusion, the Court
emphasized two key differences between such "shall-issue
regimes" and the New York law.  First, in contrast to the
New York regime, which "require[d] applicants to show an
atypical need for armed self-defense," these "shall-issue
regimes, which often require applicants to undergo a
background check or pass a firearms safety course, are
designed to ensure only that those bearing arms in the
jurisdiction are, in fact, 'law-abiding, responsible citizens.'"
*Id*. (quoting *Heller*, 554 U.S. at 635).  Second, in the case of
the shall-issue regimes, the grant or denial of an application
turned on "'narrow, objective, and definite standards'
guiding licensing officials," *id*. (quoting *Shuttlesworth*, 394
U.S. at 151), rather than on "the 'appraisal of facts, the
exercise of judgment, and the formation of an opinion,'" *id*.
(quoting *Cantwell*, 310 U.S. at 305).  The Court cautioned,
however, that, "because any permitting scheme can be put
toward abusive ends," the Court did "not rule out
constitutional challenges to shall-issue regimes where, for
example, lengthy wait times in processing license
applications or exorbitant fees deny ordinary citizens their
right to public carry." *Id*.

**2**

Although the *Bruen* Court did not explicitly set forth
why it concluded that the constitutional validity of such
"'shall-issue' licensing regimes" was consistent with
*Bruen*'s "analysis" of the Second Amendment, 597 U.S. at
38 n.9 (citation omitted), we think that the Court's reasoning
is discernible from the points made in the footnote.

In particular, we think it noteworthy that the Court
anchored the validity of such regimes in background checks'

role in "ensur[ing] only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. (quoting *Heller*, 554 U.S. at 635). Although neither *Heller* nor *Bruen* purported to provide a comprehensive description of those persons who properly would *not* be considered to be "law-abiding, responsible citizens," *see Rahimi*, 602 U.S. at 701–02, there can be little doubt that footnote 9 was at least referring to the general categories of persons that, according to *Heller*, it was "presumptively lawful" to exclude from possessing firearms—namely, "felons and the mentally ill," *Heller*, 554 U.S. at 626, 627 n.26. *Heller* expressly did not decide the precise extent to which, under a historically based analysis, felons and the mentally ill can be barred from possessing firearms, but *Heller* clearly stated that there *is* sufficient historical justification for concluding that there is some category of such persons who may be denied access to firearms. Thus, in response to the dissent's criticism that *Heller* had not provided any "colonial analogues" that would validate the Court's suggestion that laws prohibiting firearms possession by felons and the mentally ill are presumptively constitutional, *see id*. at 721 (Breyer, J., dissenting), the *Heller* Court stated that it had no need to "provid[e] extensive historical justification for those regulations of the [Second Amendment] right that [the Court] describe[d] as permissible," because there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us," *id*. at 635. *Heller*, and the *Bruen* Court's footnote 9, thus both presume that there is a historically based category of felons and the mentally ill who may constitutionally be denied access to firearms.

Viewed in this context, *Bruen*'s footnote 9 must be understood as grounding the presumptive constitutional validity of background checks in the historically based "exception[]" allowing the government to forbid "felons and the mentally ill" from possessing firearms. *Heller*, 554 U.S. at 626, 635. In that sense, the use of background checks in such shall-issue permitting regimes promotes a historically based "permissible reason" for regulating firearms acquisition, *Rahimi*, 602 U.S. at 692, and thereby satisfies the "why" aspect of the *Bruen* test. *See Bruen*, 597 U.S. at 29.

We hasten to add that, like the Court in *Heller* and *Bruen*, we have no occasion to explore the precise boundaries of any such historically based exception concerning felons and the mentally ill. That is because Plaintiffs here do not challenge *any* of the particular disqualifying grounds set forth in Hawaii law, including Hawaii's prohibition on firearms possession by felons and the mentally ill. *See* HAW. REV. STAT. § 134-7. Rather, what is at issue here is a *facial* challenge to one logistical detail of Hawaii's permitting system, which (among other things) uses background checks to screen for those who are disqualified from possessing firearms. But given that *Heller* and *Bruen* indicate that there *is* a historically based category of persons who may be excluded from firearms ownership, and given the limited nature of Plaintiffs' challenge, we may proceed on the assumption that at least a subset of the persons that Hawaii excludes from firearms ownership fall within that historically based category. In the context of this facial challenge, the result is that Hawaii's permitting system, like the shall-issue regimes discussed in *Bruen* footnote 9, helps to effectuate Hawaii's invocation of that historically

grounded exclusion and it likewise satisfies the "why" prong of *Bruen*'s historically based test.

### 3

The remaining question, then, is whether § 134-2(e) satisfies the "how" prong of *Bruen*'s test. In explaining how § 134-2(e)'s temporal limit on firearm-acquisition permits furthers the permissible objective of screening out properly disqualified persons, the State asserts that, absent a time limit, the permittee may "have become ineligible due to recent events" occurring after the issuance of the permit but before the actual acquisition of the firearm. This temporal aspect of Hawaii's permitting regime, like the overall regime itself, is thus ultimately grounded in the use of background checks to screen out disqualified persons. In approaching the issue of "historical analogies" for such screening-regime features in connection with *Bruen*'s "how" question, one cannot avoid noting that the entire concept of background checks rests on "dramatic technological changes"—namely, fingerprinting and rapidly searchable databases for checking criminal records—that have no counterpart in the founding era or even the post-Civil War era.[9] *Bruen*, 597 U.S. at 27.

---

[9] "[T]he first systematic use of fingerprinting for criminal record purposes in the United States" occurred in 1903 in New York. *See* THE FINGERPRINT SOURCEBOOK 1-16 (U.S. Department of Justice, Office of Justice Programs). While law enforcement officials in the British Empire evidently began to attempt to "identify recidivist criminals" via their fingerprints as early as the 1870s, "[t]he obvious drawback to this system in the pre-computer age was the prohibitively labor-intensive nature of comparing each new print set with numerous previous sets to try and find a match." Dorothy E. Schmidt, *A Dark and Stormy Night: The Mystery of the Missing Science in Fingerprint Identification*, 75 DEF. COUNS. J. 47, 48 (2008).

Consequently, a "more nuanced approach" to the issue of "historical analogies" will be required in this area. *Id*.

Unfortunately, neither the *Bruen* Court in footnote 9, nor Justice Kavanaugh in his *Bruen* concurrence, set forth their precise reasoning for implicitly concluding that modern background-check systems satisfy the "how" prong of *Bruen*'s historically based test. Perhaps the *Bruen* Court relied on the view that regulating firearms acquisition *at the point of acquisition* is a regulatory *means* that falls within *Heller*'s suggestion that a historically based approach would allow the government, for proper purposes, to impose appropriate "conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 627.[10]  But whatever *Bruen*'s unstated reasoning was, the Court's dicta in footnote 9 must be understood as having effectively concluded that attaching modern-day background checks to

---

[10] This is certainly a much more plausible historically based analogy for justifying background checks than Hawaii's strained analogies to colonial era laws allowing disarmed persons, such as British Loyalists or felons, to have their rights, including their right to possess firearms, restored by, respectively, a loyalty oath or a pardon. A system of individualized applications that governs *only* persons who have *already* been determined to lack the ability to possess firearms (such as the loyalty oath and pardon systems invoked by Hawaii here) is not "relevantly similar" to a system that requires *all* persons, the great majority of whom *cannot* constitutionally be disarmed, to submit individualized applications before they may exercise their constitutional rights. *Rahimi*, 602 U.S. at 692 (citation omitted). That is, broadly imposing a temporary restriction on all persons is materially different, in terms of the resulting burden on Second Amendment rights, than imposing burdens only on a targeted and discrete subset of persons who arguably are permissibly subject to greater regulation. *Cf. id*. at 698–99 (holding that § 922(g)(8)(C)(i) satisfied the "how" component of *Bruen* because, like the surety laws, its temporary burdens were targeted at only those persons who had been judicially determined to present a threat to the safety of others).

the acquisition of firearms satisfies both the "how" and "why" aspects of *Bruen*'s historically based test.[11]  To the extent that Hawaii's permitting system serves to condition firearms acquisition on the completion of such a background check, footnote 9 of *Bruen* compels the conclusion that *that* aspect of the system is not facially invalid.

Plaintiffs contend, however, that the State must also supply an adequate historical analogy for the *particular* feature of the Hawaii permitting system that they challenge, which is the temporal limit on the validity of permits.  In addressing that issue, one must again be guided by the Court's analysis in footnote 9 of *Bruen*.  The Court there addressed the possibility that specific features of an otherwise-constitutionally-valid background-check and permitting system might nonetheless violate the Second Amendment, and it conspicuously did not require that each logistical feature be separately justified by a historical analogue.  That makes sense, because the very concept that a modern regulation need only be "*relevantly* similar" to a historical analogue necessarily means that some particular details of each regulatory approach will differ.  *Bruen*, 597 U.S. at 29 (emphasis added).  Moreover, in this case and in *Bruen* footnote 9, the particular regulatory means at issue (*viz*., point-of-acquisition background checks) is based on modern technological developments, and requiring that every operational detail of such a uniquely modern regulation be separately justified by its own historical analogue would disregard *Bruen*'s insistence on a more

---

[11] Contrary to what the dissent suggests, *see* Dissent at 72-73, 89 n.14, *Heller* held that the "exceptions [it] ha[s] mentioned"—including "laws imposing conditions and qualifications on the commercial sale of arms"—rested on "*historical* justifications." *Heller*, 554 U.S. at 626–27, 635 (emphasis added).

"nuanced approach" in such cases. *Id*. at 27. Instead, in discussing possible constitutional challenges to particular aspects of a background-check-based permitting system, the *Bruen* Court drew on *First Amendment* jurisprudence governing the logistical operation of permitting systems, stating that any such permitting system must be guided by "narrow, objective, and definite standards," *Bruen*, 597 U.S. at 38 n.9 (quoting *Shuttlesworth*, 394 U.S. at 151), and must not employ "abusive" features such as "lengthy wait times" and "exorbitant fees," which would "deny ordinary citizens" their Second Amendment rights. *Id*. Absent further guidance from the Court, this same approach is appropriate here. Accordingly, in determining whether a particular feature of an otherwise-valid background-check-based permitting system is impermissibly "abusive," one should apply in the Second Amendment context, *mutatis mutandis*, the same principles applied in evaluating permitting systems in the First Amendment context.[12]

In the limited areas—such as conducting a "march, parade, or rally" in a "public forum[]"—in which the First

---

[12] Applying First Amendment standards to this specific question is also consistent with the Court's repeated instruction, beginning in *Heller*, that a historically based body of legal principles must be recognized in the Second Amendment context, just as has been done in the First Amendment context. *See Bruen*, 597 U.S. at 24 (noting that "*Heller* repeatedly compared the right to keep and bear arms" to "the freedom of speech in the First Amendment" and that *Bruen*'s historically based approach "accords with how [the Court] protect[s]" First Amendment free-speech rights); *id*. at 24–25 (noting that the basic framework of First Amendment doctrine rests on an understanding of the "historic and traditional categor[ies]" defining constitutionally protected speech); *see also Heller*, 554 U.S. at 634–35 (similarly noting that the basic framework of First Amendment law establishes certain historically based categories and principles, rather than "a freestanding 'interest-balancing' approach").

Amendment may tolerate an advance permitting requirement, the Court has held that any such permitting scheme "must meet certain constitutional requirements." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). The Court has described those requirements as follows:

> [The permit scheme] may not delegate overly broad licensing discretion to a government official. Further, any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication.

*Id*. (citation omitted). In addition, an otherwise permissible permitting system in the First Amendment context must not involve "undue delay," and decisions on permit applications must be made "within a specified and reasonable time period" and "there must be the possibility of prompt judicial review in the event that the [permit] is erroneously denied." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990). Transposing these limitations, *mutatis mutandis*, into the Second Amendment context, establishes the following requirements. A firearms permitting scheme must not "delegate overly broad licensing discretion to a government official." *Forsyth Cnty.*, 505 U.S. at 130. The applicable time frames governing the system must be "specified" in advance, avoid unreasonable and undue delays, and provide for prompt judicial review. *FW/PBS, Inc.*, 493 U.S. at 228. The practical logistical burdens on firearms possession that arise from the operation of the background-check-based

permitting system—which are akin to logistical limitations on the "time, place, and manner" of speech—"must be narrowly tailored to serve a significant governmental interest" and ultimately "must leave open" the full exercise of Second Amendment rights.[13]  *Forsyth Cnty.*, 505 U.S. at 130.    Application of these standards here confirms that Hawaii's temporal limitation on the validity of firearms-acquisition permits is "abusive" within the meaning of *Bruen*.  *See* 597 U.S. at 38 n.9.[14]

---

[13] The resulting highly constrained and limited application of means-ends scrutiny is not inconsistent with *Bruen* and *Heller*, which rejected the sort of "freestanding 'interest balancing' approach" that took hold in the lower courts after *Heller*.  *See Heller*, 554 U.S. at 634; *see also Bruen*, 597 U.S. at 22–24.    In the First Amendment context, such reticulated tests have been applied by the Court *within* specific subareas of historically grounded categories of permissible regulation.    So too here, such First-Amendment-based standards, under *Bruen*'s footnote 9, will apply only in examining the details of a particular regulatory system whose relevant contours have been held to satisfy *Bruen*'s historically based standards.    That approach is a far cry from what *Bruen* and *Heller* rejected, under which the entire general framework of Second Amendment jurisprudence was simply a means-end scrutiny test that allowed judges "to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Bruen*, 597 U.S. at 23 (quoting *Heller*, 554 U.S. at 634).

[14] The dissent is flatly wrong when it repeatedly contends that these standards—which are explicitly derived from the First Amendment test for time, place, and manner regulations—are somehow equivalent to "strict scrutiny."  *See* Dissent at 92, 93, 94, 95, 96. As the Supreme Court held in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), the narrow tailoring requirement applicable to time, place, and manner regulations—unlike that applicable under strict scrutiny—does *not* require that "the least restrictive or least intrusive means" of serving the governmental interest be chosen, and the Court therefore explicitly reaffirmed that it "ha[s] *never* applied strict scrutiny in this context."  *Id*.

Here, as in the First Amendment context, the State must
provide "tangible evidence" that the purely incidental
restrictions imposed on Second Amendment rights by the
operation of its background-check-based permitting process
"are 'necessary' to advance" the significant governmental
interest it invokes to justify those restrictions. *See Edwards
v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001)
(citation omitted); *see also Bruen*, 597 U.S. at 24 ("[W]hen
the Government restricts speech, the Government bears the
burden of proving the constitutionality of its actions."
(quoting *Playboy Ent. Grp.*, 529 U.S. at 816 )); *Reynolds v.
Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (noting that, in
the First Amendment context, the government must "present
actual evidence supporting its assertion that a speech
restriction does not burden substantially more speech than
necessary; argument unsupported by the evidence will not
suffice to carry the government's burden"). The State is not
necessarily required "to conduct new studies or produce
evidence independent of that already generated" by others,
*Cuviello v. City of Vallejo*, 944 F.3d 816, 828 (9th Cir. 2019)
(citation omitted), but unsupported speculation will not
suffice, *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622,
664 (1994). The State likewise bears the burden to
demonstrate that its incidental restrictions are "narrowly
tailored." *Edwards*, 262 F.3d at 863; *see also Ward v. Rock
Against Racism*, 491 U.S. 781, 798–800 (1989).

---

at 798 & n.6 (emphasis added). Despite *Ward*'s square holding that
review of "time, place, or manner" regulations does *not* entail "strict
scrutiny," *id.*, the dissent defiantly insists that it will continue to call such
review "strict scrutiny." *See* Dissent at 93 n.18. The dissent's baffling
persistence in the deliberate misuse of language resembles Humpty
Dumpty's insistence that, "When *I* use a word, . . . it means just what I
choose it to mean—neither more nor less." LEWIS CARROLL, THROUGH
THE LOOKING-GLASS AND WHAT ALICE FOUND THERE 117 (1902 ed.).

The State has not carried this burden to justify its very short temporal limit on firearms-acquisition permits. As noted earlier, the State's justification for the challenged temporal limit is that a person who could lawfully acquire firearms at the time the permit was granted might, due to a change in circumstances, no longer be eligible at the actual time of acquisition. But the State has pointed to no evidence to support the view that it may reasonably be expected that qualified citizens may suddenly become disqualified *within the span of 10 or even 30 days.* While the State presumably has a valid interest in ensuring that the background-check results are not stale, the State has pointed to no evidence that would support the extravagant view that anything over 10 days or 30 days counts as stale.

Moreover, just as in the First Amendment context, so too here the State's failure to consistently apply its asserted rationale "may diminish the credibility of the government's rationale for restricting [constitutional rights] in the first place." *Barr v. American Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 622 (2020) (plurality opinion) (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994)). On its face, § 134-2(e) takes a very different approach to what counts as too stale in the context of the acquisition of "any *rifle* or *shotgun*": in such cases, the acquisition permit remains valid "for a period of *one year from the date of issue* without a separate application and permit for each acquisition." HAW. REV. STAT. § 134-2(e) (emphasis added). The statute reiterates that, if the person becomes disqualified from possessing firearms during that one-year period, he remains prohibited from acquiring a firearm notwithstanding the permit, *see id*. (confirming that any such permit remains "subject to the disqualifications under section 134-7"), and it also states that the permit "shall be impounded" if the

"permittee is arrested" for certain specified categories of offenses, *see id*. The fact that Hawaii's permitting system thus takes an alternative approach with respect to rifles and shotguns that is much less burdensome on Second Amendment rights powerfully undercuts the State's argument that § 134-2(e)'s strict temporal limits vis-à-vis handguns and revolvers are properly tailored to its asserted interest in ensuring that a permittee remains qualified at the actual moment of acquisition. *See City of Ladue*, 512 U.S. at 52–53.

**4**

We conclude that Hawaii's imposition of a very short time limitation on the validity of an acquisition permit is impermissibly "abusive." *Bruen*, 597 U.S. at 38 n.9. Accordingly, we affirm the district court's judgment that this aspect of § 134-2(e) is unconstitutional under the Second Amendment. We remand for the district court to revise its permanent injunction, as appropriate, in light of the recent amendment to § 134-2(e) and to conform to our ruling.

**V**

We next address Plaintiffs' challenge to § 134-3's requirement that, within five days of acquiring a firearm, the firearm must be physically inspected by the local "chief of police" as part of the process of registering the firearm.

Because this requirement regulates and burdens the acquisition of firearms by ordinary citizens, it regulates conduct that is covered by the text of the Second Amendment and "presumptively protect[ed]" by it. *Bruen*, 597 U.S. at 24. As with § 134-2(e), the State therefore must carry its burden to "justify its regulation by demonstrating

that it is consistent with the Nation's historical tradition of firearm regulation." *Id*.[15]

In the district court, Plaintiffs did not challenge any aspect of the registration process other than the requirement to have the firearm physically inspected within five days. Their challenge to § 134-3 was likewise narrowly focused in their merits brief in this court, including their supplemental brief addressing the impact of *Bruen*. Although Plaintiffs subsequently filed a letter with this court purporting to challenge the underlying "basic registration" requirement as unconstitutional, we decline to consider this much-belated contention raised for the first time in this court. Accordingly, we consider only whether the State has carried its burden to justify the in-person inspection requirement imposed by § 134-3.

In analyzing whether the "how" and "why" of § 134-3's physical inspection requirement are "relevantly similar" to a historical analogue, *see Rahimi*, 602 U.S. at 698, we first summarize Hawaii's proffered understanding of that provision.

The challenged requirement for in-person inspection of firearms within five days of acquisition was added to § 134-3 by Act 74 of the 2020 Hawaii Session Laws and took effect on September 15, 2020. *See* Act 74, § 9, 2020 Haw. Sess. Laws 479, 483. According to the text of Act 74, the

---

[15] The dissent contends that, because the amended version of § 134-3 now contains a significant exception (*viz*., for firearms purchased from a licensed dealer), the challenged statute no longer regulates acquisition *simpliciter*, but "only a few small categories of acquisition." *See* Dissent at 83 n.9. While it is true that the amended statute no longer applies to *all* acquisitions, it cannot be said to be, like the restriction at issue in *B&L*, so narrowly focused that it does not "meaningfully constrain[]" Second Amendment rights. *B&L*, 104 F.4th at 119.

Legislature's findings in support of the amendments made by Part II of that Act (including the in-person inspection requirement) are as follows:

> The legislature finds that a "ghost gun" is a firearm that is assembled without serial numbers or other identification markings. A person may assemble a ghost gun from a prepackaged kit requiring only minimal expertise and, thus, bypass background checks, registration, and other legal requirements. The legislature also finds that the State's lack of laws addressing ghost guns allows persons who would normally be prohibited under state law from owning or possessing firearms to do so. The ease with which ghost guns may be obtained defeats the intent of the State's otherwise strict firearm permitting and registration laws. It is these laws that have helped Hawaii to achieve the lowest gun violence death rate in the nation.

Act 74, § 2, 2020 Haw. Sess. Laws at 480–81. Based on this finding, the declared purposes of the relevant amendments are (1) to "[p]rohibit the manufacture, purchase, or obtaining of firearm parts for the purpose of assembling a firearm having no serial number" and (2) to "[a]mend certain requirements relating to firearms registration." *Id*. In support of these purposes, Part II of Act 74 enacted provisions that, *inter alia*, (1) make it a felony for anyone other than a licensed manufacturer or dealer to produce or obtain a firearm receiver lacking a serial number; (2) require that, for "firearms assembled from parts created using a three-dimensional printer, the serial number shall be

engraved on stainless steel and permanently embedded to the firearm receiver during fabrication or construction"; and (3) generally require that any firearm registered under § 134-3 "be physically inspected by the respective county chief of police or the chief's representative at the time of registration." Act 74, §§ 3, 5, 2020 Haw. Sess. Laws at 481–83.

In its briefs in this court, the State thus contends that the in-person inspection requirement is necessary to address the assertedly novel problem of firearms that can be assembled without serial numbers. The State also contends that in-person inspection serves the additional purposes of allowing the police to determine whether the firearm is one that is unlawful to possess under Hawaii law, as well as "facilitating the tracing of firearms by law enforcement" in the event that a particular firearm is used in a crime. Given these asserted purposes of the in-person inspection requirement, it is clear that, in contrast to the permitting requirement at issue in § 134-2(e), the in-person inspection requirement cannot be considered to be part of a *background-check system* aimed at "ensur[ing] only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9. The *physical inspection* of the newly acquired firearm for purposes of enforcing a serial-number requirement and subsequent tracing simply bears no logical or practical relationship whatsoever to the conduct of any background check to determine whether the acquirer is lawfully able to possess firearms. Accordingly, in contrast to the "why" of the permitting requirements discussed in footnote 9 of *Bruen*, the "why" of § 134-3's in-person inspection requirement is *not* rooted in the historically based "exception[]" allowing the government to bar "felons and

the mentally ill" from possessing firearms.  *Heller*, 554 U.S. at 626, 635.

In an effort to nonetheless ground its novel in-person inspection requirement in a sufficient historical analogue, Hawaii points to a set of colonial-era militia laws.  These militia laws generally required all male citizens of fighting age to serve in the militia;[16] required militiamen to keep and maintain fighting weapons suitable for militia service;[17] and,

---

[16] Georgia, for instance, required militia service of "all the Male free Inhabitants of this State, from the Age of Sixteen to fifty Years."  *See* U.S. SELECTIVE SERVICE SYSTEM, BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION (hereinafter "MILITARY OBLIGATION"), Vol. II, Pt. 4, at p. 141 (1947) (reproducing Ga. Act of Feb. 26, 1784).  New York required the same of "every able bodied male person[,] Indians and slaves excepted[,] residing within this State from sixteen years of age to fifty," *id*., Vol. II, Pt. 9, at p. 271 (reproducing N.Y. Act of Apr. 3, 1778), while North Carolina provided that the "Militia of every County shall consist of all the effective men from Sixteen to fifty years of Age inclusive," *id*., Vol. II, Pt. 10, at p. 68 (reproducing N.C. "Act to Regulate and Establish a Militia in This State," enacted during the legislative session of Apr. 14, 1778–Jan. 19, 1779).

[17] *See*, *e.g.*, Ch. 33, § 1, 2d Cong., 1 Stat. 271, 271 (May 8, 1792) (stating that every enrolled militiaman must, *inter alia*, "provide himself with a good musket or firelock"); MILITARY OBLIGATION, *supra*, Vol. II, Pt. 2, at pp. 250, 256 (reproducing Conn. "Act for forming, regulating, and conducting the military Force of this State," enacted in 1784 (requiring militiamen to "be furnished at their own Expence" with, among other things, "a well fixed Musket" with a "Barrel not less than three Feet and a Half long")); MILITARY OBLIGATION, *supra* note 16, Vol. II, Pt. 9, at p. 271 (reproducing N.Y. Act of Apr. 3, 1778 (requiring every militia member to "furnish and provide himself at his own expence with a good musket or firelock fit for service," as well as "a sufficient bayonet with a good belt")); MILITARY OBLIGATION, *supra*, Vol. II, Pt. 14, at pp. 255, 274 (reproducing Va. Act of Jul. 17, 1775 (requiring "every militia man" to "furnish himself with a good rifle, if to be had, or otherwise with a tomahawk" or other suitable weapon)).

in particular, often required militiamen to allow their weapons to be inspected in order to ensure their continued suitability for combat.    Connecticut law, for example, required a militia officer to review "all under his command," as well as "all others dwelling within the limits of his company who are by law obliged to keep arms," by requiring such persons "to bring forth their arms and ammunition at a certain time and place" to ensure that they were not "deficient in arms or ammunition." MILITARY OBLIGATION, *supra* note 16, Vol. II, Pt. 2, at pp. 201–02 (reproducing Conn. Act of Oct. 11–25, 1775).    South Carolina, meanwhile, provided that "every person liable to bear arms by this Act, whose arms, ammunition or accoutrements shall be found at any muster deficient . . . shall forfeit and pay" up to three pounds, unless he can show that his failure was "not from wilful neglect." *Id*., Vol. II, Pt. 13, at pp. 61, 67–68 (reproducing S.C. Act of Mar. 28, 1778).    And Massachusetts law required militia commanders to periodically review their companies' "arms and equipments" for combat suitability. *Id*., Vol. II, Pt. 6, at pp. 261, 264 (reproducing Mass. "Act for regulating and governing the Militia of the Commonwealth of Massachusetts," as contained in 1789 compilation of "Perpetual Laws" of Mass.).    Hawaii also notes that many of these militia laws required militia commanders to make a general report of the actual state of the militia and of its arms. *See*, *e.g.*, Ch. 33, § 10, 2d Cong., 1 Stat. 271, 273 (May 8, 1792) (requiring specified militia officials to make a report, at least annually, of "the actual situation of the arms, accoutrements, and ammunition of the several corps"); MILITARY OBLIGATION, *supra*, Vol. II, Pt. 6, at pp. 220, 224 (reproducing Mass. Act of Jan. 22, 1776 (requiring the relevant clerk of the militia to

make periodic reports containing "an exact list of his company, and of each man's equipments")).

Hawaii emphasizes that the "how" of these colonial laws is similar to the challenged provision of § 134-3, because the colonial laws, like § 134-3, required the covered persons to submit their firearms for inspection. But there are also significant differences in the "how" of these laws, most notably that the inspection requirement in the colonial laws was not tied to, or a condition of, the *acquisition* of a firearm. More importantly, however, the "why" of the colonial laws bears no resemblance to that of § 134-3. On their face, the colonial-era weapons-inspection laws were aimed at ensuring that weapons were *operable*, so that they would be ready for immediate use in the event of military need. As the district court aptly observed here, the colonial militia laws were intended "to ensure that the armed forces maintained weapon stockpiles suitable for the nation's defense and warfare needs." 554 F. Supp. 3d at 1087. That objective is entirely distinct from those that Hawaii proffers in defense of § 134-3's in-person inspection requirement. Hawaii contends that the "why" is nonetheless similar because both § 134-3 and the colonial militia laws were ultimately aimed at ensuring the safety of the community. But *Bruen* and *Rahimi* do not permit us to define the "why" of a regulation at that enormously high level of generality. Because firearms are, by definition, dangerous weapons, and all firearms regulations are thus, in some general sense, ultimately aimed at "public safety," Hawaii's loose approach to applying *Bruen*'s test would effectively eviscerate the Second Amendment's protections. *Bruen* instead requires a more focused approach on whether "laws at the founding regulated firearm use to address *particular* problems." *Rahimi*, 602 U.S. at 692 (emphasis added).

Accordingly, we conclude that the colonial militia inspection laws are not "relevantly similar" to § 134-3 for purposes of applying *Bruen*'s historically based test. *Bruen*, 597 U.S. at 29.

Hawaii alternatively argues that § 134-3's physical inspection requirement should be upheld based on an analogy to the discussion of background-check-based permitting systems in footnote 9 of *Bruen*. According to Hawaii, the overall *registration* system—which Plaintiffs did not challenge below—is validly justified by a historical analogy, and the newly added physical-inspection requirement is merely an "[i]ncidental administrative and enforcement provision[]" that is "valid as [a] corollar[y] to [the] otherwise lawful and enforceable underlying [registration] regime[]." We reject this contention. Even assuming *arguendo* that Hawaii's basic system of registering firearms by owner, type, serial number, etc., is valid under *Bruen*—a point we do not decide—Hawaii's broad in-person inspection requirement cannot be justified as merely a proper ancillary logistical measure in support of such a system. As explained earlier, the approach that Hawaii posits here would, at the very least, require Hawaii to point to evidence that the in-person inspection requirement is "narrowly tailored to serve a significant governmental interest." *See supra* at 43. Hawaii has failed to do so. Here, as in the later *Heller* litigation, the government has failed to point to evidence supporting its conclusion that the addition of a broadly applicable and burdensome physical inspection requirement will materially advance the objectives of the registration system. *See Heller v. District of Columbia*, 801 F.3d 264, 277 (D.C. Cir. 2015) (invalidating D.C.'s physical-inspection requirement on this ground). Although Hawaii insists that the physical-inspection requirement was

properly added to address the novel and specific problem of home-assembled guns made using "3-D printers" or assembly kits, § 134-3 is not properly tailored to that problem because it broadly applies to acquisition of all types of firearms and not just to so-called "ghost guns." Moreover, that particular significant lack of tailoring remains, even after the recent amendment of § 134-3 that exempts from the physical-inspection requirement those firearms that have been purchased from licensed dealers.

We therefore affirm the district court's conclusion that the in-person inspection requirement violates the Second Amendment. As with Plaintiffs' challenge to § 134-2(e), we remand to the district court to revise its permanent injunction, as appropriate, in light of the recent amendment to § 134-3 and to conform to our ruling.

## VI

For the foregoing reasons, we generally affirm the district court's judgment, but we remand to the district court with instructions to revise its judgment in light of the recent amendments to the challenged laws.

**AFFIRMED and REMANDED.**

Lee, Circuit Judge, concurring.

The U.S. Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* reset the legal landscape for the Second Amendment. 597 U.S. 1 (2022). No longer could courts rely on a malleable means-end analysis. Instead, the Court set a framework rooted in text, history, and tradition. *Id.* at 24.

But *Bruen* did not provide a detailed map for all factual scenarios. This is not surprising or unusual: Consider, for example, the Court's often-jumbled caselaw for the Establishment Clause,[1] the Free Exercise Clause,[2] the Free Speech Clause[3], or the Takings Clause.[4] The Supreme Court has issued dozens of opinions on these clauses over the past

---

[1]  *Compare Van Orden v. Perry*, 545 U.S. 677 (2005) (Ten Commandments display in Texas State Capitol did not violate the Establishment Clause) *with McCreary County v. ACLU*, 545 U.S. 844 (2005) (Ten Commandments display at Kentucky courthouse violated the Establishment Cause).

[2] *Compare Wisconsin v. Yoder*, 406 U.S. 205 (1972) (law compelling Amish family to send children to high school against beliefs violated the Free Exercise Clause) *with United States v. Lee*, 455 U.S. 252 (1982) (law requiring Amish to pay social security tax against beliefs did not violate the Free Exercise Clause).

[3] *Compare Morse v. Frederick*, 551 U.S. 393 (2007) (no violation of First Amendment where school punished student for holding a banner that says "Bong HiTs for Jesus") *with Mahanoy Area School Dist. v. B.L.*, 594 U.S. 180 (2021) (violation of First Amendment where school punished student for posting "fuck school fuck softball fuck cheer fuck everything").

[4] *Compare Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) (Pennsylvania statute prohibiting coal mining that caused land subsidence violated Takings Clause) *with Keystone Bituminous Coal Ass'n v. DeBenedicti*s, 480 U.S. 470 (1987) (Pennsylvania statute prohibiting coal mining that caused land subsidence did not violate the Takings Clause).

several decades in hopes of providing clarity—yet it
continues to grant certiorari as it addresses new factual
scenarios. Few people would, however, say that we should
jettison our entire analytical framework for these
constitutional provisions just because they can be hard to
apply in some cases. Similarly, it can be difficult to discern
the scope of the Second Amendment, especially because the
Court has only recently (and sparingly) analyzed the
contours of the Second Amendment.

Judge Collins' excellent majority opinion methodically
analyzes the Court's Second Amendment jurisprudence. I
join his opinion except for his discussion in IV.B.3 on how
to interpret the opaque dicta in footnote 9 of *Bruen*. In that
footnote, the Court suggested that "shall issue" licensing
regimes for firearms—in which governmental officials must
issue a firearms permit if certain objective requirements are
met—are unconstitutional if they are used "toward abusive
ends." *Id.* at 38 n.9. It then cited examples of "lengthy wait
times in processing license applications or exorbitant fees
[that] deny ordinary citizens their right to public carry." *Id.*

Judge Collins states that *Bruen* suggested that we should
apply a limited means-end inquiry borrowed from the First
Amendment's caselaw in determining whether a permitting
scheme is "abusive." The majority opinion then holds that
Hawaii's requirement that a person obtain a gun within 30
days of receiving a permit is "abusive" under this test.
Admittedly, I am unsure what to make of footnote 9. But
given that the *Bruen* court shunned interest-balancing tests,
I think we should—absent clear direction from the Supreme
Court—determine "abusive ends" by comparing Hawaii's
temporal limit in its firearms permitting regime to relevantly
similar historical analogues. And as a practical matter, I am
wary of even a limited means-end inquiry because our court

has a history and tradition of whittling down the Second
Amendment through means-end analysis.

\* \* \* \*

In *District of Columbia v. Heller*, the Supreme Court
clarified that the Second Amendment protects an "individual
right to keep and bear arms" for "defensive purposes."  554
U.S. 570, 598 (2008).  The Court later incorporated this right
against the States under the Fourteenth Amendment but it
did not provide more substantive guidance to lower courts.
*See McDonald v. City of Chicago*, 561 U.S. 742 (2010).
Except for a five-paragraph per curiam opinion in *Caetano
v. Massachusetts*, 577 U.S. 411 (2016), it would be a dozen
years until the Court revisited the Second Amendment in
*Bruen.*

But to understand why the Court ruled the way it did in
*Bruen*, we need to take a brief detour to examine what
happened in the inferior courts.  After *Heller* and *McDonald*,
lower courts began applying tiers of scrutiny to Second
Amendment challenges to firearm restriction laws.   On
paper, that mode of analysis appeared attractive, as we have
applied that framework to government infringement of rights
under the Free Speech and Equal Protection Clause.  There,
courts properly apply searching scrutiny when the
government seeks to limit the people's constitutional rights.
Anyone thumbing through the Federal Reporter volumes
will find that they are littered with literally dozens of
opinions in which lower courts have applied strict scrutiny
to Free Speech and Equal Protection claims.

Yet when it came to the Second Amendment, lower
courts almost never applied strict scrutiny, even to laws that
severely restricted the right to bear arms.  They instead
purported to apply intermediate scrutiny.  Again, on paper,

perhaps that seemed defensible when applied to less severe restrictions. But, in reality, lower courts so diluted intermediate scrutiny that it amounted to a rational basis review of laws restricting firearms.

This is how lower courts pre-*Bruen* neutered the Second Amendment: As every law school student knows, the standard formulation for intermediate scrutiny is that the government must have an "important" goal and that the challenged law is "*substantially related*" to that interest. *Craig v. Boren*, 429 U.S. 190, 197 (1976) (emphasis added). And the "substantially related" prong has some "bite" to it. *See Boren*, 429 U.S. at 200–04 (striking down law limiting alcohol sales for males under 21 years old and females under 18 as not "substantially related" to governmental interest in traffic safety, even though one study showed that over 90% of all persons arrested for driving under the influence were male).

In a Second Amendment challenge, public safety will almost always satisfy the "important" goal prong of intermediate scrutiny. So whether a law falls will hinge on whether it is "substantially related" to the governmental interest of public safety. But lower courts defanged intermediate scrutiny's "bite" by replacing "substantially related" with "reasonable fit." *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013) (requiring only a "reasonable fit between the challenged regulation and the asserted objective"); *Worman v. Healey*, 922 F.3d 26, 38 (1st Cir. 2019) (stating that "there must be a 'reasonable fit' between the restrictions imposed by the law and the government's valid objectives"); *Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d. 106, 119 (3d Cir. 2018) (asking only for "a reasonable fit between that asserted interest and the challenged law").

But "reasonable fit" is basically like "rationally related" under the rational basis test. So once lower courts replaced "substantially related" with "reasonable fit" under intermediate scrutiny, they upheld almost every firearm restriction law because such a law could "reasonably" further the government's interest of public safety. Even laws that were grossly overbroad or intrusive would still pass constitutional muster because those laws could "reasonably" advance the government's goal.

And how did lower courts tamper with one of the staple formulations of constitutional law? Sometimes lower courts would cherry-pick an out-of-context reference to "reasonable fit" from a commercial speech case. *Chovan*, 735 F.3d at 1139 (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989))). But if one looks at the underlying Supreme Court case, it does not support the "reasonable fit" formulation. The Supreme Court held that the "not more extensive than is necessary" element of *Central Hudson*'s commercial speech test falls short of a "least restrictive means" standard. *Fox*, 492 U.S. at 480. In explaining what "reasonable fit" means, the Court said that it is "a fit that is not necessarily perfect, but reasonable; that . . . is 'in proportion to the interest served'"; and that is "a "means narrowly tailored." *Id.* In other words, "reasonable fit" as used by the Supreme Court in that case is, if anything, more like "narrowly tailored." No matter—lower courts ignored that pertinent language and only cited

the "reasonable fit" language to suggest that it is akin to rational basis.**5**

In other cases, lowers courts imported the "reasonable fit" standard from two related Supreme Court cases that addressed technical rules imposed on cable television companies. *See, e.g.*, *Pena v. Lindley,* 898 F.3d 969, 979 (9th Cir. 2018) (quoting *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997)). But as the Court explained in *Turner*, this deferential review applies to "cases . . . involving congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change" such that "the deference to Congress is in one respect akin to deference owed to administrative agencies because of their expertise." 520 U.S. at 196. While the Second Amendment implicates weighty and emotionally charged issues, it does not involve complex regulatory or esoteric technological issues like those addressed in *Turner*. Yet many lower courts adopted this *Chevron*-like deference when it came to the Second Amendment.

None of this should be a revelation. Our panel opinion in *Duncan v. Becerra* devoted several pages explaining how we went astray in our Second Amendment cases. 970 F.3d 1133, 1165–67 (9th Cir. 2020), *vacated*, 988 F.3d 1209 (9th Cir. 2021). (Indeed, much of this discussion is cribbed

---

5 It was also dubious to compare laws restricting firearms commonly used for self-defense to commercial speech restrictions. Commercial speech—unlike political speech—does not fall within the core First Amendment right. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980). In contrast, the Second Amendment protects the "core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

directly from that panel opinion).  That panel opinion was
vacated after a majority of this court voted to take it en banc.
And what happened during en banc proceedings?  The en
banc court adopted the "reasonable fit" standard again by
citing the inapt *Turner* formulation of intermediate scrutiny.
*Duncan v. Bonta*, 19 F. 4th 1087, 1108 (9th Cir. 2021) (en
banc).  And under this "reasonable fit" standard, the outcome
was preordained because the en banc court essentially
applied rational basis review, as it held that it must "defer to
reasonable legislative judgments."  *Id.*  Notably, the en banc
opinion never addressed the panel opinion's lengthy
discussion of why a "reasonable fit" standard cannot be
incorporated into an intermediate scrutiny analysis.  And
*Duncan* was not an aberration.  As one of our colleagues has
explained, our court has taken en banc almost every single
panel opinion in which we vindicated a Second Amendment
right.  *See Duncan*, 19 F.4th at 1165 (VanDyke, J.,
dissenting).

\* \* \* \* \*

It was under this backdrop of inferior court resistance
that the Supreme Court in *Bruen* rejected the tiers of scrutiny
analysis, noting that "*Heller* and *McDonald* do not support
applying means-end scrutiny in the Second Amendment
context."  597 U.S. at 19.  It then held that lower courts
should first see if the "Second Amendment's plain text
covers an individual's conduct."  *Id.* at 24.  If so, then "the
Constitution presumptively protects that conduct."  *Id.*  And
the "government must then justify its regulation by
demonstrating that it is consistent with the Nation's
historical tradition of firearm regulation."  *Id.*  In some cases,
this "inquiry will be fairly straightforward."  *Id.* at 26.  But
in other cases, it will be harder because of, say, technological
changes.  Courts should thus look at "whether a historical

regulation is a proper analogue for a distinctly modern firearm regulation." *Id.* at 28–29. In doing so, the historical analysis should center on (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense," and (2) whether that burden is comparably justified." *Id.* at 29. To justify its gun regulation, the government can "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. *See also United States v. Rahimi*, 602 U.S. 680, 698 (2024) (applying "relevantly similar" historical analogue to uphold § 922(g)(8)(C)(i)).

The Court in *Bruen* then invalidated New York state's "may carry" gun licensing regime—which gave wide discretion to the government to reject a firearms permit— given the lack of a historical analogue. In footnote 9, it added:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko*, 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Rather, it appears that these shall-issue regimes, which often require

> applicants to undergo a background check or
> pass a firearms safety course, are designed to
> ensure only that those bearing arms in the
> jurisdiction are, in fact, "law-abiding,
> responsible citizens." *Ibid.* And they likewise
> appear to contain only "narrow, objective,
> and definite standards" guiding licensing
> officials, *Shuttlesworth v. Birmingham*, 394
> U.S. 147, 151 (1969), rather than requiring
> the "appraisal of facts, the exercise of
> judgment, and the formation of an opinion,"
> *Cantwell v. Connecticut*, 310 U.S. 296, 305
> (1940)—features that typify proper-cause
> standards like New York's. That said,
> because any permitting scheme can be put
> toward abusive ends, we do not rule out
> constitutional challenges to shall-issue
> regimes where, for example, lengthy wait
> times in processing license applications or
> exorbitant fees deny ordinary citizens their
> right to public carry.

597 U.S. at 38 n.9.

But how do figure out whether a "shall issue" licensing regime—which curbs the discretion of government officials—is being used for "abusive ends"? The opinion offers little guidance, forcing us to flyspeck a footnote containing brief and murky dicta.

Here, one of the issues is whether Hawaii's "shall issue" regime—which now imposes a 30-day time period to obtain a gun after receiving the permit—is "abusive." Haw. Rev. Stat. § 134-2(e). Judge Collins suggests that we apply a similar but limited means-end method from the First

Amendment context for analyzing governmental permits for parades and other expressive activities. From a logical reasoning perspective, his analysis perhaps makes sense and it anchors us to a framework that we have applied before. *Cf.* Eugene Volokh, *Implementing the Right to Keep and Bear Arms after* Bruen, 98 N.Y.U. L. Rev. 1950, 1960–61 (2023) (noting that it "might be feasible" to apply similar First Amendment analysis for analyzing burdens on Second Amendment rights).

But without more guidance from the Supreme Court, I am reluctant to say that even a limited means-ends inquiry is appropriate, especially given the Court's emphatic rejection of such analysis in *Bruen*. 597 U.S. at 19–24. And from a practical perspective, I fear that inferior courts will mangle and render meaningless even this limited means-end inquiry, as we have seen over a dozen years pre-*Bruen. Supra* at 4–8.

Without further guidance from the Court, I would construe footnote 9 to require the government to provide a historical analogue to justify the temporal limit on firearm permits. The state of Hawaii has failed to do so. It thus cannot restrict the Second Amendment right of its people.

BEA, Circuit Judge, dissenting:

This case could have been much more simple. The question it puts is straightforward: Does the Second Amendment presumptively prohibit the government from imposing facially neutral, ancillary regulations on the acquisition of firearms? In my view, text and precedent alike speak with a clear voice in answering "no." But the majority does not agree. My colleagues hold instead that any government regulation which applies generally to all firearm acquisitions, no matter how small, is presumptively invalid under the Second Amendment, subject to the government's steep burden of proving otherwise. But that approach avoids the Amendment's text, misreads instructions from the Supreme Court, contravenes controlling Circuit precedent, and diverges from some of our sister Circuits' applications of the Second Amendment. The result of the majority's errors is a regime of tight supervision over state gun laws, in which the Federal Judiciary is required to police the minutiae of every state firearm licensing system across the Nation. The Second Amendment does not require such a disruptive result. I respectfully dissent.[1]

The majority's critical error is its conclusion that "the acquisition of a firearm by an individual, through purchase or otherwise," is conduct "covered by the plain text of the Second Amendment." Maj. Op. at 33. From that conclusion, the majority reasons that the Supreme Court's holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), compels us to apply that case's historical analysis to government regulations which impose conditions

---

[1] While I dissent from the disposition of the appeal, I concur in the denial of Hawaii's motion to dismiss the appeal as moot for the reasons stated in the majority opinion. *See* Maj. Op. at 11–15.

se 1:19-cv-00578-JMS-RT    Document 129    Filed 03/14/25    Page 66 o
66                      Y̶o̶u̶n̶g̶ ̶v̶.̶ ̶J̶o̶n̶e̶s̶e̶z
                        PageID 1302

on an individual's ability to acquire a firearm like the ones at issue here.  Maj. Op. at 33.  I disagree with the premise of that reasoning.  The plain text of the Second Amendment does not wholly protect the purchase or the acquisition of firearms.  The majority's contrary conclusion conflicts with controlling Circuit precedent, and it creates a split between this Circuit and at least two others over how to apply *Bruen*'s still-novel historical test to cases like this one.

In making that mistake, the majority also adopts a strained reading of the Supreme Court's Second Amendment cases.  *Bruen* explicitly instructs that its history and tradition test is to be applied only to those regulations which directly regulate conduct covered by the "plain text" of the Second Amendment.  597 U.S. at 24.  *Bruen*'s footnote 9—about which more later—made clear the Court's intention to leave largely undisturbed those permitting schemes which "do not require applicants to show an atypical need for armed self-defense."  *See id.* at 38 n.9.  Such permitting schemes, the Court explained, "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry."  *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).  *Heller* similarly carved out of its holding certain "presumptively lawful regulatory measures" such as "conditions and qualifications on the commercial sale of arms."  554 U.S. at 626–27 & n.26.  In my view, these instructions from *Bruen* and *Heller* implicitly recognize what my colleagues miss: facially neutral, ancillary regulations imposing conditions on the acquisition of firearms do not regulate conduct protected by the Second Amendment's plain text.

This is not to say that the acquisition of arms is wholly unprotected from government regulation, or that regulations like the ones before us today can entirely evade judicial

scrutiny. Instead, consistent with *Bruen* and *Heller*, I would recognize a presumption of constitutionality when the regulations in question are facially neutral, ancillary regulations which impose conditions on acquisition of arms. To rebut or overcome that presumption of constitutionality, a plaintiff challenging a state licensing regulation should bear the burden of alleging and proving that the regulation at issue is "put toward abusive ends," such that the regulation effectively or in practice "den[ies] ordinary citizens their" rights to keep and carry. *See Bruen*, 597 U.S. at 38 n.9. In other words, he needs to prove that the regulation operates to "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Heller*, 554 U.S. at 635).

But on this "*facial* challenge to one logistical detail of Hawaii's permitting system," Maj. Op. at 37 (emphasis in original), Plaintiffs have neither alleged nor proven that they or anyone else are in practice denied their rights to keep and carry arms. Plaintiffs have therefore not carried their burden of proving that the regulations they challenge are abusive within the meaning of *Bruen* footnote 9 and our precedents. I would therefore reverse the district court's judgment and vacate the permanent injunction.

# I.

## A.

It will be helpful to start with some first principles, from which the rest of the analysis will follow. The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Before going any further, it's worth pausing to define the precise meaning of the words "keep" and "bear." The definitions are not particularly controversial, but the plain

textual meaning of the operative words should always be the touchstone of the analysis.

"[T]he most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Heller*, 554 U.S. at 582. The "most relevant[]" meanings of "keep" include "to retain; not to lose," and "to have in custody." *Id* (cleaned up). At least one early nineteenth century dictionary "defined [keep] as '[t]o hold; to retain in one's power or possession.'" *Id.* (quoting N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). At the time of the Framing, "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen and everyone else." *Id.* at 583 (emphasis omitted). So, the right to keep arms refers to the right to possess and retain control of arms.

The verb "bear" also has a well-accepted meaning. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* at 584 (citation omitted). In the context of bearing *arms* in particular, "the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* Thus, "the right to bear arms refers to the right to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 597 U.S. at 32 (cleaned up).

So, the plain text of the Second Amendment protects two discrete, specific actions: (1) to possess and retain control of arms, and (2) to carry arms in public in case of confrontation (*i.e.*, for self-defense). *Id.*; *Heller*, 554 U.S. at 582–84. The plain text of the Second Amendment does not speak of any right to "purchase" or "acquire" or "receive" arms, which actions constitute conduct different from "keeping" and

"bearing." As the majority opinion and some of our prior cases point out, however, the right to keep and bear arms would be rather hollow were the government able to ban the purchase or acquisition of firearms nonetheless. *See* Maj. Op. at 27–28. I agree with the majority that "one cannot ordinarily 'possess' an item—particularly something as complex as a firearm—if he or she cannot acquire it." *Id.* at 28. That is because acquisition, or "tak[ing] possession," *id.*, is a *predicate act* necessary to actual possession.

"The law has long recognized that the '[a]uthorization of an act also authorizes a necessary predicate act.'" *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 192 (2012) (hereinafter Scalia & Garner)). This "ancient" principle is known as the "predicate-act canon." Scalia & Garner 192. The basic idea is that whenever a power is given by a statute or some other text, any other action that is necessary to exercise that power is also given by implication. *Id.* 192–93. "This logic applies equally to individual rights. . . Constitutional rights thus implicitly protect those closely related acts necessary to their exercise." *Luis*, 578 U.S. at 26 (Thomas, J., concurring in the judgment). As relevant here, for example, "[t]he right to keep and bear arms . . . implies a corresponding right to obtain the bullets necessary to use them, . . . and to acquire and maintain proficiency in their use." *Id.* (internal citations and quotations omitted).

The predicate-act canon therefore sheds some light on how we ought to think about protecting the acquisition of firearms from government regulation, considering the Second Amendment's textual protection of the rights to keep and bear them. The protection of predicate acts, though, does not imply a level of protection identical to that of the

core right.  "The predicate-act canon must be applied with caution, lest the tail of what is implied wag the dog of what is expressly conferred."  Scalia & Garner 193.  So, for example, "permission to harvest wheat on one's land implies permission to enter on the land *for that purpose*," Scalia & Garner 192 (emphasis added), but not for any other purpose, such as to hunt or to drill for water.  In the context of keeping and bearing arms, the canon instructs that we should protect all acts—and *only* those acts—which are reasonably necessary to effectuate the right to keep and bear arms.  The acquisition of arms, then, certainly is protected by the Second Amendment, but only to the extent necessary to preserve the explicitly granted rights to keep and bear arms.[2]

## B.

With those interpretive principles in mind, let us turn to *Heller* and *Bruen*.  Both cases, unlike this one, concerned regulations which directly restricted the core textual Second Amendment rights to "keep and bear" arms.  The District of Columbia law at issue in *Heller* "totally ban[ned] handgun possession in the home," *i.e.*, it directly prohibited the

---

[2] The majority characterizes this view as thinking the Second Amendment "protect[s] the right to retain guns that you have no right to acquire."  Maj. Op. at 30.  That is not true.  The difference of opinion is over what is protected by the Amendment's *plain text*.  And my view is that there is a difference between rights which are expressly conferred and those which are *implied* by the text, with the latter category of rights receiving protection only to the extent necessary to preserve the former.  It is not the case, as should be clear, that I view the Second Amendment as not protecting rights to acquire arms at all.  Instead, it prohibits the government from regulating acquisition in a way that effectively, or "in practice," denies the rights to possess and carry.  *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring); *see also id.* at 38 n.9 (distinguishing state licensing laws which do not operate to "prevent law-abiding, responsible citizens from exercising their Second Amendment right[s]").

keeping of arms.  *See* 554 U.S. at 628.  In *Bruen*, the New York regulation at issue required individuals to show "proper cause" to obtain a license to carry a handgun.  597 U.S. at 11–12.  Because New York's law did not allow most ordinary citizens to "carry[] handguns publicly for self-defense," the Court had "little difficulty concluding that" the law regulated conduct protected by the "plain text of the Second Amendment."  *Id.* at 32.  In each case, the law at issue clearly and directly restricted the ability of ordinary citizens to keep arms (in the case of *Heller*) or bear arms (in the case of *Bruen*).

Both opinions were also careful to distinguish the laws at issue from other types of arms regulations, such as regulations requiring background checks, *Bruen*, 597 U.S. at 38 n.9, and "laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27. Footnote 9 of *Bruen*, which my colleagues spend much time dissecting, reasoned that at least some preconditions to obtaining a firearms permit "do not necessarily prevent 'law abiding, responsible citizens' from exercising their Second Amendment right to public carry."  *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).  The Court in *Heller* described preconditions on purchase as "presumptively lawful."  *See* 554 U.S. at 626–27 & n.26.  And Justice Kavanaugh's concurrence in *Bruen* emphasized that the decision "*does not prohibit* States from imposing licensing requirements for carrying a handgun for self-defense." *Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring).[3]  Indeed, in Justice Kavanaugh's view, *Bruen* did not even "affect the

---

[3] As the majority recognizes, Justice Kavanaugh's concurrence was joined by the Chief Justice, and both Justice's votes were necessary to *Bruen*'s six-justice majority.  Maj. Op. at 23.

existing license regimes" in the vast majority of states with a "shall-issue" regulatory scheme. *Id.*

There is no need to guess, as does the majority, why the Court in *Heller* and *Bruen* thought that regulations which impose preconditions to obtaining a firearms permit were different from the laws before the Court in those cases. *See* Maj. Op. at 39 ("Unfortunately, neither the *Bruen* Court in footnote 9, nor Justice Kavanaugh in his *Bruen* concurrence, set forth their precise reasoning for implicitly concluding that modern background-check systems satisfy the 'how' prong of *Bruen*'s historically based test.").    The test announced in *Bruen* answers that question: "When the Second Amendment's *plain text* covers an individual's conduct, . . . [t]he government must [] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."    597 U.S. at 24 (emphasis added).    What footnote 9 implicitly observed is that most preconditions on a permit to acquire a firearm do not regulate conduct covered by the "plain text" of the Second Amendment.    Instead, such regulations impose conditions and qualifications on an individual's ability to *acquire* a gun, not when, where, or how he can *possess* (*Heller*) or *carry* (*Bruen*) one.

The majority is therefore incorrect that the *Bruen* Court "implicitly conclude[ed]" that at least *some* modern preconditions on the acquisition of arms, such as background checks, are consistent with our Nation's history of firearms regulation. Maj. Op. at 39. Rather, the *Bruen* Court instead concluded that background checks are not subject to that historical tradition test *at all*. Unlike the regulations at issue in *Heller* and *Bruen*, regulations which impose background checks, waiting periods, filing fees, and other administrative processing requirements do not on their face "deny ordinary

citizens their right to public carry." *See Bruen*, 597 U.S. at 38 n.9.

To be sure, the *Bruen* Court and Justice Kavanaugh's concurrence both recognized a problem already explained: there must be some limits on the government's ability to regulate acquisition of arms, else the rights to possess and carry them would be hollow indeed. The Court in footnote 9 explained that "because any permitting scheme can be put toward abusive ends," successful challenges to such a permitting scheme can still obtain if the scheme nonetheless operates effectively to "deny ordinary citizens their right to public carry." *Id.* Justice Kavanaugh reasoned that even though regulatory permitting schemes in general "are constitutionally permissible," a plaintiff remains free to bring "an *as-applied challenge*" if the scheme "does not operate in that manner *in practice*." *Id.* at 80 (Kavanaugh, J., concurring) (emphasis added).

*Heller* and *Bruen* are thus entirely consistent with the textual analysis undertaken above. The two cases recognize and support the principle that the predicate act of acquiring a firearm should be protected, but only to the extent necessary to preserve the explicitly granted rights to keep and bear arms. The Second Amendment explicitly protects the rights of ordinary citizens to possess and carry firearms for self-defense, and government restrictions on those activities ought to be subject to the exacting historical scrutiny that *Heller* and *Bruen* employed. But when it comes to ancillary[4] regulations imposing conditions on the

---

[4] The qualifier term "ancillary" in this context should not be understood as describing regulations which place "incidental prohibitions on 'core' rights." Maj. Op. at 32. The distinction I have drawn here has no basis

purchase or acquisition of arms, the Second Amendment
implicitly imposes lesser restrictions on the government.
The government may permissibly regulate the *process* by
which individuals may acquire arms, so long as it does not
put such regulations "toward abusive ends" such that the
regulations "deny ordinary citizens their right to public
carry." *Bruen*, 597 U.S. at 38 n.9.    Otherwise, such
regulations are "presumptively lawful." *Heller*, 554 U.S. at
626–27 & n.26.    The majority opinion therefore
misconstrues these instructions from the Supreme Court,
concluding instead that laws which impose conditions on the
acquisition of arms are subject to the same judicial tests and
scrutiny as those laws that directly restrict their possession
or carry.

## II.

### A.

Neither does Ninth Circuit precedent side with the
majority.    Respectfully, my colleagues misread and
misapply our pre-*Bruen* decision, *Teixeira v. County of
Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc) to find that
acquisition of a firearm is protected by the Second
Amendment to the same extent as keeping or carrying a
firearm.  And our more recent—and much more relevant—
decision in *B&L Productions v. Newsom*, 104 F.4th 108 (9th
Cir. 2024), forecloses the majority's interpretation of

---

in the "incidental" burdening of rights.  Instead, the question is what the
law actually regulates on its face.  When the law's text does not regulate
possession or carry, it is ancillary, and further inquiry is necessary to
determine whether it "prevent[s] 'law abiding, responsible citizens' from
exercising their Second Amendment right[s]." *Bruen*, 597 U.S. at 38 n.9
(quoting *Heller*, 554 U.S. at 635).

*Teixeira*.  In other words, today's decision conflicts with the current law of our Circuit.

Respectfully, the majority's interpretation of *Teixeira* is simply incorrect.  *Teixeira* concerned an Alameda County zoning ordinance that prohibited retailers from obtaining a permit to sell firearms in certain areas, such as near residences, schools, and liquor stores.  873 F.3d at 673.  The en banc panel *affirmed* the district court's dismissal of a Second Amendment challenge to that law because the plaintiff "failed to state a claim that the ordinance impedes Alameda County residents from acquiring firearms."  *Id.* at 678.  In so concluding, the court recognized that "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."  *Id.* at 677 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

The majority mischaracterizes that passage from *Teixeira* as "holding . . . that the purchase and acquisition of firearms is conduct that is protected by the plain text of the Second Amendment."[5]  Maj. Op. at 28.  To the contrary, the *Texeira* opinion explicitly recognized, as explained above, that there is a difference between the "core right to possess a firearm for self-defense" and the "*ancillary* rights necessary to the realization" of that right.  *See* 873 F.3d at 677

---

[5] Indeed, I was the lone dissenter on the en banc panel in *Teixeira*, and I explained at the time that the majority opinion did not give *enough* importance to the predicate rights to purchase or sell firearms.  *See Teixera*, 873 F.3d at 695–96 (Bea, J., dissenting).  Obviously, developments in the law since that case was decided have somewhat reshaped my views on the topic.  But regardless the wisdom of the *Teixeira* opinion at the time, it binds us here, and it decidedly did *not* hold that the right to acquire a firearm is fully protected by the Second Amendment's plain text.

(emphasis added). The court was in fact quite careful not to "define the precise scope of any such acquisition right under the Second Amendment." *Id.* at 678. The opinion makes no mention of such a right to acquire as being covered by the Second Amendment's "plain text" (and, as discussed earlier, that conclusion would be incorrect). The majority thus conflates *Teixeira*'s acknowledgment of a *relationship* between the possession and acquisition of arms—a premise not in dispute—with an affirmative holding that the two activities are protected to the same extent.

Were there any remaining doubt about the correct reading of *Teixeira*, our decision in *B&L Productions* resolves it contrary to the majority's interpretation. In evaluating a challenge to California statutes that banned the sale of guns on state property, the panel in that case concluded that "the plain text of the Second Amendment does not cover [the plaintiff's] proposed conduct," so the statutes were presumptively constitutional. *B&L Prods.,* 104 F.4th at 117. "The plain text of the Second Amendment directly protects [only] the right to 'keep and bear' firearms. . . [But] we acknowledged [in *Teixeira*] that unless the right to acquire firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless." *Id.* at 117–118. The panel also read *Heller* and *Bruen* to "suggest[] that the ancillary right at issue in these cases—the right to acquire firearms—only implicates the Second Amendment in limited circumstances."[6] *Id.* at 118. As a consequence, the court

---

[6] This language forecloses any argument by the majority that *B&L Productions* was limited only to "the specific conduct of 'contracting for the sale of firearms and ammunition *on state property*,'" *i.e.*, acquisition by "one particular *means*." Maj. Op. at 28–29 (emphasis in original)

held that the right to acquire firearms is protected "to the extent necessary" to preserve the right to keep and bear firearms for lawful purposes and self-defense. *Id.*

In arriving at its conclusion, the court in *B&L Productions* was drawing on the same language from *Heller* and *Bruen* discussed earlier. "[*Heller*] explicitly framed 'laws imposing conditions and qualifications on the commercial sale of arms' as '*presumptively lawful* regulatory measures.'" *Id.* at 118–19 (quoting *Heller*, 554 U.S. at 626–27 & n.26). To be presumptively lawful, the court explained, "it necessarily must not implicate the plain text of the Second Amendment." 104 F.4th at 119. "Otherwise, *Bruen* makes clear that the Constitution would 'presumptively *protect*[] that conduct,' and the government would bear the burden of identifying a historical tradition of similar regulation." *Id.* "The most reasonable interpretation of [*Heller* and *Bruen*] is that commercial restrictions *presumptively* do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *See id.* at 119

---

(quoting *B&L Prods.*, 104 F.4th at 117). The *B&L Productions* court defined the "ancillary right" under consideration as "the right to acquire firearms." 104 F.4th at 118. Its conclusion that such a right is protected only to the extent necessary to preserve the core right to keep and bear arms is therefore the law of the Ninth Circuit, and this panel is bound to follow it. See *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit."). Plus, the same logic the majority uses to distinguish *B&L Productions* could be applied here: the proposed course of conduct isn't "acquisition *simpliciter*," Maj. Op. at 28, it is purchasing a firearm *more than thirty days after a permit is issued*. This sort of manipulation of the "level of generality" at which the right is defined cannot be the basis for determining how we evaluate different kinds of regulations. *Cf. United States v. Rahimi*, 602 U.S. 680, 739–40 (2024) (Barrett, J., concurring).

(emphasis added). The majority's holding simply does not square with this thorough and binding language from *B&L Productions*. *See Johnson*, 256 F.3d at 914.

All this should sound familiar by now. An array of sources that bind our review—the text of the Constitution, directives from the Supreme Court, and published Ninth Circuit opinions—establish the rule the majority ignores today: a facially neutral government regulation which imposes conditions on the acquisition of firearms does not regulate conduct covered by the plain text of the Second Amendment, and it is therefore presumptively constitutional.

**B.**

The majority's conclusion that regulations on the acquisition of arms are presumptively protected because they are covered by the Second Amendment's plain text also diverges from our sister Circuits. An examination of three recent cases from the Fifth and Tenth Circuits helps illustrate.

In *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), the Fifth Circuit considered a challenge to an expansion of federal background check procedures that required a ten-day waiting period in which to await the results of a background check before a gun could be acquired. The court analyzed *Bruen*'s footnote 9 as "distinguish[ing] the treatment of prohibitions on 'keeping and bearing'—such as the law at issue in *Bruen*—and other ancillary firearm regulations such as background checks preceding sale." *McRorey*, 99 F.4th at 836–37. The court noted that the Second Amendment's "plain text covers plaintiffs' right 'to keep and bear arms,'" which "on its face . . . does not include purchase—let alone without a background check." *Id.* at 838. But, once again,

the panel recognized that "[t]he right to 'keep and bear' can *implicate* the right to purchase. That is why [*Bruen* footnote 9] prohibits shoehorning restrictions on purchase into *functional* prohibitions on keeping. But such an implication *is not the same thing as being covered by the plain text of the amendment*." *Id.* (emphasis added).

For that reason, the Fifth Circuit concluded that background checks and the ten-day waiting period were "presumptively lawful," and turned "to whether plaintiffs have shown that these presumptively lawful regulations have been 'put toward abusive ends' or have otherwise rebutted that presumption." *Id.* at 839. The court concluded that the plaintiffs could not do so, because a ten-day period does not amount to "a *de facto* prohibition on possession," which would "subject [the regulation] to *Bruen*'s historical framework," because that is when the regulation would restrict conduct protected by the plain text of the Second Amendment. *See id.* at 840.

The Tenth Circuit then reasoned similarly when it decided *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), in which it upheld a Colorado statute that prohibited the purchase of firearms by persons under the age of twenty-one. The court undertook a similar analysis as did the Fifth Circuit to conclude that Supreme Court's Second Amendment cases contain a "recognition that certain 'longstanding' regulations—including 'laws imposing conditions and qualifications on the commercial sale of arms,'—are 'presumptively lawful.'" *Rocky Mountain*, 121 F.4th at 118 (quoting *Heller*, 554 U.S. at 626–627 & n.26). The Tenth Circuit interpreted "*Bruen*'s 'abusive ends' limitation to mean that any condition or qualification on the sale or purchase of firearms, if found to have such abusive

ends, negates the presumption that the law or regulation is lawful." *Id.* at 122 (quoting *Bruen*, 597 U.S. at 38 n.9).

Not to be outdone, the Fifth Circuit even more recently considered a similar *federal* ban on sales to persons under the age of twenty-one by federally licensed firearms dealers. *Reese v. Bureau of Alcohol, Tobacco, and Firearms*, 127 F.4th 583, 586 (5th Cir. 2025). The court went the other way from the Tenth Circuit, holding that such a prohibition was facially unconstitutional, applying *Bruen*'s historical framework. *Id.* at 589–90, 600 At first blush, it might seem like the Fifth Circuit and Tenth Circuit were no longer on the same page, but there is less tension here than initially meets the eye. As the Fifth Circuit pointed out in *Reese*, the Tenth Circuit "committed a category error in its analysis that a *complete ban* on the most common way . . . to secure a firearm" does not regulate conduct covered by the Second Amendment's plain text. *See id.* at 590 n.2 (emphasis added). I agree that the Tenth Circuit erroneously conflated a *total ban* on an entire class of people from acquiring a firearm with an *ancillary regulation* on acquisition. Nonetheless, the Tenth Circuit's *Rocky Mountain* decision still recognized the correct principle that regulations on acquisition ought to be treated differently than those on keep and carry. The difference is simply one of application: even if the under-twenty-one restrictions at issue in *Rocky Mountain* and *Reese* were nominally regulations on "acquisition" in a purely semantic sense, a plaintiff clearly would overcome any presumption of constitutionality in a challenge to such a restriction. A total ban on purchase by an entire class of people obviously "meaningfully constrains" the ability of members of that class to exercise their core Second Amendment rights. *B&L Prods.*, 104 F.4th at 119. In other words, its practical effect is to "deny

ordinary citizens" under the age of 21 their rights to keep and bear arms. *See Bruen*, 597 U.S. at 38 n.9.[7]

These cases from our sister Circuits show an emerging (and quite correct, in my view) consensus that ancillary regulations which impose *preconditions* on acquisition of arms ought to be treated differently from those that directly restrict keep and carry. While there is some inter-Circuit debate over how that rule should apply to more onerous wholesale *bans* on purchase by certain groups, all agree that the ancillary regulations like the ones before us today are of a different kind.

## III.

Let us now turn to the regulations at issue in this case and examine them under the correct legal standard. Hawaii law provides that "No person shall acquire the ownership of a firearm . . . until the person has first procured from the chief of police . . . a permit to acquire the ownership of a firearm as prescribed in this section." Haw. Rev. Stat. § 134-2(a). "Permits issued to acquire any pistol or revolver shall be void unless used within thirty days after the date of issue." *Id.* § 134-2(e). Pistols and revolvers also "require a separate application and permit for each transaction." *Id.* On the

---

[7] The Fifth Circuit's *Reese* decision implicitly acknowledged this important point when it distinguished its holding from *McRorey*. It reasoned that, even though the *McRorey* panel concluded that the plain text of the Second Amendment doesn't fully protect acquisition rights, the *McRorey* court nonetheless "noted that [*Bruen* footnote 9] 'prohibits shoehorning restrictions on purchase into *functional* prohibitions on keeping.'" *Reese*, 127 F.4th at 590 n.2 (quoting *McRorey*, 99 F.4th at 838) (emphasis added). The *Reese* court determined that an "outright ban" goes far beyond a "functional prohibition" through ancillary conditions on purchase or acquisition, and so the *Bruen* test applied. *Id.* I quite agree.

other hand, "Permits issued to acquire any rifle or shotgun shall entitle the permittee to make subsequent purchases of rifles or shotguns for a period of one year from the date of issue without a separate application and permit for each acquisition." *Id.* Hawaii thus has special, and stricter, rules for handguns than for rifles and shotguns: the rules require an individual to obtain a permit for each handgun transaction, and the permit is valid only for thirty days.[8] Rifles and shotguns, in contrast, require only a single permit, valid for subsequent purchases for one year. From this set of regulations, plaintiffs specifically challenge the thirty-day expiration period for the handgun permits.

There is one more regulation at issue. Regardless the type of firearm acquired under the above-described sections, the firearm must be registered "within five days of acquisition." Haw. Rev. Stat. § 134-3(b). In addition, "[i]f the firearm is acquired from a person who is not a [licensed dealer] . . . the firearm shall be physically inspected by the chief of police . . . at the time of registration." *Id.* Like the expiration period for handgun permits, this in-person inspection requirement has undergone some changes since the district court originally considered it. As the majority recounts, in the past this provision applied to all acquisitions of a firearm, but it now applies only to firearms not acquired from a state or federally licensed firearms dealer. Maj. Op. at 12–13. While those changes were originally temporary, the Hawaii legislature has made them permanent. It is therefore not the case that this inspection requirement applies to every purchaser or every firearm. In their supplemental briefing, Plaintiffs identified three categories

---

[8] As the majority discusses, the expiration period for a handgun permit was originally ten days, rather than thirty, when this case originally came to us from district court. Maj. Op. at 12.

of firearms to which the in-person inspection requirement applies: (1) guns which lack serial numbers (so-called "ghost guns"); (2) guns brought into Hawaii from out of state; and (3) guns transferred between private persons.[9]

On their face, neither the thirty-day expiration period for a handgun permit nor the in-person inspection requirement regulate conduct covered by the plain text of the Second Amendment.    Such regulations place no restrictions whatsoever on the permit holder's ability to keep and possess the acquired arm in his home or elsewhere, nor does it preclude him from carrying the weapon in public or otherwise "bearing" it.    Plaintiffs therefore should have the burden here of establishing—by allegation and proof—that the regulation "meaningfully constrains the right to keep and bear" firearms.  *See B&L Prods.*, 104 F.4th at 119.  In *Bruen* terms, they need to prove that, "in practice," *Bruen* 597 U.S. at 80 (Kavanaugh. J., concurring), the regulation is "put toward abusive ends," such that it effectively "den[ies] ordinary citizens their right to public carry."  *Bruen*, 597 U.S. at 38 n.9.

On this record, Plaintiffs have not met that burden.  They have not adduced any evidence that could lead a factfinder to conclude that either regulation practically denies them their right to keep and bear arms.  They do not, for example, proffer proof to establish that the Hawaii's handgun

---

[9] The majority does not explain why its analysis distinguishing laws which regulate "acquisition *simpliciter*" and those "that merely restrict one particular *means* of acquiring a firearm," Maj. Op. at 28–29, does not alter its conclusion as to the in-person inspection requirement. Setting aside the thinly veiled nature of the distinction, *see* n. 5 *supra*, the in-person inspection requirement plainly does not regulate "acquisition *simpliciter*."   It regulates only a few small categories of acquisition.

permitting system operates differently "in practice" than it
does on paper.  *See Bruen*, 597 U.S. at 80 (Kavanaugh, J.,
concurring).    Nor do they point to any evidence that
Plaintiffs, in particular, will not be able to acquire, possess,
and carry the handguns they seek as a result of the thirty-day
permit expiration period.[10]    Plaintiffs also do not explain
why having to meet the in-person inspection requirement
might effectively "deny [Plaintiffs] their right to public
carry."  *Id.* at 38 n.9.

Some of Plaintiffs' allegations in their complaint are
illustrative of these defects.[11]   For example, Plaintiff Todd
Yukutake alleges that on one occasion, he was unable to
register a handgun at a police station because *he himself* "had
misplaced his permit to acquire."   After he "found" it, "he
returned to [the police station] the next day and retrieved his
firearm."   Obviously, Yukutake does not make out a claim
that the regulations are abusive on account of a one-day

---

[10] The majority characterizes the thirty-day expiration period as
"narrow" and "very short."  Maj. Op. at 33, 45.  But the majority does
not explain its metric as to  *why* thirty days is "very short" or "narrow."
There is no claim or proof, for instance, that citizens in Hawaii are not
ordinarily able to acquire a handgun within thirty days.  The majority's
conclusion is thus ultimately an unexplained and subjective, values-
based assessment.  Would sixty days be narrow? Ninety? The better
approach is instead to require *evidence*, submitted by the plaintiff who
bears the burden of proof, to determine whether the time period is
unfairly "very short" or "narrow," rather than to rely on "the
philosophical or policy dispositions of the individual judge." *Cf. Rahimi*,
602 U.S. at 717 (Kavanaugh, J., concurring).

[11] This case is at the summary judgment stage, but I refer to the
allegations in the operative complaint merely to demonstrate the kinds
of facts that the Plaintiffs here alleged, and to explain why such facts,
even had they been proven, would not be sufficient.

delay in registering his firearm because he misplaced his own permit.

One of Yukutake's allegations admittedly gets a little closer to establishing that the *prior*, now revoked, ten-day expiration period might have been abusive, at least in some circumstances. Yukutake alleges that he agreed to purchase a handgun on November 11, 2018, applied for the permit to acquire it on December 13, 2018, and "picked up" the issued permit on either December 27 or 28. When he went to the gun shop to acquire his new handgun, though, "the shop was closed and the sign on the door stated it would be closed through January 9, 2019," which would have been outside the ten-day expiration period that then applied to his permit. As a result, Yukutake had to start the permit process all over again. At the complaint stage, this *might* make out a claim that the ten-day period was, at least sometimes, impermissibly abusive. But even that is debatable on Yukutake's specific facts—Yukutake waited over a month from when he agreed to buy the handgun to apply for his permit, by which point the business closings of the holiday season and new year period made it more difficult to execute each step that the permitting regulations required of him. Nor does he allege that he was unable to renew his permit and subsequently acquire, possess, and carry the gun. Regardless, it is the thirty-day period which is before us today. That the ten-day period might have been abusive in a limited and particular circumstance does not come close to establishing the same as to the thirty-day period in all or even most circumstances. Yukutake makes no allegations as to the abusiveness of the in-person inspection requirement

(and, as discussed, it may no longer apply to his desired acquisitions).**¹²**

The majority responds by asserting that the standard gleaned from the language of *Bruen* and *Heller* requires a Second Amendment plaintiff to make a "demanding threshold showing." Maj. Op. at 32. I do not think this standard is demanding at all, particularly in an as-applied challenge. All a plaintiff must do is explain, by reference to factual allegations and proof, why the regulation he challenges in practice denies his ability to keep and carry a gun. If he cannot do so, why should the regulation be held to violate his rights? And remember, this case presents a *facial challenge*, where the plaintiff has to show that the regulation is unconstitutional as applied to everyone, and in all or nearly all cases. *See Rahimi*, 602 U.S. at 693. That is, of course, "a heavy burden of persuasion," but it is one we require in any facial challenge. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 200 (2008). Outside the First Amendment context, it is black-letter law that "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)

---

¹² The same analysis applies to Plaintiffs' allegations that they are required to "take time off work" to meet Hawaii's permitting requirements. The mere fact that they have to take off work to apply for a permit, register the gun, and in some limited circumstances bring it for inspection does not establish abusiveness in all or nearly all cases, even if under some unusual conditions it might prevent someone from obtaining a gun to keep and carry. This is particularly so given the expansion of the handgun permitting expiration to thirty, rather than ten, days (as well as the narrowing of the in-person inspection requirement to a highly limited set of firearm acquisitions).

(quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

More fundamentally, I take strong issue with the idea that it is somehow wrong to require a plaintiff to meet an evidentiary burden to prove his case. The situations in which we require a plaintiff to prove something before we declare that a challenged law is unconstitutional are far too numerous to list. *See, e.g., Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2021) ("Under this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses."); *Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State."); *Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1122 (9th Cir. 2016) ("[T]he extent of the burden that a primary system imposes on associational rights is a factual question on which the plaintiff bears the burden of proof."); *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010) (In a Dormant Commerce Clause challenge, "[t]he party challenging the statute bears the burden of showing discrimination.").

Plaintiffs have neither sufficiently alleged nor proven that either of the challenged regulations prevents "a single individual from keeping and bearing firearms." *See B&L Prods.*, 104 F.4th at 119. For that reason, I would vacate the district court's injunction and remand with instructions to grant summary judgment to Defendants on Plaintiffs' facial challenge.[13]

---

[13] If my view had carried the day, I would certainly have left the door open for Yukutake or any other Plaintiff to bring an *as-applied* challenge

**IV.**

Now to examine the majority's contrary holding. Despite all said here, my colleagues nonetheless conclude that the permit expiration period "applies generally to all acquisition of handguns, and it therefore clearly implicates the plain text of the Second Amendment." Maj. Op. at 39. And as to the in-person inspection requirement, the majority likewise holds that it "regulates and burdens the acquisition of firearms by ordinary citizens," and it therefore "regulates conduct that is covered by the text of the Second Amendment." *Id.* at 46–47. As a consequence of that conclusion, the majority proceeds to *Bruen* "step two" for each provision, requiring Hawaii to "carry its burden to 'justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24). I have already attempted to explain why the premise—that the conditions imposed on acquisition of an arm regulate conduct covered by the plain text of the Second Amendment—is incorrect. But the majority's errors do not stop there. The majority's resulting application of *Bruen*'s history and tradition standard is difficult to understand. And the implication of its holding is that federal courts will become a kind of bureaucratic police, scrutinizing and invalidating even the most mundane details of state licensing regimes.

**A.**

**1.**

To start, a brief word about the limited disagreement between my colleagues in the majority and Judge Lee's

---

to the regulations, based on concrete facts, either on remand or in a new lawsuit.

concurring opinion. As I understand it, Judge Collins and Judge Lee agree on the critical threshold question that has been the focus of this dissent: whether the permitting regulations at issue here regulate conduct covered by the plain text of the Second Amendment, such that *Bruen*'s historical framework applies. Where my colleagues appear to part ways is the question of what to make of *Bruen's* footnote 9, and in particular how to determine whether a regulation from a shall-issue regime, such as Hawaii's, is put "toward abusive ends." Concurring Op. at 56. I cannot share my colleagues' mystified view of how the Court came to write footnote 9. Rather, I think the implications of its reasoning are readily apparent, particularly when viewed in light of the rest of *Heller*'s and *Bruen*'s analysis and the textualist principles that guide our review.[14]

At any rate, seeking to avoid the inquiry into what to make of footnote 9, Judge Lee would simply require Hawaii to put forward a historically analogous regulation. Concurring Op. at 64. Finding none, he concludes that the regulations are unconstitutional and would apparently stop there. *Id.* As explained, I would apply *Bruen* differently at the threshold, concluding that the regulations at issue here

---

[14] The majority is misguided in its search for some "unstated reasoning" by the Supreme Court that background checks must in some way satisfy the *Bruen* historical framework. Maj. Op. at 39; *see also* Concurring Op. at 63–64. As explained above, what *Bruen*'s footnote 9 "implicitly conclud[ed]," Maj. Op. at 39, is that background checks are not subject to its historical framework at all. It is difficult to believe, to put it mildly, that the Court would conclude that modern digital background checks align with some historically analogous regulation without saying anything at all about what that analogue might be. That is certainly not what the Court did in *Rahimi,* where it went into some detail about the emergence and practice of surety and affray laws as historical support for its rationale. *See Rahimi*, 602 U.S. at 693–98.

do not regulate conduct covered by the plain text of the
Second Amendment, and thus do not require justification by
historical analogue under *Bruen*. My disagreement with
Judge Lee is therefore limited to the threshold question.

As to how to resolve the "abusiveness" inquiry, my
colleagues are split. Judge Lee's approach simply requires
the government to point to historical analogues in line with
the analyses in *Bruen* and *Rahimi*. Judge Collins instead
takes *Bruen*'s invitation to fashion a "more nuanced
approach" in cases, like this one, which involve modern
technology and law enforcement practices far afield from
those known to the Framers more than 200 years ago. Maj.
Op. at 38.

The practical implications of both of my colleagues'
views are the same, *see infra* IV.B, but methodologically
they are quite different. Judge Lee's view is admittedly
more straightforward—had I agreed with my colleagues that
the regulations before us covered conduct protected by the
plain text of the Second Amendment, I would agree with
Judge Lee's application of *Bruen*'s historical test. But I
disagree with Judge Collins' alternative approach, even
taking the threshold "plain text" error as a given, and will
attempt to explain why.

### 2.

As I have done here, Judge Collins focuses in large part
on *Bruen*'s footnote 9, and in particular on the Supreme
Court's instruction that certain aspects of state permitting
regimes may be unconstitutional if they are "abusive" such
that they "deny ordinary citizens" their Second Amendment
rights. Maj. Op. at 40–41 (quoting *Bruen*, 597 U.S. at 38
n.9). In his view, footnote 9 was drawing on First
Amendment principles to conclude that permitting systems

"must be guided by 'narrow, objective, and definite standards.'" *Id.* That makes some sense, especially in light of *Heller*'s and *Bruen*'s other references to First Amendment principles. *See* Maj. Op. at 41 n.12. I generally agree that First Amendment principles, particularly those principles "governing the logistical operation of permitting systems," Maj. Op. at 41, can be helpful to determining when an ancillary regulation on acquisition crosses the line to become an abusive restriction that would in turn be subject to *Bruen*'s historical framework.[15]

Respectfully, Judge Collins takes that modest proposition too far. He reasons that the usefulness of First Amendment principles to the Second Amendment analysis ought to mean that we transpose, *mutatis mutandis*,[16] First Amendment jurisprudence onto the Second Amendment entirely. Maj. Op. at 41. But First Amendment principles can take us only so far in Second Amendment territory. For starters, the First Amendment protects an entirely different set of rights. While the focus tends to be on "freedom of

---

[15] Other areas of law are also surely helpful. In the Fifth Amendment takings context, "courts determine whether a regulatory action is functionally equivalent to the classic taking[,] using essentially ad hoc, factual inquiries, designed to allow careful examination and weighing all the relevant circumstances." *Bridge Aina L'ea, LLC v. Land Use Comm'n*, 950 F.3d 610, 625 (9th Cir. 2020) (internal quotation and citation omitted). The doctrine of unconstitutional conditions, the requirements of procedural due process, and other areas of constitutional jurisprudence also independently govern how and when government regulators may allow, deny, revoke, or condition the purchase or acquisition of firearms as part of its overall regulatory scheme. In other words, there is no need to force the Second Amendment to do all the doctrinal work necessary to prevent government encroachment on the rights of citizens to keep and carry arms.

[16] Literally, "things having been changed that have to be changed." *See* https://www.merriam-webster.com/dictionary/mutatis%20mutandis.

speech," the First Amendment also protects "freedom . . . of the press." U.S. Const. amend. I. Freedom of the press means freedom from what we usually call prior restraints, or "previous restraints upon publication." *See* 4 W. Blackstone, *Commentaries on the Laws of England*, 150–53 (Chicago Ed. 1979). In the First Amendment context, the whole idea of permits, which are prior restraints on publication, usually brings with it a high level of Constitutional suspicion. *See, e.g., Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009) ("A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality." (internal quotation and citation omitted)). Judge Collins does not purport to apply the same level of First Amendment scrutiny to *all* kinds of Second Amendment permits. Nor could he, given the *Bruen* Court's conclusion in footnote 9 that firearm permitting schemes, as a general matter, are presumptively Constitutional. In the First Amendment context, it's the opposite: Speech permitting schemes are, as a general matter, unconstitutional. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 720–721 (1931).

I also join Judge Lee in disagreeing with Judge Collins's choice to use means-ends scrutiny as part of his analysis.[17] To conclude that the provisions at issue are "abusive" within

---

[17] While I appreciate Judge Lee's recitation of the recent history of our court and others misusing means-ends scrutiny to whittle down Second Amendment rights, I respectfully do not think that those concerns should carry any water here. The problem with means-ends scrutiny is that its use to evaluate Second Amendment claims violates the Supreme Court's express holding in *Bruen*. It is also a methodologically poor tool to adjudicate claims like the ones before us here. Many legal and jurisprudential principles have a checkered past in the hands of certain judges and litigants. That descriptive fact, while unfortunate, does not alter our path to answer the legal questions before us best we can.

the meaning of footnote 9, Judge Collins would subject the regulations to strict scrutiny, the most demanding form of means-ends scrutiny. Maj. Op. at 43, 53.**[18]** While the use of means-ends scrutiny is cabined as "highly constrained and limited," Maj. Op. at 43 n.12, the better use of means-end scrutiny in a Second Amendment case is not to use it at all. The Supreme Court has given us clear instructions to that effect. *See Bruen*, 597 U.S. at 19 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."). Nor does the application of strict scrutiny comport with *Bruen*'s description of permissible regulations. *See id.* at 38 n.9; *id.* at 79–80 (Kavanaugh, J., concurring). Strict scrutiny—which very few regulations can satisfy—is plainly a poor method by which to determine whether a facially neutral regulation is *abusive*.

Even taken at face value, the "more nuanced approach" is difficult to follow. As I understand it, Judge Collins thinks that the application of strict scrutiny is necessary to evaluate the "how" prong of *Bruen*'s historical framework.**[19]** Maj.

---

[18] Judge Collins tells us that the version of means-ends scrutiny he employs here is not actually "strict scrutiny," but instead something else "derived from the First Amendment test for time, place, and manner regulations." Maj. Op. at 43 n.14. Regardless what one calls it, his test requires that the regulation be "narrowly tailored to serve a significant governmental interest." *Id.* at 43. Strict scrutiny requires the government to demonstrate that the challenged regulation is "narrowly tailored to serve a compelling government interest." *E.g., Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 455 (2015). I do not think the difference between strict scrutiny and Judge Collins' test—if there is any—is material to the disagreement, so for ease of reference I will continue to refer to his test as strict scrutiny.

[19] As the majority explains, the historical framework imposed by *Bruen* requires evaluating "at least two metrics: *how* and *why* the regulations

Op. at 38–41.  The majority apparently agrees that the "why" prong of the *Bruen* analysis is satisfied here because the regulations fit within an overarching background check regime, which the *Bruen* court implicitly concluded were constitutional because they "promote[] a historically based 'permissible reason' for regulating firearms acquisition." Maj. Op. at 36 (quoting *Rahimi*, 602 U.S. at 692).  But because background check regimes and their attendant regulations depend on significant advancements in technology and law enforcement practices since the time of the Framing, Judge Collins has trouble evaluating the "how" prong by reference to historical analogues, as Judge Lee would do.  Maj. Op. at 38–39.  The resulting "'more nuanced approach' to the issue of 'historical analogies'" is simply to borrow the strict scrutiny test from First Amendment jurisprudence to evaluate the "how" prong instead.  *Id.* at 39, 43 (quoting *Bruen*, 597 U.S. at 27).  That is, the regulation must be narrowly tailored to serve a significant government interest.  Maj. Op. at 43.

Respectfully, that approach does a lot of violence to *Bruen*'s rationale.  Its somewhat convoluted chain of reasoning aside, it ignores *Bruen*'s explicit instruction to avoid means-ends scrutiny altogether in Second Amendment cases.  *Bruen*, 597 U.S. at 19.  It is also difficult to square the application of strict scrutiny with footnote 9's conclusion, for example, that a state regulation requiring a permit applicant to "pass a firearms safety course," would be

---

burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 597 U.S. at 29 (emphasis added); Maj. Op. at 21.  The "how" asks the method and means of the regulation—how it limits or regulates the right.  The "why" asks the justification for the limitation or regulation.  The majority thus applies this two-pronged analysis here, by evaluating both "how" and "why" Hawaii requires individuals to undertake the regulatory requirements at issue here.

equally permissible as a background check.  *Bruen*, 597 U.S. at 38 n.9.  Neither of my colleagues could possibly think such a regulation would hold up under either of their proposed approaches.

More to the point, the resort to means-ends scrutiny is necessary *only because* of the initial analytical mistake—the conclusion that regulations imposing preconditions on acquisition of arms regulate conduct covered by the plain text of the Second Amendment and therefore must be subject to *Bruen*'s historical framework.  The resulting somewhat contrived analysis could be avoided were we to recognize the falsity of that premise and hold instead that regulations like those at issue here are presumptively constitutional, subject to a plaintiff's burden of proving otherwise.[20]

## B.

My final point concerns the practical implications of the majority's decision today.  As a result of its flawed analysis, the majority concludes that the state must satisfy strict scrutiny (Judge Collins), or point to a historical analogue (Judge Lee), to justify every single logistical detail of its firearm licensing system.[21]  That is quite a difficult burden, and one that applies even when the regulation at issue

---

[20] The majority criticizes my approach as "effectively resurrecting the very framework that *Bruen* rejected."  Maj. Op. at 31.  Not so.  The framework that *Bruen* rejected was "judicial deference to legislative interest balancing" in the form of means-ends scrutiny.  *Bruen*, 597 U.S. at 26.  Instead, the correct approach is to ground the analysis in whether the regulation in question prevents a plaintiff from engaging in a course of conduct covered by the "plain text of the Second Amendment."  *Id.* at 32.

[21] After all, the majority tells us that its test applies whenever a permitting regulation "generally governs *any* acquisition of" a firearm, *i.e.*, "acquisition *simpliciter*."  Maj. Op. at 28 (emphasis in original).

facially does not preclude any person from keeping or bearing arms. After today's decision, a plaintiff who challenges any aspect of such a regime bears practically no burden of his own. Once he cites to the majority opinion to establish that a particular permitting provision "regulates and burdens the acquisition of firearms by ordinary citizens," a criterion scarcely difficult to meet, the majority places the burden on the state either to satisfy strict scrutiny or put forth a historical analogue to justify that provision. Maj. Op. at 46–47. The majority thus turns the Second Amendment into a kind of regulatory code for firearm licensing requirements, with federal courts to supervise any and all details of a state's permitting regime which impose conditions generally on all acquisitions of firearms.

*Bruen* explicitly does not require any of that, for all the reasons here explained. But what is perhaps most puzzling is that the majority—both Judges—gleans its extreme test from footnote 9 itself, which explicitly *disclaimed* the invalidation of permitting regulations like the ones at issue here. Consider for example regulatory requirements that a permit applicant must "pass a firearms safety course," *Bruen*, 597 U.S. at 38 n. 9, or "undergo training in firearms handling and in laws requiring the use of force," *id.* at 80 (Kavanaugh, J., concurring). These regulations would plainly fail both of my colleagues' tests. The *Bruen* Court thought such regulations would be presumptively permissible, but the majority would instead subject them to strict scrutiny or require them to be justified by historical analogues, which would invalidate them in every case.

And what about the aspects of Hawaii's regime that Plaintiffs don't challenge in this appeal? For example, remember that Hawaii requires one handgun permit per handgun transaction, while permits for rifles and shotguns

se 1:19-cv-00578-JMS-RT   Document 129   Filed 03/14/25   Page 97 o
YUKUTAKE v. JEREZ     97
PageID.1339

are good for as many transactions as needed in a year. Haw. Rev. Stat. § 134-2(e). Registration of any firearm has to be completed within five days of acquiring it. *Id.* § 134-3(b). The registration process also requires individuals to complete a form with a list of numerous specifications (for example: manufacturer, caliber or gauge, source of the weapon, and name of the prior registrant). *Id.* Plaintiffs do not argue before us that any of these are unconstitutional. But were they raised, the majority would subject all of them to strict and historical scrutiny and strike most if not all as facially violative of the Second Amendment. As I have explained, text and precedent alike instruct us not to take such a sledgehammer to state permitting regimes.

\* \* \*

Under my colleagues' view of the Second Amendment, federal judges are to become the inspectors general of state firearm regulations. "Laws imposing conditions and qualifications on the commercial sale of arms" are transformed from "presumptively lawful" to presumptively unconstitutional. *See Heller*, 554 U.S. at 626–27 & n.26. Rather than "allow[ing] a 'variety' of gun regulations," the majority turns the Second Amendment into "a regulatory straightjacket." *Bruen*, 597 U.S. at. at 80 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636). That result is as unfortunate as it is unnecessary.